1  Laurence M. Rosen, Esq. (SBN 219683)
2  **THE ROSEN LAW FIRM, P.A.**
   355 South Grand Avenue, Suite 2450
3  Los Angeles, California 90071
   Telephone: (213) 785-2610
4  Facsimile: (213) 226-4684
   Email: lrosen@rosenlegal.com
5
6  *Counsel for Plaintiffs*

7

8              **IN THE UNITED STATES DISTRICT COURT**
9              **NORTHERN DISTRICT OF CALIFORNIA**

10  JOHN GONZALEZ and MATTHEW
    CANNELLA, derivatively on behalf of
11  QUANTUMSCAPE CORPORATION,
                                              Case No.:
12
          Plaintiffs,
13
14        v.
                                              **VERIFIED SHAREHOLDER DERIVTIVE**
15  JAGDEEP SINGH, FRITZ PRINZ, TIMOTHY          **COMPLAINT**
    HOLME, KEVIN HETTRICH, FRANK
16  BLOME, BRAD BUSS, JOHN DOERR,
    JÜRGEN LEOHOLD, JUSTIN MIRRO,             **DEMAND FOR JURY TRIAL**
17  DIPENDER SALUJA, J.B. STRAUBEL, and
    VOLKSWAGEN GROUP OF AMERICA
18  INVESTMENTS, LLC,

19        Defendants,
20
          and
21
22  QUANTUMSCAPE CORPORATION,

23        Nominal Defendant.

24

25

26

27

28

## INTRODUCTION

Plaintiffs John Gonzalez and Matthew Cannella ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant QuantumScape Corporation ("QuantumScape" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Jagdeep Singh, Fritz Prinz, Timothy Holme, Kevin Hettrich, Frank Blome, Brad Buss, John Doerr, Jürgen Leohold, Justin Mirro, Dipender Saluja, and J.B. Straubel (collectively, the "Individual Defendants") and Volkswagen Group of America Investments, LLC ("VGA" and, together with the Individual Defendants and QuantumScape, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of QuantumScape, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiffs' complaint against the Individual Defendants and Defendant VGA, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding QuantumScape, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by QuantumScape's controlling shareholder, directors, and officers between November 27, 2020, through at least January 19, 2022, both dates inclusive (the "Relevant Period").

2.     QuantumScape is a Delaware corporation based in San Jose, California, that designs, manufactures, and sells specialized lithium-metal solid-state batteries for use in electrical vehicles. The Company, in its current form, came about as the result of a merger deal that closed on November 25, 2020

(the "Merger") between Kensington Capital Acquisition Corp. ("Kensington"), to which the Company is the successor, and a separate entity also called QuantumScape Corporation, which is now a subsidiary of the Company ("Legacy QuantumScape"). The Company's Class A common stock now trades on the New York Stock Exchange ("NYSE") under the ticker symbol "QS" with its publicly traded warrants also trading on the NYSE under the ticker symbol "QS.WS."

3.      Beginning November 27 and through April 14, 2021 (the "Battery Statements Period"), the Individual Defendants and Defendant VGA made, or caused the Company to make, materially false and misleading statements concerning QuantumScape's business. Specifically, the statements made were that the Company's battery technology was "positioned to become a leading supplier of solid-state batteries" for electric vehicles, that the Company's batteries were "designed to be safer, and to deliver greater range, faster charge times and improved cycle life" when compared to similar batteries, and that the Company's batteries were capable of "up to 80% longer range compared to today's lithium-ion batteries." These false and misleading statements deceived the investing public and inflated the Company's stock price in advance of its secondary public stock offering ("SPO"), beginning on December 31, 2020, in the course of which at least four and as many as eight of the Individual Defendants and Defendant VGA sold their shares at artificially inflated prices.

4.      The truth about these statements began to emerge on January 4, 2021, when *Seeking Alpha* published a report about QuantumScape that stated, *inter alia*, that QuantumScape's batteries "will likely never achieve the performance they claim," that the batteries likely "will only last for 260 cycles or about 75,000 miles of aggressive driving," and that the batteries' "energy density [target for] 2028 will not beat today's state of the art, and will not be state of the art when it is achieved."

5.      On news of this report, the Company's share price declined by approximately 40.8%, or $34.49, from closing at $84.45 per share on December 31, 2020, the previous day of trading and the day of the SPO, to closing at $49.96 per share on January 4, 2021. However, the Individual Defendants continued to obfuscate the truth as to the nature of their batteries.

6.      In the months following the publication of the *Seeking Alpha* report, many of the Individual Defendants personally made public statements that the batteries produced by QuantumScape were ready

to be mass produced and placed on the market. The Individual Defendants continued making these statements, and providing positive updates on their technology, in communications to shareholders as well as public SEC filings.

7. The truth fully emerged on April 15, 2021, when a research firm called Scorpion Capital published a report titled "QuantumScape (NYSE: QS) *A Pump and Dump SPAC Scam by Silicon Valley Celebrities, That Makes Theranos Look Like Amateurs*." (the "Scorpion Report"). The report revealed, among other things, that QuantumScape made a number of compromises in its testing procedures, including cell size, elevated temperatures, and "pulse tests" that allowed QuantumScape to publish six "[p]hony claim[s]" regarding its battery technology. The six claims it made were: (1) the solid-state material resists dendrites; (2) battery performance in lower temperatures; (3) the batteries can fast charge in less than 15 minutes; (4) a battery life of over 1000 charge/discharge cycles; (5) the length of battery life in lower temperatures; and (6) aggressive automotive power profiles.

8. On news of this report, the Company's share price declined by approximately 12.2%, or $5.00, from closing at $40.85 per share on April 14, 2021, to closing at $35.85 per share on April 15, 2021.

9. During the Battery Statements Period, the Individual Defendants and Defendant VGA breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants and Defendant VGA willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the power, longevity, or energy density that they were being held out as having; (2) the Company did not have, and was extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

10.     The Individual Defendants and Defendant VGA also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while at least four and as many as eight of the Individual Defendants and Defendant VGA sold shares in the SPO at inflated prices.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants and Defendant VGA caused the Company to fail to maintain adequate internal controls.

12.     Moreover, and separately from the abovementioned misconduct, the Individual Defendants and Defendant VGA breached their fiduciary duties by engaging in, permitting, and causing the Company to engage in the Discriminatory Misconduct (defined below). In addition, the Individual Defendants and Defendant VGA breached their fiduciary duties by issuing false and misleading statements regarding the Discriminatory Misconduct. Throughout the Relevant Period, the Board never had a female director, in violation of California state law, nor had the Company's executive management team included a female member. Moreover, the Company did not have a single Black or Hispanic director or executive management team member, despite holding itself out as an employer that "value[s] diversity and recognize[s] the importance of fostering a positive, inclusive culture."

13.     Only half a century ago, almost every single board of directors in America was solely comprised of White males. Since, most corporations have made gradual but steady progress to inculcate more diverse representation on their boards and within their executive management teams.

14.     A research report by Catalyst, a nonprofit organization focused on workplace inclusion for women, noted that:

> In 2019, the proportion of women in senior management roles globally grew to 29%, the highest number ever recorded. In 2020, this percentage remains the same.
> * * *
> **The Higher up the Corporate Ladder, the Fewer Women**
> A 2020 analysis by Mercer of over 1,100 organizations across the world found a leaky pipeline for women in leadership:
>
> - Executives: 23%
> - Senior Managers: 29%
> - Managers: 37%
> - Professionals: 42%
> - Support staff: 47%

\* \* \*

**Despite a Record-High Number of Fortune 500 Women CEOs in 2020, There are Still Nearly 13 Companies Run by a Man for Every Company Run by a Woman**

**But before they even get close to the glass ceiling, women face barriers in advancing to their first management roles**.

In the United States, women were nearly half (47.0%) of the labor force, but **only slightly over a third (40.0%) of managers in 2019**.

\* \* \*

**Women are falling behind early in their careers. If first-level women managers were hired and promoted like men, there would be 1 million more women in management over the next five years.**

(Emphasis in original.)

15.      According to a post by *Hult International Business School*, "[m]en and women will inevitably have different experiences and backgrounds, which shape their approach to business" and that "[c]hallenging each other and collaborating with people who think differently can breed creativity and promote the innovative ideas that push organizations forward."[1] Additionally, women "excel at the soft skills needed for business leadership." According to a 2016 study published by the global consulting firm Hay Group, "women outperform men in 11 of 12 key emotional intelligence competencies" including "emotional self-awareness, empathy, conflict management, adaptability, and teamwork—all essential skills for effective leadership in the workplace." Increasing female leadership can also "make products and services more marketable and a business more profitable." Recent research demonstrated that gender-diverse businesses are "more likely to outperform financially above the industry median."

16.      In addition to the benefits of gender diversity, in a post, published by *Calvert Research and Management* following civil unrest that coincided the killing of George Floyd, among others, John Streur stated the following, in relevant part:

---

[1] https://www.hult.edu/blog/women-in-business-advantages-challenges-and-opportunities/. (Last visited October 23, 2024).

We are a country suffering from racial inequality. And we want the inequality and suffering to end.

Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers.

17.     As a tech Company, QuantumScape's responsibility to engage and address the lack of diversity in its Company leadership is especially important. Recently, the tech industry received increased criticism for "the number of women and racial minorities in its workforce, as those totals remain significantly lower than in the overall U.S. workforce."[2] Tech companies have been taking measures over the past few years in response to these criticisms. In 2018, Chief Diversity Officer at Dell Technologies, Brian Reaves, stated in an interview: "I view this topic and what we're doing as important to the future business success of the company as anything we'll do technologically . . . . It's not something that's nice to do. It's really something one must do."

18.     Notwithstanding this societal imperative, while other companies had been dedicated to achieving a significant increase in diversity within their highest ranks and workforce, the Individual Defendants and Defendant VGA breached their fiduciary duties by causing QuantumScape to violate federal and state laws regarding diversity and discrimination by repeatedly refusing to nominate, appoint, and/or hire women, Black, or Hispanic individuals to the Board or QuantumScape's executive management team (the "Discriminatory Misconduct"). Ironically, QuantumScape holds itself out as a Company that "value[s] diversity and recognize[s] the importance of fostering a positive, inclusive culture." Yet, *zero* women, or Black or Hispanic individuals resided on the Company's Board or worked on the Company's executive management team during the Relevant Period.

19.     The Individual Defendants and Defendant VGA further breached their fiduciary duties to the Company by causing it to be in violation of Cal. Corp. Code § 301.3. This provision requires that "[n]o later than the close of the 2019 calendar year, a publicly held domestic or foreign corporation whose

---

[2]     https://www.statesman.com/news/20180827/tech-firms-said-they-wanted-to-improve-diversity-have-they-. Last visited October 23, 2024.

principal executive offices, according to the corporation's SEC 10-K form, are located in California shall have a minimum of one female director on its board." Cal. Corp. Code § 301.3 continues that "[t]he Secretary of State may adopt regulations to implement this section. The Secretary of State may impose fines for violations of this section…." Initial fines for violating Cal. Corp. Code § 301.3 are $100,000 and subsequent fines are $300,000. The Individual Defendants' and Defendant VGA's engagement in the Discriminatory Misconduct caused QuantumScape to be in violation of the statute and therefore subjected the Company to a significant risk of prosecution, and resultant penalties and costs related to an investigation and defense of, *inter alia*, the Company's failure to comply with state law. Still, neither the Individual Defendants nor Defendant VGA, who appointed an additional, White male director—nonparty Jens Wiese ("Wiese")—to the Company's Board during the Relevant Perio, did anything to bring the Company into compliance with the law to avoid liability.

20.     In light of the Individual Defendants' and Defendant VGA's misconduct, which has subjected the Company and its former Chief Executive Officer ("CEO") to a consolidated action comprised of three federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions")—with one of the Company's directors, its Chief Technology Officer ("CTO"), its Chief Financial Officer ("CFO"), and Defendant VGA, as controlling shareholder of QuantumScape, named in one of the three Securities Class Actions—, the need to undertake intake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company, and/or who benefitted from the wrongdoing alleged herein, the Company has had and will continue to have to expend many millions of dollars.

21.     The Company has been substantially damaged as a result of the Individual Defendants' and Defendant VGA's knowing or highly reckless breaches of fiduciary duty and other misconduct.

22.     Before initiating this derivative action, Plaintiffs served a pre-suit demand on the Board of Directors of QuantumScape (the "Board") on August 4, 2021 (the "Demand"), and a supplemental demand

on January 19, 2022 (the "Supplemental Demand," and collectively, the "Demands"), to investigate, remediate, and prosecute the claims alleged herein.

23.    On March 14, 2022, the Board wrongfully refused the Demand and partially refused the Supplemental Demand (the "Refusal"). To date, the Board has also constructively refused the remaining claims raised in the Supplemental Demand, as Plaintiffs received no further correspondence from the Board about the additional allegations levied in the Supplemental Demand since the Refusal, despite the Board maintaining that it would separately address the same. Tellingly the Refusal was prepared and sent to Plaintiffs by conflicted counsel after a purported investigation undertaking by the Nominating and Corporate Governance Committee—the members of whom were most implicated by the allegations outlined in the Demand, which center around long-standing discriminatory misconduct and misrepresentations concerning the same.

24.    Although the Refusal outlined both a "factual" and "legal" analysis, it is clear from the outset that the Board delegated its duty to investigate to a questionable committee of the Board—who then delegated that investigation to Wilson Sonsini Goodrich & Rosati ("WSGR"), who is leading the defense for the Company and several of the Individual Defendants in the related Securities Class Action and who, as of March 14, 2022, when the Refusal was issued, was anything but independent. Unsurprisingly, the Refusal took no measures whatsoever to establish that the underlying "investigation" was conducted in a good faith and independent manner, as required under Delaware law. Rather, the Refusal reflects nothing more than a defense-oriented, litigious response to Plaintiff's assertions. The vague assertions outlined in the Refusal, and reliance on inapposite case law, provide little assurance to Plaintiff that any true inquiry took place that considered the merits of Plaintiff's allegations and the glaring deficiencies with QuantumScape's policies, practices, and disclosure controls surrounding diversity, equity and inclusion and compliance with relevant laws and regulations over the same. The Board unanimously adopted WSGR's findings that it would be too expensive and not within the Company's best interests to take action in connection with the Demand. Yet, the Board and Company also made hasty changes to the composition of the Board just before issuing the Refusal (although the Refusal makes no mention of them) and highlighted such changes in the 2021 proxy statement issued in August 2021, signaling that the Board did

indeed appreciate the merits of Plaintiffs' allegations, but determined instead to deny them and take measures to protect themselves from possible liability, or, as to the Supplemental Demand, ignore them altogether.

25.     Plaintiffs' Demands set forth a credible case that QuantumScape's officers and directors breached their fiduciary duties to the Company, at minimum. And by refusing to consider, investigate in good faith, and take appropriate action, the Board acted improperly when it rejected the Demand and ignored the Supplemental Demand. Its determination lacked any indication that the Board acted in a reasonably informed manner (without being driven by conflicts of interest), in good faith, and consistent with its fiduciary duties. Thus, the Refusal was not a product of an exercise of good faith business judgment. It is clear from Plaintiffs' correspondence with counsel representing the Board that it has failed to take the Demands seriously and failed to timely pursue the issues raised. The Board's failure to investigate and/or respond to the Supplemental Demand, and failure to obtain tolling agreements from any possible defendants further reflects the deliberate refusal to safeguard the Company's interests.

26.     Accordingly, Plaintiffs now bring this action on behalf of the Company to prevent irreparable harm to the Company.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

28.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

29.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     Venue is proper in this District because QuantumScape's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein

occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

**PARTIES**

**Plaintiffs**

31.    Plaintiffs are current shareholders of QuantumScape. Plaintiffs have continuously held QuantumScape common stock at all relevant times.

**Nominal Defendant QuantumScape**

32.    QuantumScape is a Delaware corporation with its principal executive offices at 1730 Technology Drive, San Jose, California 95110. QuantumScape's shares trade on the NYSE under the ticker symbol "QS," with its publicly traded warrants also trading on the NYSE under the ticker symbol "QS.WS." QuantumScape has two classes of common stock, Class A and Class B, with shares of Class B common stock having ten votes each compared to shares of Class A common stock's one.

**Defendant Singh**

33.    Defendant Jagdeep Singh ("Singh") is the Company's Chairman of the Board and has served in that role since the Merger in November 2020. He is also the Company's former President and CEO, serving in those roles until 2023 and 2024, respectively. Prior to the Merger, he cofounded Legacy QuantumScape where he served as the CEO and as a director from May 2010 until the Merger. According to the Company's Prospectus filed with the SEC pursuant to Rule 424(b)(3) on December 31, 2020 (the "Prospectus"), as of December 23, 2020, Defendant Singh beneficially owned 28,818,240 shares of the Company's Class A and Class B common stock, which represented 7.68% of the Company's outstanding common stock as of that date and 10.07% of the total voting power. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020, was $110.79, Defendant Singh owned approximately $3.2 billion worth of QuantumScape stock.

34.    According to the Company's Proxy Statement filed with the SEC on April 29, 2024 (the "2024 Proxy Statement"), as of March 31, 2024, Defendant Singh beneficially owned 18,023,988 shares of the Company's Class A common stock and 11,424,366 shares of the Company's Class B common stock, which represented 4% of the Company's outstanding Class A common stock as of that date, 20.9%

of the Company's Class B common stock as of that date, and 13.2% of the total voting power. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Singh owned approximately $113.4 million worth of QuantumScape stock.

35.     During the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Singh earned a total salary of $17,052,115. This was comprised of $277,116 in base salary, $16,719,999 in stock awards, and $55,000 in all other compensation. During the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Singh earned a total salary of $69,102,285. This was comprised of $373,462 in base salary, $68,368,938 in option awards, $107,650 in non-equity incentive plan compensation, and $252,235 in all other compensation.

36.     The Prospectus listed Defendant Singh as having offered up to 32,608,050[3] shares of Company Class A and Class B common stock as part of the SPO.

37.     The Prospectus stated the following about Defendant Singh:

**Jagdeep Singh** has served as our Chief Executive Officer and the Chairman of our Board since November 2020. Mr. Singh co-founded Legacy QuantumScape and has served as its Chief Executive Officer and on Legacy QuantumScape's board of directors since its incorporation in May 2010. Prior to joining Legacy QuantumScape, he was the founder and Chief Executive Officer at Infinera Corporation (NASDAQ: INFN), a telecommunications company, from 2001 to 2009. Mr. Singh holds a B.S. in Computer Science from the University of Maryland College Park, an M.B.A. from the University of California, Berkeley, Haas School of Business, and a M.S. in Computer Science from Stanford University.

We believe Mr. Singh is qualified to serve on our Board because of the perspective and experience he brings as Legacy QuantumScape's Chief Executive Officer, his leadership experience in the energy storage industry, his educational background and his strong scientific knowledge.

**Defendant Prinz**

38.     Defendant Fritz Prinz ("Prinz") has served as a Company director since the Merger in November 2020. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since December 2010, which he cofounded. According to the Prospectus, as of December 23, 2020,

---

[3] The discrepancy between the beneficial ownership numbers for Defendant Singh, as well as other Defendants, and the number of shares they offered in the SPO represent additional options and restricted stock units which vest more than sixty days after December 23, 2020, and therefore not counted for beneficial ownership purposes.

Defendant Prinz beneficially owned 13,484,541 shares of the Company's Class B common stock, representing 3.70% of all outstanding common stock and 7.62% of total voting power. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020, was $110.79, Defendant Prinz owned approximately $1.5 billion worth of QuantumScape stock.

39.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Prinz beneficially owned 1,359,541 shares of the Company's Class A common stock and 10,087,631 shares of the Company's Class B common stock, which represented 18.5% of the Company's Class B common stock as of that date and 10.3% of the total voting power. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Prinz owned approximately $8.6 million worth of QuantumScape stock.

40.     For the 2020 Fiscal Year, Defendant Prinz earned $202,788 for his role as a director. That consisted of $202,788 in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Prinz earned $216,000 in exchange for technical consulting and advising services.

41.     The Prospectus listed Defendant Prinz as offering up to 13,484,451 shares of Company Class B stock in the SPO.

42.     The Prospectus stated the following about Defendant Prinz:

**Prof. Fritz Prinz** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since December 2010. Prof. Prinz has served as Professor of Materials Science and Engineering, Professor of Mechanical Engineering, and Senior Fellow at the Precourt Institute for Energy since September 2010. He has also served as the Finmeccanica Professor at the School of Engineering at Stanford University since September 1994. Prof. Prinz holds a Ph.D. in Physics and Mathematics from the University of Vienna, Austria.

We believe Prof. Prinz is qualified to serve on our Board because of his in-depth educational expertise and his broad insight and research into energy conservation.

**Defendant Holme**

43.     Defendant Timothy Holme ("Holme") has served as the Company's CTO since the Merger in November 2020. Prior to the Merger, he had served as CTO at Legacy QuantumScape since January 2011, which he cofounded. According to the Prospectus, as of December 23, 2020, Defendant Holme beneficially owned 14,859,424 shares of Company Class A and Class B common stock, representing

4.07% of the Company's outstanding common stock and 7.85% of total voting power. Given that the price per share of the Company's common stock at the close of trading on December 31, 2020, was $110.79, Defendant Holme owned over $1.6 billion worth of QuantumScape stock.

44.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Holme beneficially owned 697,363 shares of the Company's Class A common stock and 11,686,003 shares of the Company's Class B common stock, which represented 21.4% of the Company's Class B common stock as of that date and 11.9% of the total voting power. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Holme owned approximately $4.4 million worth of QuantumScape stock.

45.     For the 2020 Fiscal Year, Defendant Holme earned $2,015,983 for his role as CTO. That consisted of $285,683 in base salary, $1,672,000 in stock awards, and $58,300 in all other compensation. For the 2021 Fiscal Year, Defendant Holme earned $7,570,596 for his role as CTO. That consisted of $373,716 in base salary, $6,836,887 in option awards, $107,734 in non-equity incentive plan compensation, and $252,259 in all other compensation.

46.     The Prospectus listed Defendant Holme as offering up to 15,222,385 shares of Company Class A and Class B common stock in the SPO.

47.     The Prospectus stated the following about Defendant Holme:

**Dr. Timothy Holme** has served as our Chief Technology Officer since November 2020. Dr. Holme served as Legacy QuantumScape's Chief Technology Officer from January 2011 to November 2020. Prior to joining Legacy QuantumScape, he was a Research Associate at Stanford University from June 2008 to January 2011. Dr. Holme holds a B.S. in Physics, a M.S. in Mechanical Engineering, and a Ph.D. in Mechanical Engineering from Stanford University.

### Defendant Hettrich

48.     Defendant Kevin Hettrich ("Hettrich") has served as the Company's CFO since the Merger in November 2020. Prior to the Merger, he had served as the CFO at Legacy QuantumScape since September 2018, and prior to that he had served in various executive and management positions at Legacy QuantumScape since January 2012. According to the Prospectus, as of December 23, 2020, Defendant Hettrich beneficially owned 2,594,023 shares of the Company's common stock. Given that the price per

share of the Company's Class A and Class B common stock at the close of trading on December 23, 2020, was $110.79, Defendant Hettrich owned over $287 million worth of QuantumScape stock.

49.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Hettrich beneficially owned 593,065 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Hettrich owned approximately $3.7 million worth of QuantumScape stock.

50.     For the 2020 Fiscal Year, Defendant Hettrich earned $3,717,096 for his role as CFO. That consisted of $310,096 in base salary, $3,344,000 in stock awards, and $63,000 in all other compensation. For the 2021 Fiscal Year, Defendant Hettrich earned $3,920,656 for his role as CFO. That consisted of $373,506 in base salary, $3,418,434 in option awards, $107,596 in non-equity incentive plan compensation, and $21,120 in all other compensation.

51.     The Prospectus listed Defendant Hettrich as having offered up to 2,594,023 shares of Company Class A and Class B common stock as part of the SPO.

52.     The Prospectus stated the following about Defendant Hettrich:

**Kevin Hettrich** has served as our Chief Financial Officer since November 2020. Mr. Hettrich served as Legacy QuantumScape's Chief Financial Officer and head of Business Operations from September 2018 to November 2020. Prior to this, Mr. Hettrich served as Legacy QuantumScape's Vice President of Business Operations from March 2016 to March 2018, as Senior Director of Finance and Product Management from March 2014 to March 2016, as a Director of Product Management from March 2013 to March 2014, and as a Manager of Product Management from January 2012 to March 2013. Prior to joining Legacy QuantumScape, Mr. Hettrich served as a Private Equity Associate of Bain Capital, an investment firm, from September 2007 to July 2009. Mr. Hettrich also served as a Business Analyst at McKinsey & Company, a management consulting firm, from September 2004 to July 2007. Mr. Hettrich holds a B.A. in Economics from Pomona College, a M.B.A. from Stanford Graduate School of Business, and a M.S. in Environment and Resources from Stanford University.

### Defendant Blome

53.     Defendant Frank Blome ("Blome") served as a Company director from the Merger in November 2020 until July 5, 2024, when he left the Board to assist in facilitating a Collaboration Agreement between PowerCo and QuantumScape. He also served as a member of the Company's Nominating and Corporate Governance Committee. Prior to the Merger, he had served as a director on

the board of Legacy QuantumScape since September 2020. In addition, Defendant Blome also serves as the Head of the Battery Center of Excellence at Volkswagen Aktiengesellschaft ("Volkswagen") and, as such, is an affiliate of VGA, which is a Volkswagen subsidiary.

54.     The Prospectus stated the following about Defendant Blome:

**Frank Blome** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since September 2020. Mr. Blome has also served on the board of QSV Operations LLC since September 2020. Mr. Blome has 25 years of professional experience in the automotive industry, with a particular focus on alternative powertrain technologies and battery cell technology. Since January 2018, Mr. Blome has served as the Head of the Battery Center of Excellence of Volkswagen AG. Prior to this, Mr. Blome served from May 2016 to June 2016 as Chief Executive Officer at Mercedes-Benz Energy GmbH, a subsidiary of the Daimler Group active in the EV battery storage space. From July 2013 to June 2017, Mr. Blome served as Chief Executive Officer of LiTec Battery GmbH, a battery cell manufacturing company started as a joint venture between Daimler Group and Evonik Industries AG, a specialty chemicals company. In addition to these roles, Mr. Blome served from June 2009 to June 2017 as the Chief Executive Officer of Deutsche Accumotive GmbH & Co KG, a subsidiary of Daimler Group, producing batteries for hybrid and EVs, after which Mr. Blome was on garden leave until January 2018 when he started in his current position at Volkswagen. Mr. Blome holds a diploma in electrical engineering from the University of Applied Sciences Bielefeld.

We believe Mr. Blome is qualified to serve on our Board due to his vast experience in the automotive and alternative powertrain industries.

**Defendant Buss**

55.     Defendant Brad Buss ("Buss") has served as a Company director since the Merger in November 2020. He also serves as Lead Independent Director, Chair of the Audit Committee and as a member of the Compensation Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since August 2020. According to the Prospectus, as of December 23, 2020, Defendant Buss beneficially owned 304,426 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on December 31, 2020, was $110.79, Defendant Buss owned over $33.7 million worth of QuantumScape stock.

56.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Buss beneficially owned 1,366,598 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Buss owned approximately $8.6 million worth of QuantumScape stock.

57.     For the 2020 Fiscal Year, Defendant Buss earned $4,540,863 for his role as a director. That consisted of $4,540,863 in option awards. For the 2021 Fiscal Year, Defendant Buss earned $231,450 for his role as a director. That consisted of $104,500 in fees earned or paid in cash and $126,950 in stock awards.

58.     The Prospectus listed Defendant Buss as offering up to 1,712,038 shares of the Company's Class A common stock in the SPO.

59.     The Prospectus stated the following about Defendant Buss:

**Brad Buss** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since August 2020. From August 2014 until his retirement in February 2016, Mr. Buss served as the Executive Vice President and Chief Financial Officer of SolarCity Corporation, a solar energy company acquired by Tesla, Inc. (NASDAQ: TSLA), a high-performance electric vehicle company. Mr. Buss also served as the Executive, Vice President and Chief Financial Officer of Cypress Semiconductor Corporation (NASDAQ: CY), a semiconductor design and manufacturing company, from August 2005 to June 2014. Mr. Buss has served on the boards of Advance Auto Parts, Inc. (NYSE: AAP) ("Advance"), an automotive parts and accessories provider, since March 2016, Marvell Technology Group Ltd. (NASDAQ: MRVL) ("Marvell"), a semiconductor company, since July 2018, and AECOM (NYSE: ACM), an engineering firm, since August 2020. Mr. Buss serves as Chair of the Audit Committee of Advance, Chair of the Nominating and Corporate Governance Committee and a member of the Audit Committee of Marvell, and a member of the Nominating and Governance Committee and Compensation and Organization Committee of AECOM. Mr. Buss previously served on the boards of Tesla, Inc. from November 2009 to June 2019, Cavium, Inc., a semiconductor company, from July 2016 until its acquisition by Marvell in July 2018, and CafePress Inc., an e-commerce company, from October 2007 to July 2016. He served on the Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee, and Disclosure Committee of Tesla, the Audit Committee and Compensation Committee of Cavium, Inc., and the Audit Committee and Compensation Committee of CafePress Inc. Mr. Buss holds a B.A. in Economics from McMaster University and a Honors Business Administration degree from University of Windsor.

We believe Mr. Buss is qualified to serve on our Board because of his vast leadership expertise and experience on the boards of major automotive companies.

**Defendant Doerr**

60.     Defendant John Doerr ("Doerr") served as a Company director from the Merger in November 2020 until February 9, 2022. He also served as a member of the Nominating and Corporate Governance Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since December 2010.

61. For the 2021 Fiscal Year, Defendant Buss earned $212,200 for his role as a director. That consisted of $85,250 in fees earned or paid in cash and $126,950 in stock awards.

62. The Prospectus stated the following about Defendant Doerr:

**John Doerr** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since December 2010. Mr. Doerr currently serves as Chairman at Kleiner Perkins, a venture capital firm, and previously served as a Partner from August 1980 to March 2016. Mr. Doerr currently serves on the boards of Amyris, Inc. (NASDAQ: AMRS), a biotechnology company, since May 2006, Bloom Energy Corporation (NYSE: BE), an energy solutions company, since April 2002, and Alphabet, Inc. (NASDAQ: GOOGL), a multinational technology company, since May 1999. He serves as Chair of the Nominating and Corporate Governance Committee of Amyris, Inc., a member of the Compensation and Organizational Development Committee of Bloom Energy Corporation, and Chair of the Leadership Development and Compensation Committee of Alphabet, Inc. Mr [sic] Doerr previously served on the boards of Zynga, Inc. (NASDAQ: ZNGA), a social game developer, from March 2013 to May 2017, and Amazon.com, Inc. (NASDAQ: AMZN), a multinational technology company, from June 1996 to May 2010. Mr. Doerr holds a B.S. and an M.E.E. in Electrical Engineering from Rice University and an M.B.A. from Harvard Business School.

We believe Mr. Doerr is qualified to serve on our Board because of his extensive investment experience in the technology industry and extensive expertise and skills in strategy, finance and management.

**Defendant Leohold**

63. Defendant Jürgen Leohold ("Leohold") has served as a Company director since the Merger in November 2020. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since May 2015. In addition, he served in various leadership positions including at Volkswagen from April 2006 until May 2019. According to the Prospectus, as of December 23, 2020, Defendant Leohold beneficially owned 341,858 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020, was $110.79, Defendant Leohold owned approximately $37.9 million worth of QuantumScape stock.

64. According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Leohold beneficially owned 355,736 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Leohold owned approximately $2.2 million worth of QuantumScape stock.

65.     For the 2020 Fiscal Year, Defendant Leohold earned $60,283 for his role as a director. That consisted of $60,283 in fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Leohold earned $441,471 for his role as a director. That consisted of $441,471 in stock awards.

66.     According to the Prospectus, Defendant Leohold offered up to 804,350 shares of Company's Class A stock in the SPO.

67.     The Prospectus stated the following about Defendant Leohold:

> **Prof. Dr. Jürgen Leohold** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since May 2015. From October 2012 to December 2017, Prof. Dr. Leohold served as the Head of the Volkswagen AutoUni, an advanced training and research institution for Volkswagen Aktiengesellschaft, a German automobile manufacturer. He continued to serve as a consultant for Volkswagen AutoUni's research and development group from January 2018 until retiring in May 2019. He also served as the Executive Director of Group Research at Volkswagen Aktiengesellschaft from April 2006 to July 2016. Prof. Dr. Leohold holds a degree in Electrical Engineering from the University of Hannover, a M.S. in Electrical Engineering from the Georgia Institute of Technology and a doctoral degree from the University of Hannover.

> We believe Prof. Dr. Leohold is qualified to serve on our Board because of his leadership experience and his expertise in the energy technology and automotive fields.

**Defendant Mirro**

68.     Defendant Justin Mirro ("Mirro") served as a Company director from the Merger in November 2020 until April 2022. He also served as Lead Independent Director, as the Chair of the Nominating and Corporate Governance Committee, and as a member of the Audit Committee. Prior to the Merger, Defendant Mirro served as the Chairman and CEO of the Company's predecessor, Kensington, from April 2020 until November 2020. According to the Prospectus, as of December 23, 2020, Defendant Mirro beneficially owned 1,744,898 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020, was $110.79, Defendant Mirro owned over $193.3 million worth of QuantumScape stock.

69.     For the 2021 Fiscal Year, Defendant Mirro earned $237,867 for his role as a director. That consisted of $110,917 in fees earned or paid in cash and $126,950 in stock awards.

70.     The Prospectus listed Defendant Mirro as offering up to 1,744,898 shares of Class A common stock and 879,357 warrants for Class A common stock as part of the SPO.

71.     The Prospectus stated the following about Defendant Mirro:

**Justin Mirro** has served on our Board since November 2020, and as Kensington's Chairman and Chief Executive Officer from April 2020 to November 2020. Mr. Mirro has over 25 years of operating, mergers and acquisitions and financing experience in the automotive and automotive-related sector. He began his career at General Motors Company ("GM") as a Tool and Die Manufacturing Engineer, with successive positions at Car and Driver Magazine, Toyota Motor Corporation and Itochu International Inc. prior to transitioning to automotive investment banking at Schroder & Co. Inc./Salomon Smith Barney, Inc./ABN Amro Inc. in 1996. In 1999, Mr. Mirro formed Kensington Capital Partners, LLC, where he has served as President since 2015, to invest in automotive and automotive-related sector businesses. In 2005, Mr. Mirro transitioned to Jefferies & Company, Inc. as Head of Automotive Investment Banking, and later served as the Head of Automotive Investment Banking at Moelis & Company, LLC ("Moelis") and RBC Capital Markets, LLC ("RBC Capital Markets") from 2008 to 2011 and 2011 to 2014, respectively. In his role, Mr. Mirro played a key role in leading and executing all aspects of capital raising, mergers and acquisitions and restructurings, and has advised on over 70 transactions totaling more than $60 billion of value for OEMs, suppliers and automotive-related industries. From 2016 to 2019, Mr. Mirro served as Chairman of the board of directors and audit committee of Pure Power Technologies, Inc. ("Pure Power") one of the largest aftermarket suppliers of diesel fuel injectors, which was later sold to Stanadyne LLC ("Stanadyne"). In his role, Mr. Mirro focused on deal sourcing, structuring, capital raising, executive recruitment and the eventual sale process. Mr. Mirro has sat on the boards of Cooper-Standard Holdings Inc. ("Cooper-Standard Holdings") and Transtar Industries, Inc., since 2015 and 2017, respectively, where he has focused on mergers and acquisitions, capital structuring and public market strategy.

We believe Mr. Mirro is qualified to serve on our Board due to his experience serving as Kensington's Chairman and Chief Executive Officer, as well as his extensive skills in strategy, finance and management.

**Defendant Saluja**

72.     Defendant Dipender Saluja ("Saluja") has served as a Company director since the Merger in November 2020. He also serves as a member of the Nominating and Governance Committee, and he formerly served on the Audit Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since August 2012.

73.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Saluja beneficially owned 264,384 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Saluja owned approximately $1.7 million worth of QuantumScape stock.

74.     For the 2021 Fiscal Year, Defendant Saluja earned $211,742 for his role as a director. That consisted of $84,792 in fees earned or paid in cash and $126,950 in stock awards.

75.     The Prospectus stated the following about Defendant Saluja:

**Dipender Saluja** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since August 2012. Mr. Saluja has served as Managing Director of Capricorn Investment Group, an investment firm, since 2006. Prior to Capricorn Investment Group, he served in various positions from 1990 to 2006 at Cadence Design Systems, an electronic design company. Mr. Saluja also currently serves as a Commissioner of the Global Commission to End Energy Poverty, a non-profit organization dedicated to providing electricity services to under-served communities, and also on the boards of several private companies.

We believe Mr. Saluja is qualified to serve on our Board because of his extensive investment experience in the technology industry and extensive expertise and skills in strategy, finance and management.

**<u>Defendant Straubel</u>**

76.     Defendant J.B. Straubel ("Straubel") has served as a Company director since the Merger in November 2020. He formerly served as a member of the Compensation Committee. Prior to the Merger, he had served as a director on the board of Legacy QuantumScape since December 2019. According to the Prospectus, as of December 23, 2020, Defendant Straubel beneficially owned 636,772 shares of the Company's Class A and Class B common stock. Given that the price per share of the Company's common stock at the close of trading on December 23, 2020, was $110.79, Defendant Straubel owned over $70.5 million worth of QuantumScape stock.

77.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant Straubel beneficially owned 670,370 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 28, 2024, was $6.29, Defendant Straubel owned approximately $4.2 million worth of QuantumScape stock.

78.     For the 2021 Fiscal Year, Defendant Straubel earned $208,533 for his role as a director. That consisted of $81,583 in fees earned or paid in cash and $126,950 in stock awards.

79.     According to the Prospectus, Defendant Straubel offered up to 1,407,611 shares of Company Class A and Class B common stock in the SPO.

80.     The Prospectus stated the following about Defendant Straubel:

**J.B. Straubel** has served on our Board since November 2020, and on Legacy QuantumScape's board of directors since December 2019. Mr. Straubel has served as the Founder and Chief Executive Officer of Redwood Materials Inc., an electronic recycling and development company, since May 2017. Prior to joining Legacy QuantumScape, Mr. Straubel also co-founded and served as the Chief Technology Officer of Tesla, Inc. from May 2005 to July 2019. Mr. Straubel previously served on the board of SolarCity Corporation and as a member of its Nominating and Corporate Governance Committee from August 2006 until its acquisition by Tesla, Inc. in November 2016. Mr. Straubel holds a B.S. in Energy Systems Engineering and a M.S. in Engineering, with an emphasis on energy conversion, from Stanford University.

We believe Mr. Straubel is qualified to serve on our Board because of his technical and manufacturing expertise along with his leadership experience in electronic companies.

**Defendant VGA**

81.     Defendant VGA is a Delaware limited liability company based in Herndon, Virginia. It is a Volkswagen subsidiary. According to the Prospectus, as of December 23, 2020, Defendant VGA beneficially owned 70,995,205 shares of the Company's Class A and Class B common stock, representing 19.51% of the Company's outstanding Common Stock and 13.15% of total voting power, making VGA a controlling shareholder of QuantumScape as of that date. Moreover, VGA exercised the power to nominate two directors to the Company's Board, Defendant Blome, who the Company admits is a VGA affiliate through his employment with Volkswagen, and nonparty Wiese, who joined the Board in January 2021 and is also affiliated with VGA through his employment with Volkswagen.

82.     According to the 2024 Proxy Statement, as of March 31, 2024, Defendant VGA beneficially owned 68,236,103 shares of the Company's Class A common stock and 17,980,436 shares of the Company's Class B common stock, which represented 15.3% of the Company's outstanding Class A common stock as of that date, 32.9% of the Company's Class B common stock as of that date, and 25.0% of the total voting power, making VGA a controlling shareholder of QuantumScape as of that date.

83.     According to the Prospectus, VGA offered up to 70,995,205 shares of the Company's Class A and Class B common stock in the SPO.

84.     The Prospectus stated the following about the Company's relationship with VGA and with Volkswagen, in relevant part:

***Concentration of ownership among Volkswagen and our executive officers, directors and their affiliates may prevent new investors from influencing significant corporate decisions.***

As of December 23, 2020, Volkswagen beneficially owns approximately 25.53% of the Class A Common Stock and 11.51% of Class B Common Stock outstanding, representing 13.15% of the vote, and our executive officers, directors and their affiliates as a group beneficially own approximately 39.49% of Class A Common Stock and 61.52% Class B Common Stock outstanding, representing 58.79% of the vote. As a result, these stockholders will be able to exercise a significant level of control over all matters requiring stockholder approval, including the election of directors, any amendment of our amended and restated certificate of incorporation (the "Certificate of Incorporation") and approval of significant corporate transactions. In addition, Volkswagen holds the right to designate two directors to our board of directors (our "Board"). This control could have the effect of delaying or preventing a change of control of our changes in our management and will make the approval of certain transactions difficult or impossible without the support of these stockholders and of their votes.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS AND DEFENDANT VGA

85.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of QuantumScape and because of their ability to control the business and corporate affairs of QuantumScape, the Individual Defendants and Defendant VGA owed QuantumScape and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage QuantumScape in a fair, just, honest, and equitable manner. The Individual Defendants and Defendant VGA were and are required to act in furtherance of the best interests of QuantumScape and its shareholders so as to benefit all shareholders equally.

86.     Each controlling shareholder, director, and officer of the Company owes to QuantumScape and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

87.     The Individual Defendants and Defendant VGA, because of their positions of control and authority as controlling shareholder, directors, and/or officers of QuantumScape, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

88.    To discharge their duties, the controlling shareholder, officers, and directors of QuantumScape were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

89.    Each Individual Defendant and Defendant VGA, by virtue of his or its position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants and Defendant VGA complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and officers of QuantumScape, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants and Defendant VGA were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised QuantumScape's Board at all relevant times.

90.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

91.    To discharge their duties, the officers and directors of QuantumScape were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal

controls of the Company. By virtue of such duties, the officers and directors of QuantumScape were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to QuantumScape's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how QuantumScape conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of QuantumScape and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that QuantumScape's operations would comply with all applicable laws and QuantumScape's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

Verified Shareholder Derivative Complaint

92.     Each of the Individual Defendants and Defendant VGA further owed to QuantumScape and the shareholders the duty of loyalty requiring that each favor QuantumScape's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

93.     At all times relevant hereto, the Individual Defendants were the agents of each other and of QuantumScape and were at all times acting within the course and scope of such agency.

94.     Because of their advisory, executive, managerial, directorial, and controlling positions with QuantumScape, each of the Individual Defendants and Defendant VGA had access to adverse, nonpublic information about the Company.

95.     The Individual Defendants and Defendant VGA, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by QuantumScape.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

96.     In committing the wrongful acts alleged herein, the Individual Defendants and Defendant VGA have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants and Defendant VGA caused the Company to conceal the true facts as alleged herein. The Individual Defendants and Defendant VGA further aided and abetted and/or assisted each other in breaching their respective duties.

97.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' and Defendant VGA's  violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

98.     The Individual Defendants and Defendant VGA accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to

conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants and Defendant VGA collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of QuantumScape was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

99.     Each of the Individual Defendants and Defendant VGA aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants and Defendant VGA acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

100.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of QuantumScape and was at all times acting within the course and scope of such agency.

## QUANTUMSCAPE'S CODE OF CONDUCT AND GOVERNANCE

### QuantumScape's Code of Conduct[4]

101.     In a section titled, "Purpose," the Company's Code of Conduct states that it "applies to all directors, officers and employees … of the Company, as well as Company contractors, consultants and agents." The Code of Conduct further states that it "serves as a guide" and that the Company "expects employees to use good judgment" and "adhere to the high ethical standards to which the Company is committed."

102.     The section titled, "Purpose," of the Company's Code of Conduct also states that it is designed to "deter wrongdoing" and to promote:

    1.   **fair and accurate financial reporting**;

---

[4] The Code of Conduct referenced and language quoted herein is from the version of the Code of Conduct in use during the Relevant Period.

2. ***compliance with applicable laws, rules and regulations including***, without limitation, full, fair, accurate, timely and understandable disclosure in ***reports and documents that [the Company] files with, or submit to, the U.S. Securities and Exchange Commission*** and in the Company's other public communications;

3. the prompt ***internal reporting of violations of this Code*** as set forth in this Code;

4. ***honest and ethical conduct***, including the ethical handling of actual or apparent conflicts of interest; and

5***. a culture of honesty and accountability***.

(Emphasis added.)

103.    Moreover, under the section titled, "Financial Reports and Other Records – Disclosure," the Code of Conduct states, in relevant part, that:

Employees are responsible for the accurate and complete reporting of financial information within their respective areas and for the timely notification to senior management of financial and non-financial information that may be material to the Company to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with government agencies or releases to the general public.

Each employee involved in the Company's disclosure process must familiarize themselves with the disclosure requirements applicable to the Company and the business and financial operations of the Company, and must not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators and self-regulatory organizations.

Employees must maintain all of the Company's books, records, accounts and financial statements in reasonable detail, and reflect the matters to which they relate accurately, fairly and completely. Furthermore, employees must ensure that all books, records, accounts and financial statements conform both to applicable legal requirements and to the Company's system of internal controls….

104.    In a section titled, "Conflicts of Interest," the Code of Conduct provides, in relevant part, that directors, officers, and employees "must act and behave in the Company's best interests and not based on personal relationships or benefits. You should avoid situations where your personal activities and relationships conflict, or appear to conflict, with the Company's interests."

105.    In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states, in relevant part:

All employees must respect and obey all laws when carrying out responsibilities on behalf of the Company and refrain from illegal conduct.

Employees have an obligation to be knowledgeable about specific laws, rules and regulations that apply to their areas of responsibility….

\* \* \*

Fair Employment Practices. The Company strives to maintain a work environment in which all individuals are treated with respect and dignity. Every individual has the right to work in a professional atmosphere that promotes equal employment opportunities and where discriminatory practices, including harassment, are prohibited.

The Company requires each employee to treat all colleagues in a respectful manner and to forge working relationships that are uniformly free of bias, prejudice and harassment. The Company prohibits discrimination against or harassment of any team member on the basis of race, religion or religious creed (including religious dress and grooming practices), color, ethnic or national origin, sex (including pregnancy, childbirth, breastfeeding or related medical conditions), nationality, national origin, ancestry, immigration status or citizenship, age, physical or mental disability, medical condition (including genetic information or characteristics, or those of a family member), military service or veteran status, marital status or family care status, sexual orientation, family medical leave, gender (including gender identity, gender expression, transgender status or sexual stereotypes), political views or activity, status as a victim of domestic violence, sexual assault or stalking, or any other basis or classification protected by applicable federal, state or local law.

Any employee who is found to have discriminated against another employee is subject to discipline up to and including termination.

No individual will suffer any reprisals or retaliation for making complaints or reporting any incidents of discrimination or perceived discrimination, or for participating in any investigation of incidents of discrimination or perceived discrimination.

\* \* \*

Insider Trading. Under federal and state securities laws, it is illegal to trade in the securities of a company while in possession of material non-public information about that company. Because employees will have knowledge of specific confidential information that is not disclosed outside the Company which will constitute material nonpublic information, trading in the Company's securities or in the securities of those companies with which the Company does business by employees or persons employees provide material nonpublic information to could constitute insider trading, violating the law. It is an employee's responsibility to comply with these laws and not to share material nonpublic information.

\* \* \*

<u>Keeping the Audit Committee Informed</u>. The Audit Committee of the Board (the "Audit Committee") plays an important role in ensuring the integrity of the Company's public reports. If an employee believes that questionable accounting or auditing conduct or practices have occurred or are occurring, they should notify the Audit Committee. In particular, any employee should promptly bring to the attention of the Audit Committee any information of which they may become aware concerning:

  a. the accuracy of material disclosures made by the Company in its public filings;

  b. material weaknesses or significant deficiencies in internal control over financial reporting;

  c. any evidence of fraud that involves an employee who has a significant role in the Company's financial reporting, disclosures or internal controls or procedures; or

  d. any evidence of a material violation of the policies in this Code regarding financial reporting.

<u>Maintaining and Managing Records</u>. The Company is required by local, state, federal, foreign and other applicable laws, rules and regulations to retain certain records and to follow specific guidelines in managing its records. Records include all recorded information, regardless of medium or characteristics. Civil and criminal penalties for failure to comply with such guidelines can be severe for employees, agents, contractors and the Company.

106.    The Code of Conduct further provides, in a section titled, "Compliance and Reporting," that, in relevant part: "If an employee knows of or suspects a violation of this Code, or of applicable laws and regulations (including complaints or concerns about accounting, internal accounting controls or auditing matters), or an employee has concerns about a situation that they believe does not reflect the Company's culture and values, the employee must report it immediately to their manager, the Compliance Officer or Human Resources."

107.    The Code of Conduct further requires that all employees, which the Code defines as including directors and officers, to sign an acknowledgement, *inter alia*, that they "have received and read" the Code, that they "acknowledge" and "understand" the Code, that they "agree to comply with the Code."

*Audit Committee Charter*[5]

108.    The Audit Committee Charters states that:

The purpose of the Committee is to assist the Board in its oversight of:

1.    the accounting and financial reporting processes and internal controls of the Company;

2.    the audit and integrity of the Company's financial statements;

3.    the Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements);

4.    the qualifications, independence and performance of the Company's independent auditors; and

5.    the design, implementation and performance of the Company's internal audit function, if applicable.

The Committee shall also be responsible for preparing the report required by the U.S. Securities and Exchange Commission (the "SEC") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing other duties and responsibilities as are enumerated in or consistent with this charter.

109.    The Audit Committee Charter, in relevant part, under "Responsibilities," further states: Review of Internal Controls and Integrity of Financial Statements. The Committee shall meet with management, the internal audit department, if applicable, and the Company's independent auditor to review and discuss the Company's internal controls and the integrity of the Company's audited financial statements. Included in this process shall be review of:

a.    the scope and timing of the annual audit of the Company's financial statements;

b.    the Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and Form 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations"; the Committee shall make a recommendation to the Board as to whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K for filing with the SEC;

c.    the results of the independent audit and the quarterly reviews, and the independent auditor's opinion on the audited financial statements;

---

[5] The Audit Committee Charter referenced and language quoted herein is from the version of the Audit Committee Charter in use during the Relevant Period.

d.      the quality and adequacy of the Company's internal controls, and discussion with management and the independent auditor with regard to any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls;

e.      the Company's disclosure controls and procedures, as well as the quarterly assessments of such controls and procedures by the Chief Executive Officer and Chief Financial Officer;

f.      any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

g.      any analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

h.      the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

i.      any audit problems or difficulties the independent auditor encountered in the course of its audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management.

110.    In addition, under the "Compliance with Laws," section, the Audit Committee Charter states that "[t]he Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports or complaints that raise material issues regarding the Company's financial statements or policies. The Committee must discuss with the Company's Chief Legal Officer any legal matters that may have a material impact on the financial statements or the Company's compliance procedures."

111.    Moreover, under "Enterprise Risk Management," Audit Committee Charter states that:

The Committee shall review and discuss with management, including the Company's internal audit function, if applicable, and the Company's independent auditor guidelines and policies to identify, monitor, and address enterprise risks. This shall include discussion of the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures. The Committee shall also oversee and monitor management's plans to address such risks. In connection with its review of enterprise risk, management's assessment thereof and any draft risk factors presented by management, the Committee is entitled to rely on management's identification and assessment of the operational, financial, strategic, regulatory and other risks described.

31

*Compensation Committee Charter[6]*

112.    The Compensation Committee Charter states that:

The purposes of the Committee shall be to:

1. oversee the Company's compensation policies, plans, benefits programs, and overall compensation philosophy;

2. assist the Board in discharging its responsibilities relating to (a) overseeing compensation of the Company's Chief Executive Officer ("CEO") and other individuals who are "officers" as defined in Rule 16a-1(f) (all such officers, the "Executive Officers") under the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), and (b) evaluating and recommending the Executive Officer compensation plans, policies and programs of the Company;

3. administer the Company's incentive compensation plans, equity compensation plans, and such other plans as designated from time to time by the Board; and

4. prepare the report of the Committee required by the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC").

The Committee shall seek to structure the Company's compensation plans, policies and programs in order to attract and retain the best available personnel for positions of substantial responsibility with the Company, provide incentives for such persons to perform to the best of their abilities for the Company, maintain appropriate levels of risk and reward and promote the success of the Company's business.

113.    Furthermore, under the section titled "Responsibilities," the Compensation Committee Charter notes the following, in relevant part:

<u>Executive Compensation</u>. The Committee shall have direct responsibility to:

a. review and approve annually the corporate goals and objectives applicable to the compensation of the CEO, evaluate at least annually the CEO's performance in light thereof, and consider factors related to the performance of the Company in approving the compensation level of the CEO;

b. review at least annually and approve or recommend for approval to the Board members other than the CEO, the CEO's (i) base salary, (ii) incentive bonus, including the specific goals and amount, (iii) equity compensation, (iv) any employment agreement, severance arrangement, transition or consulting agreement, retirement agreement or change of control protections and (v) any other benefits, compensation or similar arrangements, if any

---

[6] The Compensation Committee Charter referenced and language quoted herein is from the version of the Compensation Committee Charter in use during the Relevant Period.

(including, without limitation, perquisites and any other form of compensation such as a signing bonus or payment of relocation costs), including any amendments to or terminations of any of the foregoing;

c. in consultation with the CEO, review at least annually and approve or recommend for approval to the Board members other than the CEO items (i) through (v) for the other Executive Officers, including any prospective or former Executive Officers, including any amendments to or terminations of any of the foregoing;

d. review and approve, as well as approve amendments to or terminations of, any compensatory contracts or similar transactions or arrangements with such other employees as the Committee determines, including employment agreements, severance arrangements, transition or consulting agreements, retirement agreements and change-in-control agreements or provisions.

### *Nominating and Corporate Governance Committee Charter[7]*

114.    According to the Nominating and Corporate Governance Committee Charter:

The purpose of the Committee shall be to exercise general oversight with respect to the governance of the Board by:

1.    reviewing the qualifications of, and recommending to the Board, proposed nominees for election to the Board and its committees, consistent with criteria approved by the Board;

2.    developing, evaluating and recommending to the Board corporate governance practices applicable to the Company; and

3.    facilitating the annual performance review of the Board and its committees.

115.    Moreover, under the enumerated "Responsibilities," of the Committee, the Nominating and Corporate Governance Committee Charter states the following, in relevant part:

1. <u>Board Composition</u>. The Committee shall review and assess and make recommendations to the full Board regarding:

    a.    desired qualifications, expertise and characteristics sought of Board members, which assessment may include numerous factors, such as character, professional ethics and integrity, judgment, business acumen, proven achievement and competence in one's field, the ability to exercise sound business judgment, tenure on the Board and skills that are

---

[7] The Nominating and Corporate Governance Committee Charter referenced and language quoted herein is from the version of the Nominating and Corporate Governance Committee Charter in use during the Relevant Period.

Verified Shareholder Derivative Complaint

complementary to the Board, an understanding of the Company's business, an understanding of the responsibilities that are required of a member of the Board, other time commitments, ***diversity with respect to*** professional background, education, ***race, ethnicity, gender***, age and geography, as well as other individual qualities and attributes that contribute to the total mix of viewpoints and experience represented on the Board (the "Director Criteria"); and

b.  the current composition, organization and governance of the Board and its committees.

2. <u>Board Candidates</u>. The Committee shall establish procedures for the submission of candidates for election to the Board. This shall include procedures for:

a.  identifying individuals qualified to become Board members based on the Director Criteria;

b.  evaluating the performance of individual members of the Board eligible for re-election, and selecting, or recommending for the selection of the Board, the director nominees for election to the Board by the stockholders at the annual meeting of stockholders or any special meeting of stockholders at which directors are to be elected;

c.  considering the Board's leadership structure, including the separation of the Chairman and Chief Executive Officer roles and/or appointment of a lead independent director of the Board, either permanently or for specific purposes, and making such recommendations to the Board as the Committee deems appropriate;

d.  developing and reviewing periodically the policies and procedures for considering stockholder nominees for election to the Board;

e.  considering director nominee recommendations from stockholders of the Company that are validly made and in accordance with applicable laws, rules and regulations and the provisions of the Company's certificate of incorporation and bylaws;

f.  evaluating and recommending termination of membership of individual directors for cause or for other appropriate reasons;

g.  evaluating the "independence" of directors and director nominees against the independence requirements of the securities exchange on which the Company's securities are listed, applicable rules and regulations of the SEC and other applicable laws; and

h.  recommending to the Board nominees to fill vacancies and newly created directorships on the Board and nominees to stand for election as directors.

(Emphasis added.)

116.    The Individual Defendants violated the Code of Conduct, Company policy, and the Company's corporate governance documents by engaging in or permitting the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings and by facilitating and disguising the Individual Defendants' and Defendant VGA's violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, abuse of control, gross mismanagement, and failing to report the same. Moreover, at least four and as many as eight of the Individual Defendants violated the Code of Conduct by selling Company shares at inflated prices. Further, in violation of the Code of Conduct and the Audit Committee Charter, the Individual Defendants failed to maintain internal controls, failed to maintain the accuracy of Company records and reports, and failed to comply with laws and regulations.

**INDIVIDUAL DEFENDANTS' AND DEFENDANT VGA'S MISCONDUCT**

**Background**

117.    QuantumScape is a Delaware corporation based in San Jose, California, which develops and sells specialized lithium-metal solid-state batteries for use in electrical vehicles. The Company, in its current form, came about as the result of the Merger between Kensington, to which the Company is the successor, and a separate entity, Legacy QuantumScape, which is now a subsidiary of the Company.

118.    Solid-state batteries, unlike lithium-ion batteries, are designed to use solid electrolyte instead of heavy liquid electrolyte. While otherwise operating in the same way as a lithium-ion battery, doing away with the need for liquid makes solid-state batteries much denser and more compact.

119.    While solid-state batteries have the potential to be safer and more durable in the long-term, the technology of most solid-state batteries has not yet surpassed the abilities of its lithium-ion predecessor. One of the biggest drawbacks to solid-state battery development is the formation of dendrites, small needle-like metallic growths that quickly grow out of control and short out the battery.

120.    Starting in 2012 and continuing through at least June 2020, VGA made a series of investments in Legacy QuantumScape that eventually led to its being a controlling shareholder in Legacy QuantumScape. VGA, and its parent company Volkswagen, were interested in investing in Legacy QuantumScape so as to have a stake in and future access to cutting edge batteries for potential use in

Volkswagen electric vehicles. To this end, Volkswagen, VGA, and Legacy QuantumScape executed a joint venture agreement in 2018 for the purposes of establishing a U.S.-based manufacturing facility to produce the "pilot line" of batteries. To date, the joint venture "has had minimal operations."

121.    On September 3, 2020, Legacy QuantumScape and Kensington announced the Merger, under which the Company would receive even more funding from VGA as well as other sources. On November 27, 2020, the Merger was completed and QuantumScape common stock and warrants began trading on the NYSE. The press release announcing the Merger referred to QuantumScape as "a leader in the development of next generation solid-state lithium-metal batteries for use in electric vehicles." The press release also stated that in "the decade since the company was founded, QuantumScape has been exclusively focused on developing solid-state batteries and designing a scalable manufacturing process to commercialize its battery technology for the automotive industry."

122.    On December 17, 2020, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"), which was registering 305,114,065 shares of Company Class A common stock for resale in addition to 6,650,00 warrants for additional Company Class A common stock. Following amendments, by the time the Registration Statement was declared effective on December 31, 2020, this eventually grew to 306,053,642 shares of Class A common stock, with the warrants unchanged at 6,650,000. Among these shares being registered for resale were the shares, described herein, owned by Defendants Singh, Prinz, Holme, Hettrich, Buss, Leohold, Mirro, Straubel, and VGA.

**False and Misleading Statements Made During the Battery Statements Period**

***November 27, 2020 CNBC Interview***

123.    On November 27, 2020, Defendant Singh took part of an interview on CNBC's "Squawk on the Street." During the interview, Defendant Singh discussed the Company going public, stating:

> This is the beginning of a massive transformation in one of the largest industries on the planet. This is going to be a multidecade long transition. There is a huge opportunity to create, we believe, hundreds of billions of dollars of revenue over that time. The time to revenue does not reflect what is traditionally thought of as market risk or technology risk. We have technology that works. Our OEM automotive customers have tested it and we have the support of the largest car company in the world, which is Volkswagen, which is our biggest investor. ***The time between now and first revenue is really spent doing two things. One is ramping up production. Batteries take time to build and scale up. And two is to do the final automotive qualification process, which also takes some time.***

(Emphasis added.)

124.    Defendant Singh also discussed the battery technology, stating:

David Faber: It is one thing for things to work in a laboratory and another thing for them to work at scale. You're confident that your battery, your solid-state battery, that of course will be able to be charged more quickly and obviously give a longer life that it will be able to work at scale and you'll be able to produce it at scale?

Jagdeep Singh: *Well, what we are confident about is that the fundamental science risk is behind us* because the battery has been tested at automotive power by the automotive OEMs themselves. And I think that relative to scaling the production, we obviously understand out technology well. We know the process that involved making it. But keep in mind that the production partnership is with Volkswagen. We have a joint venture with VW. We are going to jointly make these batteries at scale. Obviously, VW knows how to make very high volume, very high-quality product in the marketplace. So, yes, I think we are pretty comfortable that we are able to scale this. Our technology works.

(Emphasis added.)

### *November 27, 2020 Press Release*

125.    On November 27, 2020, the Company issued a press release which announced the completion of the Merger and the commencement of QuantumScape's shares being traded on the NYSE. The press release described QuantumScape as "a leader in the development of next-generation solid-state lithium-metal batteries for use in electric vehicles" and stated, in relevant part, that:

Since the company was founded in 2010, QuantumScape has been exclusively focused on developing solid-state batteries and designing a scalable manufacturing process to commercialize its battery technology for the automotive industry. *Through its elegant "anode-less" design, QuantumScape's solid-state lithium-metal batteries are designed to be safer, and to deliver greater range, faster charge times and improved cycle life, than today's conventional lithium-ion battery technology.*

"Today marks a big step in the evolution of our company," commented *Jagdeep Singh*, Founder and Chief Executive Officer of QuantumScape. "*This transaction allows QuantumScape to fund development and commercialization of our OEM-validated battery technology as we look forward to playing our part in the electrification of the powertrain and fostering a cleaner future for all.*"

(Emphasis added.)

### *December 8, 2020 Showcase*

126.    On December 8, 2020, the Company held a showcase (the "December 8, 2020 Showcase"), consisting of a press release and slide deck which were filed with the SEC, as well as a live presentation

on YouTube. Included in the December 8, 2020 Showcase was a panelist consisting of battery scientists and Board members.

127.    During the presentation, the following slides were shown showcasing how the Company's energy density compares to regular lithium-ion.

128.    The following slide shows lithium-metal compared to lithium-ion batteries:

129.    The next slide compares the structure of QuantumScape's solid-state battery to that of a lithium-ion battery, stating that the design provides for "[i]mproved cost, energy density, and safety":

130.    The following slide showcases the Company's cell volumetric Energy density (over 1,000 Wh/L) as compared to lithium-ion energy (less than 70Wh/L):





131.    The next slide in the presentation was titled "Lithium metal architecture addresses multiple requirements simultaneously." It then listed the requirements addressed, namely energy, fast charge, life, safety, and cost:



132.    At this point in the presentation, the Defendants began to play a video that discussed the main challenges of creating a solid-state battery. These challenges included: (1) the ability to create a rapid charge without the formation of dendrites; (2) the battery's life cycle; (3) temperature operation; and (4) minimizing the excess lithium on a battery. The video then revealed that the Company's batteries had managed to overcome these obstacles, stating: (1) "QuantumScape batteries have a ceramic separator that has been shown to withstand the current density required for a 15-minute fast charge;" (2) the cells have exceeded the requirements needed for automotives at 800 cycles, allowing for hundreds of thousands of miles to be driven; (3) the "QuantumScape solid-state lithium metal battery operates across the entire automotive temperature range;" and (4) "[s]ince QuantumScape cells are manufactured without an anode, the cells have zero excess lithium."

133.    Defendant Singh then stated the following on the video:

Okay, so the quick summary is if you have a material that doesn't have the fundamental entitlement to serve as a solid-state separator, you can still make batteries out of that material but they only work under severely compromised test conditions and the main compromises that people use are either very low current densities, which ends up not being useful for real applications like driving a car, or the cycle efforts are being very short or

the cells can only work at an elevated temperature or they require excess lithium, which lowers the energy density of the cell. ***These are the problems that QuantumScape has addressed.***

(Emphasis added.)

134. Further on in the presentation, the following slide was shown, titled "Fast Charging" and stating that the battery's "capability exceeds commercial targets with commercial area single layer prototype" and claims that the battery can reach "80% charge in 15 minutes":



135. In discussing the information on this slide, Defendant Singh stated:

So what you see here is the charging profile of different battery technologies. The gray curve at the bottom is today's fast charge capability of conventional lithium-ion batteries used in EVs. You can see that they can charge to a hundred percent in about an hour or 80 percent in about 40 minutes.

Note that you can start charging these batteries at a relatively high rate of charge, but as the state of charge increases, you have to slow down that rate of charge in order to prevent dendrites from forming.

With the QuantumScape technology, ***the solid-state separator already prevents dendrites, so there's no reason to slow down the rate of charge***. You can start charging it at a really high rate and continue charging it at that really high rate until it gets all the way up to 80 percent in less than 15 minutes.

This is not only better than any of the solid-state technology, but ***it's better than you can achieve with conventional lithium-ion batteries, which always have to manage this potential dendriting issue at higher rates of charge***.

(Emphasis added.)

136.    The next slide in the presentation addressed the battery's dendrite resistance, stating its "[s]olid-state separator resists dendrites even at very high current density":



137.    In discussing this slide, Defendant Singh stated:

Here's an even more exciting chart that the battery experts in the audience will be blown away by. This is a test that tries to look at how much current density the separator can handle without dendriting and what you see is on the axis on the left, that's the current density and by way of comparison, conventional solid-state efforts under these conditions really can't get much above a few single digit milliamps per centimeter squared before they fail. So they will fail at current densities around this level here.

To do a fast charge, you have to be up on the order of 15 to 16 milliamps per centimeter squared, and you can see our cell, our material, can withstand that with no failures. We then took the current density higher and higher to see how high we could get without seeing failures, and in this case we were able to get to over a hundred milliamps per centimeter squared of current densities, which corresponds with a two-minute charge or 25C rate without a failure.

1
2
3

This is a really remarkable result. It blows away any previous demonstration in the world of solid-state separators. This was done at a lithium/lithium symmetric cell, which is a material level test at 45 degrees Celsius, and you can see here that it-- you know, there's a lot of headroom between what the application requirement is for fast charge and the capability of this material.

4
5

138.    The next slide was titled "Power" and stated that the Company's "solid state cells can deliver aggressive automotive power profiles":

6
7
8
9
10
11
12
13
14
15
16
17
18



19
20
21

139.    In discussing this slide, Defendant Singh stated:

You can put all of those things together and test this -- these single layer cells on the most aggressive type of driving that you could put a battery through, and that is a track cycle.

22
23
24
25

So in this case this is -- one of our OEMs has a racetrack on which they test their cars. The drive cycle for that racetrack is essentially oscillating between one extreme or the other. So you're either discharging the battery at full power or you're recharging the battery when you brake around the turns at full regeneration power, and the battery just swings back and forth between two extremes which, again, is the most stressful driving condition for a battery because batteries hate to be driven this aggressively.

26
27

And then in between those discharges, we recharge this battery in 15 minutes. So a really fast recharge.

28

43

So the way this test works is you drive around the lap of the track nine times and then you recharge it in 15 minutes. Just to be clear, this test was run on our single layer pouch cells, so we didn't actually put these cells into real cars. We don't have production cells yet. But we are able, in this single layer pouch cell, to stress it using the same current densities that the cell would experience in a vehicle driving around the track.

Now what you see with this aggressive test is that the cell goes well over a thousand laps, which corresponds to more than a hundred cycles of charge/discharge at these aggressive conditions, with minimal degradation of capacity.

By contrast, today's best lithium-ion cells start degrading within a few tens of cycles. So again, this result is really remarkable. Not only is it better than any previous solid-state result, but it actually blows away even today's best lithium-ion technologies. So a super exciting result that demonstrates the robustness of the QuantumScape solid-state technology.

140.    The next slide detailed the battery life of the Company's solid-state battery, stating that the battery "[m]eets commercial target with commercial area single layer prototype," and has "[c]ycling with >80% energy retention in 800+ cycles."



141.    In discussing this slide, Defendant Singh stated:

And then to assess cycle life, we run our cells under real world conditions, which represents a room -- close to room temperature, so 30 degrees Celsius, 1C charge and discharge, this is one hour charge, one hour discharge.

Also an aggressive condition. Typically, battery cycle testing is done at slower rates than this, Cover 3 rates, so a three-hour charge and discharge.

There is zero excess lithium in these cells. These are thick cathodes, over three milliamps symmetry squared, and this is the commercial area of the cells. So, these are all real world conditions. In fact they're aggressive real world conditions because of the charge rates and discharge rates. ***They are not sort of a compromised test conditions***.

And you see the battery lasts over 800 cycles, with well over 80 percent of capacity retained. The spec for commercial deployment of these batteries is in fact 80 percent or 800 cycles. So this is a really big milestone. No other battery, no other solid-state battery that we are aware of can, under these conditions, cycle anywhere near this well.

And in addition, this is not just one hero cell, this is a whole batch of cells that we made and as you can see, the batch size cycles very reliably. So this is another challenge that solid-state battery companies have, is that you make one hero cell sometimes that can cycle without shorting but it's very, very hard to make a high reliability batches of cells, and that's what we're showing here.

***So this really demonstrates that this technology is in fact ready for commercial deployment as soon as we can scale up production and make multilayer versions of these cells***. A super exciting result.

(Emphasis added.)




142.    The next slide (reflected above) was titled "Material Performance: Low Temp," and it stated that "[s]ignificant capacity is accessible even at -30º Celsius":

143.    In discussing this slide, Defendant Singh stated:

Another limitation that solid-state batteries sometimes have is they only operate at elevated temperatures. To address -- to demonstrate that we don't have that limitation, we have taken our material and tested it all the way down to negative 30 degrees and you still get substantial capacity out of the cell, even at negative 30. By contrast, lithium-ion technologies would have less capacity than we have, even at negative 25 degrees.

144.    Lastly, a slide was shown discussing the safety of the batteries, titled "Material Performance: Thermal Stability." This slide mentions that "[s]olid state separator is not combustible and has high thermal stability," as well as that "[l]ithium anode is chemically stable with separator and foil, even when molten." The slide further states that "[u]nlike a liquid electrolyte, QS solid-state separator has no appreciable reaction with molten lithium metal":



145.    In discussing this slide, Defendant Singh stated:

And finally, to address the safety issue, this is a test called the DSC test, which stands for differential scanning calorimetry, and really all it is, is you take lithium metal, put it in direct contact with either a liquid electrolyte or in our case a solid-state separator and heat

up the pair of materials, and what you see is with the liquid plus lithium scenario, when you get to lithium metallic temperatures of about 180 degrees Celsius, you see a massive exothermic reaction which corresponds to a fire.

And in the case of solid-state separator with lithium, even at lithium melting temperature, you see no exotherm, in fact you see a small endotherm, which represents lithium essentially absorbing energy in order to melt, and no reaction.

So this demonstrates the material is in fact inherently stable, even to molten lithium, which is a very encouraging result.

146.     In wrapping up, Defendant Singh stated, "to summarize very briefly, ***the data we presented today makes clear that the QuantumScape technology can address the fundamental issues***. We can charge at extremely high rates, as fast as 4C. We have very long cycle lives, on the order of 800 cycles or greater. We can operate at 30 degrees Celsius, close to room temperature, and we have no need for excess lithium on the anode." (Emphasis added.)

***December 8, 2020 Press Release***

147.     On December 8, 2020, QuantumScape released a press release titled "QuantumScape Releases Performance Data for its Solid-State Battery Technology," touting that the Company's performance data for its solid-state battery technology "demonstrates high energy density solid-state lithium-metal battery technology that improves life, charging time, and safety."

148.     The press release stated, in pertinent part:

QuantumScape Corporation (NYSE: QS, or "QuantumScape"), a leader in the development of next generation solid-state lithium-metal batteries for use in electric vehicles (EVs), ***has released performance data demonstrating that its technology addresses fundamental issues holding back widespread adoption of high-energy density solid-state batteries, including charge time (current density), cycle life, safety, and operating temperature.***

A commercially viable solid-state lithium-metal battery is an advancement that the battery industry has pursued for decades, as it ***holds the promise of a step function increase in energy density over conventional lithium-ion batteries, enabling electric vehicles with a driving range comparable to combustion engine-based vehicles. QuantumScape's solid-state battery is designed to enable up to 80% longer range compared to today's lithium-ion batteries.*** Previous attempts to create a solid-state separator capable of working with lithium metal at high rates of power generally required compromising other aspects of the cell (cycle life, operating temperature, safety, cathode loading, or excess lithium in the anode).

***QuantumScape's newly-released results***, based on testing of single layer battery cells, ***show its solid-state separators are capable of working at very high rates of power, enabling a 15-minute charge to 80% capacity, faster than either conventional battery or***

47

*alternative solid-state approaches are capable of delivering. In addition, the data shows QuantumScape battery technology is capable of lasting hundreds of thousands of miles, and is designed to operate at a wide range of temperatures, including results that show operation at -30 degrees Celsius.*

The tested cells were large-area single-layer pouch cells in the target commercial form factor with zero excess lithium on the anode and thick cathodes (>3mAh/cm2), running at rates of one-hour charge and discharge (1C charge and 1C discharge) at 30 degrees Celsius. *These tests demonstrated robust performance of these single layer pouch cells even at these high rates, resulting in retained capacity of greater than 80% after 800 cycles (demonstrating high columbic efficiency of greater than 99.97%).*

"*The hardest part about making a working solid-state battery is the need to simultaneously meet the requirements of high energy density (1,000 Wh/L), fast charge (i.e., high current density), long cycle life (greater than 800 cycles), and wide temperature-range operation. This data shows QuantumScape's cells meet all of these requirements, something that has never before been reported. If QuantumScape can get this technology into mass production, it holds the potential to transform the industry,*" said Dr. Stan Whittingham, co-inventor of the lithium-ion battery and winner of the 2019 Nobel prize in chemistry.

* * *

QuantumScape's team of scientists have worked over the past decade to create the next generation of battery technology: solid-state batteries with lithium-metal anodes. With processes and materials protected by over 200 patents and applications, QuantumScape's proprietary solid-state separator replaces the organic separator used in conventional cells, enabling the elimination of the carbon or carbon/silicon anode and the realization of an "anode-less" architecture, with zero excess lithium. In such an architecture, an anode of pure metallic lithium is formed in situ when the finished cell is charged, rather than when the cell is produced. Unlike conventional lithium-ion batteries or some other solid-state designs, this architecture delivers high energy density while enabling lower material costs and simplified manufacturing.

Beyond its ability to function at high rates of power while delivering high energy density, other key characteristics of QuantumScape's solid-state lithium-metal battery technology include:

- **Zero excess lithium:** In addition to eliminating the carbon or carbon/silicon anode, QuantumScape's solid-state design further increases energy density because it uses no excess lithium on the anode. Some previous attempts at solid-state batteries used a lithium foil or other deposited-lithium anode, which reduces energy density.

- **Long life:** Because it eliminates the side reaction between the liquid electrolyte and the carbon in the anode of conventional lithium-ion cells, QuantumScape's battery technology is designed to last hundreds of thousands of miles of driving. Alternative solid-state approaches with a lithium metal anode typically have not demonstrated the ability to work reliably at close to room temperatures (30 degrees Celsius) with zero excess lithium at high

48

current densities (>3mAh/cm2) for more than a few hundred cycles, and result in a short-circuit or capacity loss before the life target is met. By contrast, today's test results show that QuantumScape's battery technology is capable of running for over 800 cycles with greater than 80% capacity retention.

- **Low-temperature operation:** QuantumScape's solid-state separator is designed to operate at a wide range of temperatures, and it has been tested to -30 degrees Celsius, temperatures that render some other solid-state designs inoperable.

- **Safety:** QuantumScape's solid-state separator is noncombustible and isolates the anode from the cathode even at very high temperatures—much higher than conventional organic separators used in lithium-ion batteries.

(Emphasis added.)

### *December 8, 2020 Mobilist Article*

149.    On December 8, 2020, an article was published by *The Mobilist* titled, "*Even After You Fix the Explosions, Superbatteries Are Hard to Make: QuantumScape has released its first data, and battery scientists are impressed.*" The article quoted Defendant Singh, who was trying to downplay the scale of the task of upping development and production of the Company's battery, stating that "what is left is 'not chemistry. It's engineering/manufacturing.'"

### *December 2020 Registration Statement and Prospectus*

150.    On December 17, 2020, QuantumScape filed the Registration Statement with the SEC. The Registration Statement was signed by Defendants Singh, Hettrich, Blome, Buss, Doerr, Leohold, Prinz, Mirro, Straubel, and Saluja. The Registration Statement stated, *inter alia*:

### *Solid-State Separator Required to Enable Lithium-Metal Anode*

We believe that a lithium-metal battery requires that the porous separators used in current lithium-ion batteries be replaced with a solid-state separator capable of conducting lithium ions between the cathode and anode at rates comparable to conventional liquid electrolyte while also suppressing the formation of lithium dendrites. While various solid-state separators have been shown to operate at low power densities, such low power densities are not useful for most practical applications. To our knowledge, we are the only company that has been able to demonstrate a solid-state separator for lithium-metal batteries that reliably prevents dendrite formation at higher power densities, such as those required for automotive applications and fast-charging.

Verified Shareholder Derivative Complaint

We believe that our ability to develop this proprietary solid-state separator will enable the shift from lithium-ion to lithium-metal batteries.

* Catholyte includes an organic gel made of an organic polymer and organic liquid.

**Our Technology**

Our proprietary solid-state lithium-metal cell represents the next-generation of battery technology.

Our battery cells have none of the host materials used in conventional anodes. In fact, when our cells are manufactured there is no anode; lithium is present only in the cathode. When the cell is first charged, lithium moves out of the cathode, diffuses through our solid-state separator and plates in a thin metallic layer directly on the anode current collector, forming an anode. When the battery cell is discharged, the lithium diffuses back into the cathode.

Eliminating the anode host material found in conventional lithium-ion cells substantially increases the volumetric energy density. A pure lithium-metal anode also enables the theoretically highest gravimetric energy density for a lithium battery system.

Our proprietary solid-state separator is the core technology breakthrough that enables reliable cycling of the lithium-metal anode battery. Without a working solid-state separator, the lithium would form dendrites which would grow through a traditional porous separator and short circuit the cell.

An effective solid-state separator requires a solid material that is as conductive as a liquid electrolyte, chemically stable next to lithium–one of the most reactive elements–and able to prevent the formation of dendrites. Our team worked almost ten years to develop a composition that meets these requirements and to develop the techniques necessary to manufacture the separator material at scale using a continuous process. We have a number of patents covering both the composition of this material and key steps of the manufacturing process.

* * *

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Our single-layer solid-state cells have been extensively tested for power density, cycle life, and temperature performance. This is the only solid-state cell we are aware of that has been validated to run at automotive power densities by a leading automotive OEM. ***In addition, we believe our battery technology may provide significant improvements in energy density compared to today's conventional lithium-ion batteries***, as shown in the figure below.



(Emphasis in original.)

151.    In addition, the Registration Statement identified, under a section titled, "Benefits of Our Technology," that QuantumScape's "battery technology will enable significant benefits across battery capacity, life, safety, and fast charging while minimizing cost." Moreover, the Registration Statement touted "five key requirements" that the batteries were intended to meet including:

- ***Energy density.*** Our battery design is intended to significantly increase volumetric and gravimetric energy density by eliminating the carbon/silicon anode host material found in conventional lithium-ion cells. This increased energy density will enable EV manufacturers to increase range without increasing the size and weight of the battery pack, or to reduce the size and weight of the battery pack which will reduce the cost of the battery pack and other parts of the vehicle. For example, we estimate that our solid-state battery cells will enable a car maker to increase the range of a luxury performance EV—with 350 liters of available battery space— from 250 miles (400 km) to 450 miles (730 km) without increasing the size and weight of the battery pack. In the same example, our battery would enable the car maker to increase the maximum power output of such a vehicle from 420 kW to 650 kW without increasing the size of the battery pack. Alternatively, we believe that our solid-state battery cells will enable a car maker to increase the range of a

51

mass market sedan—with 160 liters of available battery space—from 123 miles (200km) to 233 miles (375km) without increasing the size and weight of the battery pack. Similarly, our battery would enable the car maker to increase the maximum power output of such vehicle from 100 kW to 150 kW without increasing the size of the battery pack.

- ***Battery life.*** Our technology is expected to enable increased battery life relative to conventional lithium-ion batteries. In a conventional cell, battery life is limited by the gradual irreversible loss of lithium due to side reactions between the liquid electrolyte and the anode. By eliminating the anode host material, we expect to eliminate the side reaction and enable longer battery life. Our latest single layer prototype cells have been tested to over 800 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity.

- ***Fast charging capability.*** Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, faster than commonly used high-energy EV batteries on the market. In these conventional EV batteries, the limiting factor for charge rate is the rate of diffusion of lithium ions into the anode. If a conventional battery is charged beyond these limits, lithium can start plating on carbon particles of the anode rather than diffuse into the carbon particles. This causes a reaction between the plated lithium and liquid electrolyte which reduces cell capacity and increases the risk of dendrites that can short circuit the cell. With a lithium-metal anode, using our solid-state separator, we expect the lithium can be plated as fast as the cathode can deliver it.

- ***Increased safety.*** Our solid-state battery cell uses a ceramic separator which is not combustible and is therefore safer than conventional polymer separators. This ceramic separator is also capable of withstanding temperatures considerably higher than those that would melt conventional polymer separators, providing an additional measure of safety. In high temperature tests of our solid-state separator material with lithium, the separator material remained stable in direct contact with molten lithium without releasing heat externally, even when heated up to 250 degrees, higher than the 180-degree melting point of lithium.

- ***Cost.*** Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries. We estimate that eliminating these costs will provide a savings of approximately 17% compared to the costs of building traditional lithium-ion batteries at leading manufacturers.

(Emphasis in original.)

152.    In addition, the Registration Statement stated the following, in relevant part, about the Company's internal controls: "Compliance with public company requirements will increase costs and

make certain activities more time-consuming. A number of those requirements will require us to carry out activities we have not done previously. For example, we have created new Board committees and adopted new internal controls and disclosure controls and procedures. In addition, expenses associated with SEC reporting requirements will be incurred. Furthermore, if any issues in complying with those requirements are identified (for example, if the auditors identify a material weakness or significant deficiency in the internal control over financial reporting), we could incur additional costs rectifying those issues, and the existence of those issues could adversely affect our reputation or investor perceptions of it."

153.    During the Battery Statements Period, the Individual Defendants and Defendant VGA breached their fiduciary duties by personally making and/or causing the Company to make the materially false and misleading statements referenced in ¶¶ 123-152. Specifically, the statements failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the supposed power, longevity, or energy density that they were being held out as having; (2) the Company did not have, and was extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

***The January 4, 2020 Seeking Alpha Report***

154.    On January 4, 2020, the website *Seeking Alpha* published a report titled, "QuantumScape's Solid State Batteries Have Significant Technical Hurdles To Overcome."[8] The report noted that the overall "science [wa]s very good," but that the Company's "batteries are small and unproven – not yet as big as an iWatch battery, and never tested outside a lab." The report further cautioned that "[t]here are significant risks associated with solid state batteries that have not been overcome" and that "[t]hey will likely never achieve the performance they claim."

---

[8] The report was slightly updated on January 13, 2020. The changes were mostly to clarify terms and did not affect the substance of its conclusions.

155.    In identifying successes achieved by QuantumScape, the *Seeking Alpha* report stated: Let's start by saying that building a solid-state battery that will function at the rates and temperatures needed for real world applications is hard - very, very hard. So hard, in fact, that nobody has done it. I've read many dozens of research papers where scientists have tried, and tout their ability to get one or more features to behave, but then apologize for the lack of a complete working battery, and lay out the significant challenges ahead. Much of the below is an interpretation of their technical presentation, which can be found here, and the webinar, which is stored on YouTube here. So far, they have:

- **Electrolyte**: a free standing, thin solid electrolyte that will sit between the anode and cathode. While we don't know much, it does deliver some relevant performance.

- **Pouch Cells**: a functioning single layer pouch cell, at 70 x 85 mm, 3.2 mAh/cm2, for a total capacity of 190 mAh and 0.7 Wh. For comparison, an iWatch battery is 205 mAh, and an iPhone 12 Pro battery is 3,768 mAh. It would take 20 of these cells to power your phone, and 100,000 to power a Tesla.

- **Lithium Metal Anode**: They are using a thin lithium metal anode, which will help them achieve high energy density...someday.

- **Fast Charging**: 80% capacity in 15 minutes, which is a considerable challenge since dendrites are known to form in solid state electrolytes at fast charging rates. More on this later.

156.    In addition, the report by *Seeking Alpha* report noted under a section titled "Areas of Overstated Success," that:

*All of these areas below are described as successful, because they are much better than has been achieved with solid state batteries in the past. But they are completely unacceptable for real world field electric vehicle performance.*

- **Power:** They have done 1200 circuits of a 90 second OEM specified track simulation, which pulled pulses of 6C. In this track, 9 circuits is full depth of discharge, after which the battery was heated to 45 degrees C (113 degrees F) and charged to 80% in 15 minutes. The cell lost about 10% of its capacity in this 130 full depth-of-discharge (FDOD)cycle test, meaning *the battery will only last for 260 FDOD cycles or about 75,000 miles of aggressive driving*. There is a note on the slide that it occurs at 3.4 atm, which likely means at high pressure. I'll comment on this later.

- **Range:** In much gentler, 1C / 1C cycling at 30 degrees C, the cell makes it for 800 cycles, or 240,000 miles. *Respectable, but not better than the vehicles on the road today.*

- **Low Temperature Operation:** They show discharge curves at 0 to -30 degrees Celsius, achieving 90 - 130 mAh/g active specific capacity. Comparing to NMC811 active specific capacity of 200 Ah/kg, the available current is from 45 - 65% of the room temperature capacity, but with an accompanying significant voltage drop. Based on voltage drop, capacity loss and the low rate of this test, this author estimates between a 50 – 80% loss in range during cold months. Also, note that the temperature capability of solid-state batteries is VERY temperature sensitive – thus the power and cycle tests at 30 and 45 degrees above would have been significantly worse if run even a few degrees lower.

- **Low Temperature Life:** They show 100 or so cycles at -10 degrees C. Respectable, except that these cycles are at C/5 charge and C/3 discharge. Thus, not 80% in 15 minutes, but rather 5% charge in 15 minutes.

- **Energy Density:** *They talk about being able to get to an energy density of 400 Wh/kg, which would be great. However, they clearly have not yet,* as all their graphs are normalized to 100%, not to an actual capacity. *And Amprius is already making cells with 450 Wh/kg,* and Tesla claimed on their Battery Day that they could achieve 350 Wh/kg. *So, while nice, this energy density they hope to achieve in 2028 will not beat today's state of the art, and will not be state of the art when it is achieved.*

(Emphasis added.)

157.    The *Seeking Alpha* report further revealed, in a section titled, "Other Significant Challenges," that:

*There are other challenges they do not mention,* which will have to be overcome before they can put the first car in the field. *Remember that they have spent $300 million so far, so these are not challenges that they didn't have the resources to address, but rather ones they have not solved yet and so remain silent about.* Many of these are related, and come from the fact that they are using a brittle, ceramic electrolyte. These include:

- **Multi-layer cells:** They have been unable to make multi-layer cells. My expectation is that it is because of the unstable interface between the cathode, which expands as much as 10% on discharge, and the solid-state electrolyte, which will not expand at all. They likely do their cycling under high isostatic pressure (remember the 3.4 atm mentioned earlier?), which will not flow through to inner layers. The inner layers will also be more rigidly constrained, so suffer more from the interfacial decay with cycling. Needless to say, 100,000 of their tiny pouch cells will never make a practical vehicle. It's important to mention here that, if your technology works, making a multilayer pouch cell is an easy afternoon's work.

- **Vibration and Dendrites:** The electrolyte is very, very stiff. It is well documented that dendrites will not grow through solid, single crystal garnet electrolytes. However, they grow freely at grain boundaries and defects. In their pristine, temperature and pressure controlled and vibration-free labs, they can get the cells

to cycle. But in a rugged SUV or on our terrible South Carolina roads, cracks and other defects will become plentiful and dendrites will grow. This will in the best case destroy cycle life, and in the worst cause the battery to explode.

- **Lithium Metal Ignition:** They tout using lithium metal to increase energy density. But they don't mention that lithium metal auto-ignites at 179 degrees Celsius, generating 200 - 300 kJ/mol, or 30 - 40 kJ/g, a massive amount of energy - about *three times higher* than ethylene carbonate, a common component of lithium-ion electrolytes. Pure lithium is the second most energetic element behind beryllium, and could be used as a component of rocket fuel (with an oxidant). In essence, they have replaced a burning separator and electrolyte for a much more flammable and energetic burning anode. There is plenty enough energy in the battery to raise the lithium to its ignition temperature, and if exposed to oxygen or water, it will likely ignite itself. There is plenty of oxygen available in the cathode materials. …

- **Cost**: ***They claim lower cost***, but are actually eliminating only one of the least expensive components - graphite. ***While this is true, they will have the added cost of building up their thin ceramic electrolyte and sintering it at high temperatures.*** My guess is that early on, their yields will be just terrible, if they can achieve production scale at all.

(Emphasis added.)

158.   To close, the *Seeking Alpha* report stated the following under "Summary," in relevant part: Given their success so far and their access to capital, I do think QuantumScape will succeed in getting a battery to market. However:

- ***It will have lower energy density*** than Amprius has achieved today.

- It will likely first show up in watches and wearables, then maybe phones.

- ***It will take much longer and cost much more*** to scale than they think.

- ***It will not be able to withstand the aggressive automotive environment***.

- ***It will be far more expensive*** than today's lithium ion batteries, and will likely never achieve lower cost than contemporary lithium-ion batteries.

- Once a suitable cell size is made, ***it may not be any safer*** than today's lithium-ion batteries.

(Emphasis added.)

159.   On news of this report, the Company's share price declined by approximately 40.8%, or $34.49, from closing at $84.45 per share on December 31, 2020, the previous day of trading and the day of the SPO, to closing at $49.96 per share on January 4, 2021.

160.    Meanwhile, in the course of the SPO on December 31, 2020, at least four and as many as eight Individual Defendants and Defendant VGA sold shares at prices inflated by the numerous false and misleading statements. As such, the Defendants continued to obfuscate the truth about the Company's batteries.

### January 4, 2021 Interview with CNBC

161.    On January 4, 2021, Defendant Singh took part in an interview on CNBC's "Closing Bell," discussing the stock plummet of the Company's shares the prior day. Despite avoiding bringing up the *Seeking Alpha* article, Defendant Singh stated:

> We have something that has never been shown to the world before, a solid-state system that delivers levels of performance that are really record breaking not only in comparison to other solid-state efforts, ***but even in comparison to conventional lithium-ion technology. So if we can get this into the market, which is the task we are currently focused on***, ramping up production and making these multilayer cells. We absolutely think we can get a huge share of the market and if we can do that then investors will be well taken care of

(Emphasis added.)

### January 15, 2021 LinkedIn Article

162.    On January 15, 2021, Defendant Holme published an article to LinkedIn discussing the performance data from the December 8, 2020 Showcase as a response to the "surge in interest."

163.    Within the article, Defendant Holme discusses QuantumScape's technology's power, stating:

> The race track drive cycle is among the harshest of battery cycling tests. Aggressive performance demands -- involving repetitive extreme acceleration and braking followed by 15-minute fast-charging -- will stress the system more and lead to more rapid degradation than normal driving conditions, which is why conventional lithium-ion BEV energy cells perform poorly on this test, as shown in the chart below. We were therefore very pleased to report that the QuantumScape cell performed significantly better on this test, delivering over 100 full charge-discharge cycles with 100% depth of discharge (i.e., 0-100% state of charge) with 90% retention of energy under these demanding conditions.



164.    Defendants claimed, compared to today's lithium-ion batteries, that the QuantumScape battery was performing favorably under compromised test conditions.

165.    The article went on to state the following regarding performance data for solid-state material in low temperatures:

> In addition to cycling data, we reported performance data for our soli-state [sic] material at extreme low temperatures, i.e., -30 degrees C. As the slide below shows, the data shows good energy retention even at these low temperatures -- better than the reference state-of-the-art BEV lithium-ion cell shown on that slide. Batteries generally perform worse at low temperatures, but the requirement is to provide enough power to drive safely while the battery system heats itself.

166.    Defendants claimed, compared to today's lithium-ion batteries, that the QuantumScape battery was performing favorably under compromised test conditions.

167.    The article went on to state the following about the safety of the solid-state batteries compared to lithium-ion, stating:

> Finally, the differential scanning calorimetry (DSC) chart below shows what happens when lithium melts in contact with our separator – there is no exothermic reaction as is the case when lithium melts in contact with a liquid electrolyte. ***We believe that safety in our cell will be improved relative to lithium-ion*** because we have replaced the combustible polymer separator with a non-oxidizable (i.e., non-combustible) separator that is thermally stable to much higher temperatures than polymers, so it will act as a more effective barrier between anode and cathode.



We believe that the above results, in aggregate, redefine the performance frontier of solid-state batteries as no previous solid-state battery efforts have reported similar results under comparable conditions.

(Emphasis added.)

168.    In discussing "Additional Key Points," the article stated:

Dendrites and Stiffness - Our solid-state separator is flexible and is demonstrably not stiff



Solving the problem of dendrites is very difficult as lithium can dendrite through polymers, single crystals, and glassy materials with no grain boundaries, as well as polycrystalline materials with grain boundaries, so none of those microstructures is by itself a solution to the dendrite problem. That is why we have been so excited at QuantumScape to have developed a material and system that we believe can address this issue.

Energy Density and Cost - Our target is to stack several dozen of our single layer unit cells together into a multilayer cell and achieve a target energy density of 1,000 Wh/L, enabled by the elimination of the anode host material. This would allow greater range than today's state-of-the-art commercially shipping BEV cells, such as the 2170 cell used in the Tesla Model 3 which has an energy density of 713 Wh/L, as reported by CleanTechnica. The higher energy density design targeted by the QuantumScape cells also reduces cost by eliminating both the anode material and the anode manufacturing line, while simplifying the formation and aging process, one of the most expensive parts of the battery manufacturing process. Our separator consists of generally inexpensive precursor materials and utilizes processes suitable for high volume continuous flow production.

In summary, when evaluating battery performance test data, it is important to note that there are many compromises in test conditions that can be made when showing battery cycle life data, many of which result in a cell that is not capable of meeting commercial requirements. What makes QuantumScape's performance data interesting is not just that it shows over 1,000 cycles with good capacity retention, ***but that it does so under commercially-relevant conditions, including high current density, close-to-room temperature, full depth of discharge, modest pressure, zero excess lithium, and commercially-relevant area and cathode loading***. We hope this explanation helps provide a better understanding of the data we have shared and our progress towards developing solid-state lithium-metal batteries.

(Emphasis added.)

***February 16, 2021 Shareholder Letter***

169.    On February 16, 2021, before the market opened, the Company published a letter to its shareholders discussing the major developments from the last quarter and fiscal year in conjunction with the earnings release for the fourth quarter of the 2020 Fiscal Year. The letter was signed by Defendants Singh and Hettrich.

170.    The letter opened with a company overview, stating:

Our technology replaces the polymer separator used in conventional batteries with a solid-state ceramic separator, enabling us to replace the carbon or carbon-silicon anode used in these cells with an anode of pure metallic lithium. Furthermore, our battery as manufactured will be anode-free in a discharged state as the lithium metal anode will form in-situ when charged. ***The lithium-metal anode enables higher energy density than is possible with conventional anodes (as high as 1,000 Wh/L compared with approximately 711 Wh/L for conventional cells used in today's best-selling EVs)***, enabling longer driving range, while simultaneously delivering high rates of power (for fast charge), long cycle life, and improved safety, addressing the fundamental issues holding back widespread adoption of battery electric vehicles.

(Emphasis added.)

171.    In discussing the December 8, 2020 Showcase, the letter stated:

In addition to enabling high energy density, the data we shared, based on the testing of single layer battery cells, shows that, unlike previous solid-state efforts, our solid-state separators can work at very high rates of power, enabling a 15-minute charge to 80% capacity, faster than either conventional batteries or alternative solid-state approaches can deliver without rapidly losing capacity. Both conventional solid-state efforts and the commercial lithium-ion energy cells used in automotive applications typically fail from dendrite (needle-like crystals of lithium metal which can grow across the separator and short-circuit the cell) formation or impedance growth during charge at these rates of power.

In addition, the data shows QuantumScape battery technology is capable of lasting hundreds of thousands of miles (1000+ cycles) even under aggressive test conditions of one-hour charge and discharge (1C/1C rates). We also presented data showing the cell can work at a wide range of temperatures, including results that show cycling at -10°C. We are not aware of any other solid-state battery effort that has shown a solid-state separator capable of cycling for long cycle counts at such high rates of power (rates required for the automotive application) without the need to elevate the operating temperature, compromise cycle life, or compromise other test conditions.

### February 16, 2021 Earnings Call

172.    On February 16, 2021, after the market closed, the Company held its first earnings call as a public company. The question-and-answer portion of the call contained the following interaction between Defendant Singh and John Saager (QuantumScape's director of investor relations):

John Saager: Okay. And our final question, **what makes you feel like you'll have a sustainable cost advantage** over the rest of the industry?

Jagdeep Singh: So in our architecture, we eliminate the traditional carbon or silicon anode entirely, which means we get rid of the anode materials, the anode electrode manufacturing line and the anode formation process, which is a multi-week long process in which a chemical side reaction is allowed to occur between the carbon particle and the liquid electrolyte. As a result, given we believe our separator will be in the same order of magnitude and cost as conventional separators, **we expect that the quantitative approach, what should be lower cost than conventional ion cells at any given manufacturing scale**.

(Emphasis added.)

### February 17, 2021 CNBC Interview

173.    On February 17, 2021, Defendant Singh was interviewed on CNBC's "Squawk on the Street," discussing the Company's fourth quarter earnings for the 2020 Fisal Year. In response to a question about the timing of the Company going public and its production schedule, Defendant Singh responded: "One of the reasons that we went public last **year is because most of the science, most of the chemistry risk is behind us** . . . We feel like the chemistry risk is largely behind us . . . There is no new chemistry involved [with stacking] . . . Those are execution related tasks." (Emphasis added.)

### February 23, 2021 Form 10-K

174.    On February 23, 2021, after the market closed, the Company filed its annual report on Form 10-K for the 2020 Fiscal Year with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Singh, Hettrich, Blome, Buss, Doerr, Leohold, Prinz, Mirro, Straubel, and Saluja. The 2020 10-K was

signed by Defendants Singh and Hettrich and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Singh and Hettrich attesting to the accuracy of the 2020 10-K and that the "information included in this [2020 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company]."

175.    The 2020 10-K was amended twice, once on April 26, 2021, and again on May 7, 2021.

176.    Regarding the Company's technology, the 2020 10-K stated, *inter alia*:

**Solid-State Separator Required to Enable Lithium-Metal Anode**

We believe that a lithium-metal battery requires that the porous separators used in current lithium-ion batteries be replaced with a solid-state separator capable of conducting lithium ions between the cathode and anode at rates comparable to conventional liquid electrolyte while also suppressing the formation of lithium dendrites. While various solid-state separators have been shown to operate at low power densities, such low power densities are not useful for most practical applications. To our knowledge, we are the only company that has been able to demonstrate a solid-state separator for lithium-metal batteries that reliably prevents dendrite formation at higher power densities, such as those required for automotive applications and fast-charging.

We believe that our ability to develop this proprietary solid-state separator will enable the shift from lithium-ion to lithium-metal batteries.

[Image Below]

Verified Shareholder Derivative Complaint

**Our Technology**



\* Catholyte includes an organic gel made of an organic polymer and organic liquid.

Our proprietary solid-state lithium-metal cell represents the next-generation of battery technology.

Our battery cells have none of the host materials used in conventional anodes. In fact, when our cells are manufactured there is no anode; lithium is present only in the cathode. When the cell is first charged, lithium moves out of the cathode, diffuses through our solid-state separator and plates in a thin metallic layer directly on the anode current collector, forming an anode. When the battery cell is discharged, the lithium diffuses back into the cathode.

Eliminating the anode host material found in conventional lithium-ion cells substantially increases the volumetric energy density. A pure lithium-metal anode also enables the theoretically highest gravimetric energy density for a lithium battery system.

Our proprietary solid-state separator is the core technology breakthrough that enables reliable cycling of the lithium-metal anode battery. Without a working solid-state separator, the lithium would form dendrites which would grow through a traditional porous separator and short circuit the cell.

An effective solid-state separator requires a solid material that is as conductive as a liquid electrolyte, chemically stable next to lithium–one of the most reactive elements–and able to prevent the formation of dendrites. Our team worked almost ten years to develop a composition that meets these requirements and to develop the techniques necessary to manufacture the separator material at scale using a continuous process. We have a number of patents covering both the composition of this material and key steps of the manufacturing process.

177.    Reiterating points discussed during the December 8, 2020 Showcase, the 2020 10-K stated: As communicated in our solid-state battery showcase event on December 8, 2020, our single-layer solid-state cells have been extensively tested for power density, cycle life, and

temperature performance. This is the only solid-state cell we are aware of that has been validated to run at automotive power densities by a leading automotive OEM. In addition, we believe our battery technology may provide significant improvements in energy density compared to today's conventional lithium-ion batteries, as shown in the figure below.



178.    In discussing the benefits of the solid-state batteries, the 2020 10-K stated:

**Benefits of Our Technology**

We believe our battery technology will enable significant benefits across battery capacity, life, safety, and fast charging while minimizing cost. We believe these benefits will provide significant value to automotive OEMs by enabling greater customer adoption of their EVs. By solving key pain-points such as 15-minute fast charging, we believe our battery technology will enable the delivery of an EV experience that is significantly more competitive with fossil fuel vehicles than what today's EVs can achieve with conventional batteries.

Our battery technology is intended to meet the five key requirements we believe will enable mass market adoption of EVs:

- Energy density. Our battery design is intended to significantly increase volumetric and gravimetric energy density by eliminating the carbon/silicon anode host material found in conventional lithium-ion cells. This increased energy density will enable EV manufacturers to increase range without increasing the size and weight

of the battery pack, or to reduce the size and weight of the battery pack which will reduce the cost of the battery pack and other parts of the vehicle. For example, we estimate that our solid-state battery cells will enable a car maker to increase the range of a luxury performance EV—with 350 liters of available battery space—from 250 miles (400 km) to 450 miles (730 km) without increasing the size and weight of the battery pack. In the same example, our battery would enable the car maker to increase the maximum power output of such a vehicle from 420 kW to 650 kW without increasing the size of the battery pack. Alternatively, we believe that our solid-state battery cells will enable a car maker to increase the range of a mass market sedan—with 160 liters of available battery space—from 123 miles (200km) to 233 miles (375km) without increasing the size and weight of the battery pack. Similarly, our battery would enable the car maker to increase the maximum power output of such vehicle from 100 kW to 150 kW without increasing the size of the battery pack.

- Battery life. Our technology is expected to enable increased battery life relative to conventional lithium-ion batteries. In a conventional cell, battery life is limited by the gradual irreversible loss of lithium due to side reactions between the liquid electrolyte and the anode. By eliminating the anode host material, we expect to eliminate the side reaction and enable longer battery life. Our latest single-layer prototype cells have been tested to over 1000 cycles (under stringent test conditions, including 100% depth-of-discharge cycles at one-hour charge and discharge rates at 30 degrees Celsius with commercial-loading cathodes) while still retaining over 80% of the cells' discharge capacity. This performance exceeds the cycle life and capacity retention in many EV battery warranties today, which may be to 150k miles to 70% of the cells' discharge capacity.

- Fast charging capability. Our battery technology, and specifically our solid-state separator material, has been tested to demonstrate the ability to charge to approximately 80% in 15 minutes, *significantly faster than commonly used high-energy EV batteries on the market*. In these conventional EV batteries, the limiting factor for charge rate is the rate of diffusion of lithium ions into the anode. If a conventional battery is charged beyond these limits, lithium can start plating on carbon particles of the anode rather than diffuse into the carbon particles. This causes a reaction between the plated lithium and liquid electrolyte which reduces cell capacity and increases the risk of dendrites that can short circuit the cell. With a lithium-metal anode, using our solid-state separator, we expect the lithium can be plated as fast as the cathode can deliver it.

- Increased safety. Our solid-state battery cell uses a ceramic separator which is not combustible and is therefore safer than conventional polymer separators. This ceramic separator is also capable of withstanding temperatures considerably higher than those that would melt conventional polymer separators, providing an additional measure of safety. In high temperature tests of our solid-state separator material with lithium, the separator material remained stable in direct contact with molten lithium without releasing heat externally, even when heated up to 250 degrees, higher than the 180-degree melting point of lithium.

Verified Shareholder Derivative Complaint

- Cost. ***Our battery technology eliminates the anode host material and the associated manufacturing costs, providing a structural cost advantage compared to traditional lithium-ion batteries***. When comparing manufacturing facilities of similar scale, we estimate that eliminating these costs will provide a savings of approximately 17% compared to the costs of building traditional lithium-ion batteries at leading manufacturers.

(Emphasis added.)

### *February 25, 2021 Yahoo! Finance Live*

179.   On February 25, 2021, Singh participated in a Yahoo! Finance Live interview, discussing the December 8, 2020 Showcase, stating:

You'll recall that in December we announced the performance results of our single layer cells, which were sort of record-breaking results. For the first time in 45 years, someone was able to show a solid-state cell ***that was capable of performing under uncompromised test conditions***—high rates of power—long cycle lives—***unelevated temperatures***. All of course with the capabilities of high energy densities and range.

(Emphasis added.)

180.   During the Battery Statements Period, the Individual Defendants and Defendant VGA breached their fiduciary duties by personally making and/or causing the Company to make the materially false and misleading statements referenced in ¶¶ 161-179. Specifically, the statements failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the supposed power, longevity, or energy density that they were being held out as having; (2) the Company did not have, and was extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

### **The Truth Fully Emerges**

### *The April 15, 2021 Scorpion Report*

181.   On April 15, 2021, Scorpion Capital published the Scorpion Report. The Scorpion Report revealed that the Company made several compromises during testing, including cell size, elevated

temperatures, and "pulse tests." As a result of these compromises, the Scorpion Report alleged that QuantumScape made six "Phony Claims" about the battery technology, namely: (1) solid state material is resistant to dendrites; (2) battery performance in low temperatures; (3) fast charging to 80% in under 15 minutes; (4) long battery life to 1000+ charge/discharge cycles; (5) battery life in low temperatures; and (6) aggressive automotive power profiles.

182.   The Scorpion Report revealed one of the compromises is that QuantumScape is using a variety of cell types, sizes, temperatures, and charge rates, as opposed to a single prototype for each test, as illustrated by the following:

| | Fast charge | Dendrite resistance | Battery life | Low temp cycle life | Low temp operation | Power |
|---|---|---|---|---|---|---|
| Prototype size | 70x85mm | Omitted | 70x85mm | 70x85mm | 30x30mm | 30x30mm |
| Configuration | Single layer pouch cell | Li/li symmetric cell | Single layer pouch cell | Single layer pouch cell | Single layer, pouch cell? | Single layer, pouch cell? |
| Charge/ discharge rate | 15 min charge | Varies | 1 hr/1 hr | 5 hr/3 hr | 3 hr/3 hr | 15 min charge |
| Temperature | 30 C | 45 C | 30 C | -10 C | 30 C charge, discharge varies | 45 C |
| Pressure | 3.4 atm | Omitted | 3.4 atm | 3.4 atm | 3.4 atm | 3.4 atm |

Source: https://s26.q4cdn.com/263384136/files/doc_presentation/2021/1/Data-Launch-Updated-Post-Presentation-20210107-2.pdf:

29

183.   A former employee explains how this is uncommon, stating "Their graphs are not consistent. You should be consistent with the cells, same size, from the same batch, or from a different batch with the same size. That's weird to me."

184.   In discussing QuantumScape's dendrite resistance claims, the Scorpion Report cited claims by experts that the Company neglected to mention that the tests were not run with a real battery capable of running in real world conditions. As one expert put it, "This is lithium/lithium. It's not a battery. You just have a thick lithium foil on both sides, and you've got your fancy solid state separator between the two pieces of lithium foil, probably just some pressure on it, and you've warmed it up to 45 C and then

you're driving a small amount of current." Additionally, one expert stated that the cells used by QuantumScape are "useless from a practical point of view."

185.    One former employee of QuantumScape also admitted to the impracticality of the Company's testing, stating:

> In a normal cell, they have a lithium metal-plated anode, and then they have a cathode—but this doesn't have that. With this lithium-lithium symmetric cell testing, they're putting lithium on both sides and passing electricity back and forth. This is giving you the max capability of the separator, the max speed at which it can cycle without destroying the separator. That actually really doesn't tell you too much about the battery. It's telling you the max capability if there is no other restriction, so you just put lithium on both sides and see how fast you can pass it from one side to the other. Of course, when you put it into an actual battery, you're going to have a cathode on the other side and not just a lithium-plated side, or else the battery is not going to hold a real charge. That's what passes electricity back and forth. By doing that, you're not going to get that type of speed. It's like when you do a Wi-Fi speed test to see the max speed. You're never actually going to get that if you start downloading, because it's just showing you the fastest signal step if you tried.

186.    Another employee reiterated those sentiments, stating: "If you want to say you have solved the dendrites problem, you have to show you solved the problem in a real product, in a multiple-layer battery. It's just a single layer. A prototype that has two anode layers, that's not enough. That's academic. That still stays at a university, it's not industry." He continued, "A lithium lithium symmetric cell is not a real battery cell… I don't believe that they have solved dendrite formation in a real battery."

187.    Additionally, it was revealed that QuantumScape used a pulse test to deceptively skew its results in its own favor. One researcher quoted in the report stated that because "[d]endrites form as lithium is subjected to a continuous current over a period of time and of course batteries must operate for continuous periods to do useful things like power a car. The graph that shows QuantumScape's purported dendrite breakthrough cheated by 'pulsing' the current applying current, stopping, applying current, stopping again which is not how batteries operate in the real world."

188.    A second expert said of pulses tests that they are "cheating" because "lithium has a low melting temperature, and pulsing creates electrical resistance that heats the lithium, which causes dendrites to smooth out in the rest period between pulses which 'is not how batteries are operated in the field.' The expert further noted the lack of a voltage spike in the pulsing data as another red flag in the chart, and

wondered what 'other tricks they played during the resting period." In short, "Anyone can 'prevent' dendrites with pulsing but it's not how batteries operate in the real world."

189.    A former research and development employee of QuantumScape stated of the pulse tests:

This test is a pulse test. You can tell that because the bottom green axis—they've got two normalized axes on the bottom. Every length of that pulse is depositing a very finite amount of lithium, and then they do a little bit of lithium plating, and then they increase the current. This is not a good way to judge that you've killed the dendrite problem [laughs] for the simple reason that if you have this in a large vehicle-size battery, a true commercial-size battery, and you really did want to charge the entire battery, not just a little bit of charging, which are these tiny steps, you'd want to charge the whole battery at a current. That's how you would prove this isn't a dendrite.

190.    A second former employee stated of the pulse tests:

That pulse step is so short that it's only taking a few minutes, and it's only depositing a fraction of a micron of lithium. You would have to hold that pulse for the full 15 minutes to prove that it didn't have a short, and you'd have to do that on the device again and again to find out when Volkswagen should void the warranty. That's the real dendrite test. The length of these pulses is still minutes; it's too short. The goal for charging a vehicle at the mall before you drive home would be the whole thing charged in 15 minutes. To really judge, these pulses should be way, way longer, orders of magnitude longer. Maybe this impresses people by saying that you've killed the dendrite problem, but the real proof is doing the test hundreds and hundreds of thousands of times. This is a tiny bit of current on cells for a little bit of time.

191.    The report also makes clear that the temperatures used in analyzing the dendrite resistance were done in impractically high temperatures. The data showing dendrite resistance was based on tests done at 45 degrees Celsius, as opposed to the usual real-world conditions of 30 degrees Celsius (room temperature). As such, the lithium is a significant percentage of the way to its melting point, at which point it is more difficult for dendrites to form in the first place.

192.    One former QuantumScape employee was quoted on this practice as saying:

What they're testing is a single-layer lithium anode battery at 45C, and that's important because 45C is not room temperature. As you can guess, there are some benefits to going higher in the temperature. The battery performs more favorably. It also can discharge and recharge more favorably at 45C versus room temperature…what is going to get the battery to that temperature? Are they putting a heater or something in the car in order to provide that?

193.    Separately when discussing this practice, an expert was quoted as saying:

Lithium's melting point is like 180°C, but if you're a material scientist, you think of everything in terms of Kelvin and what fraction of the melting temperature you're at in

Kelvin. So, by that temperature, you're a pretty high fraction of the melting point. If you're at the melting point, you can't make a dendrite. You also can use NMC as a cathode material, so you can't really run at 180°C. If they chose 30°C, like the other slides, it would be harder to achieve this result.

194.    Additionally, the Scorpion Report takes issue with the size of the cells used in testing the dendrite resistance of QuantumScape's batteries, with one former QuantumScape employee explaining:

Some things died at the coin cell stage. I'm sure you're familiar with this: as you increase the area, it increases the likelihood of failure. If you scale up to a pouch cell level, your barriers get exacerbated because there's just more area that could be potential failures. And a lot of the failures for these types of batteries are dendrites. It just takes one dendrite to fail a cell. So, if you have more area, you have more probability of failure.

195.    An expert who was interviewed stated:

The other question I have is, they call it a single layer, but is it the same area single layer? Why aren't they showing you what kind of a cell it was done in? Like what's the area of this cell that they showed, and how does that compare to the area to their commercial area? The fact that they did it in this very strange format that's not industry-accepted is weird.

196.    Another former QuantumScape employee noted:

30x30cm cells vs. 70x85mm have more rigidity and the ability to not produce dendrites just because they're small. The bigger one—my assumption is, there are clearly certain tests that they found more favorable on this smaller one and they decided to choose the better-looking data for the presentation. 30x30 has less surface area, less interaction, less chance of lithium plating—there are a lot of different things in the science. It's better performing for certain ceramic reasons. I would actually agree 100% [that they're cherry-picking different prototypes for different tests], and the reason why is scalability. There are some inherent benefits to having a smaller wafer.

197.    An additional compromise made by QuantumScape regarding dendrite prevention is that the test had only been run on a single cell, as opposed to data for a group of cells. The Scorpion Report takes note that utilizing a one-time test is a "gimmick," as a large sample of cells would be more realistic to the real-world scenarios. One expert is quoted as stating:

Anyone in this area knows this is just a little R&D test. Their conclusion that "material entitlement exists for full charge in less than 5 minutes." I don't know that I buy that. You've got a 25C rate there, and they're saying; we did this, and dendrites didn't form. Yeah but, you only did that test that one time. And normally, what happens is dendrites grow a little bit on every cycle, and you maybe even reverse them a little bit as you discharge, and then you grow a little more as you charge, but generally, it doesn't go all the way back. So, you do this a number of times, and then failure occurs.

198.    Another expert reiterated these points, stating:

71

Verified Shareholder Derivative Complaint

One of the reasons why is because you have an aging effect. If they just said, we can do 100 mA/cm2, and we're just going to 100mA /cm2 50 times and if they charged, even if they stripped lower, but let's say they charged at 100mA/cm2, then they discharged at a low current and then they did that again and again and again, that is one thing that would convince me, like, okay, this is real, and it's really impressive. The way they've shown it, it's kind of a gimmick.

199.   On the single-cell test, a former QuantumScape employee admitted the following:

Is this a one-time thing, a ten-times thing, or an every time thing? That's unclear. So, you're not sure how many times they had to test until they could get that type of result to put out there. Who knows if the battery can really do that every single time. You would want to see a sample size -this comes back to the fact that you need 200,000 of these to power a car. If you have 1 or 2 or maybe 10 cells that are able to perform this great, that's great; then you should show that data. It shows that your science checks out. If they wanted to make it convincing, they would show 100,000 of these cells that are put in one car, as well as the success rate of all those batteries because in a car, you would really not want more than 1% of the single layers to have a dendrite. If you showed 10 single layer cells and 10 out of 10 are showing no dendrites, that's great…but 10 cells doesn't really power anything.

200.   In discussing the batteries' performance at low temperatures, the Scorpion Report revealed that QuantumScape manipulated the test in its own favor. The Scorpion Report revealed the Company:

[O]nce again resorts to tricks and gimmicks, some buried in the fine print, which indicates that its 3x3cm prototype was actually charged at a sizzling 30 ºC (86 ºF) and only then discharged at a low temperature. Obviously in the real world, cars in cold climates don't have the luxury of being charged in garages or parking lots where the temperature is kept at a sweltering 86 ºF. It appears to us that QS concocted a rather unusual test in order to create a favorable slide headline. Lithium ions move in one direction (cathode to anode) while being charged and then in the opposite direction when discharged. QS seems to admit that it in cold temperatures, it can't move lithium through its solid state separator in both directions –the very definition of a working battery.

201.   In discussing QuantumScape's claims that the batteries can charge to 80% in less than 15 minutes, the Scorpion report revealed that QuantumScape failed to disclose how long it would take to charge a working battery pack. The Scorpion Report also makes clear that charging at that rate will quickly destroy the cell. A former QuantumScape employee was quoted as saying:

If you're charging and discharging fast, the general knowledge is that you're going to degrade faster. The fact that there's no charge rate versus the cycling data at that particular charge rate-so they can say this is how fast it charges, and then they're showing cycling data from a cell that's at a slower charge rate. You have to connect those two. It's easy to stick those in separate slides.

202.     A solid-state drive expert also was quoted as saying:

On slide 17 [of the December 8, 2020 Showcase], you get that fast-charging graph there, and they're showing less than a 15-minute charge, and that's good, but what's not clear at all in this is you can do that one time. The thing is, you can probably just go in the lab and put together current, any old lithium-ion configuration and force it to charge that fast, and it would not fail immediately. It's like, yeah; you can do this once, can you do it every time you charge a vehicle during its 200,000 life? I don't know the answer based on this data. If they had it, it would be here…. How many times can you do that before something bad happens? If it's thousands of times, fantastic. But is it really just like a couple of times?

203.     In discussing QuantumScape's claims that the batteries have a life cycle of over 1,000 charge cycles, the Scorpion Report revealed that the results were due to QuantumScape not using a real-world battery, but instead a tiny cell. In sum, the Scorpion Report states the Company:

[O]nce again hides the actual capacity the battery is charged to in its simulation. . . A solid-state expert used the fine print in QuantumScape's slides to calculate that the actual capacity of its prototype is about 200mAh or about 1/3 the capacity of a typical hearing aid battery. In other words, QuantumScape claims to exceed the "commercial target" for cycle life for an electric vehicle battery but by cycling a battery with a microscopic capacity.

204.     This reporting method, according to a solid-state battery expert, raises "[d]efinite red flag[s]," as it fails to adhere to industry standards or report "how much capacity is left." Further, the expert took note that the "Department of Energy doesn't even allow cycle life data this nebulous" because companies are "not allowed to use percentages." In calculating the actual capacity of the prototype using the Company's data, the expert revealed a finding of "about 1/3 the capacity of a typical hearing aid battery." Essentially, "QuantumScape claim[ed] to exceed the 'commercial target' for cycle life for an electric vehicle battery – but by cycling a battery with a microscopic capacity."

205.     The Scorpion Report later states:

Experts indicate it's a common form of cheating when making battery claims, as at low energy loadings a cell can last forever. Cycle life is one of the most important items reported for any battery. The more often a battery is charged and discharged, the shorter its lifespan, as each battery has a certain number of charge/discharge cycles in its useful life. "Depth of discharge" (DoD)is the percentage of a battery's energy that has been used up before recharging, e.g., 80% DoD on a 10kWh battery is 8kWh. Here's the rub: a battery may last 1,000 cycles at a low 10% DoD, but only 200 cycles at 80% DoD. Hence, battery performance data is meaningless unless BOTH 1) the total, actual level of charge is reported vs. just a percentage, as well as 2) the Depth of Discharge used for the cycle life test. We see neither in the QS data.

206.    In discussing QuantumScape's claims about its battery life in low temperatures, the Scorpion Report claimed that the results were misleading as the results could only have been possible if the respective discharge energies were not measured against their actual capabilities, but instead against some arbitrary lower figure. As one expert put it, "[i]f you plot the data like this, that means they don't want us to see the statistical variations."

207.    Lastly, in discussing QuantumScape's claims about it's "aggressive automotive power profiles," the Scorpion Report reveals that the Company's test battery is no better than 'today's best lithium-ion cells" and the data had been manipulated through the use of the "pulse test." As the report states:

> If one zooms in to the "track cycle" data, it appears to use short pulses of merely 5-10 seconds each, each one presumably a lap around a simulated racetrack. A solid-state researcher slammed the data as non-standard and "a huge problem" as batteries need to deliver constant current for long periods vs. 5-10 second bursts.

208.    The Scorpion Report quotes one solid-state battery researcher, who stated:

> The other thing we can see is current density of -20 while on the positive side it's only a 7 or 8. It's very asymmetric. So, it means plating and depositing. I don't understand the reason why this profile is demonstrated. I don't even know what positive and negative means. But basically, you're depositing and stripping mass. I don't know why this cycling performance is considered cumulative track cycles in terms of laps because, again, nobody in our field is using this type of protocol to show data because when we show cycle data, it's usually 80% depth of charge under constant current conditions and how long it can cycle and we say 20% depth of charge.

209.    Further, in discussing the results shown in the December 8, 2020 Showcase, one solid-state battery researcher stated:

> The silicon-carbon cell performance in slide 19, I think again you see the discharge energy is in percentage, which really, really worries me because lithium-ion cells do not look like that at all. If you look at some of the Sila Nanotechnology data, 1000 cycles is very flat. They always pick a bad cell to compare their cell to. The gray reference is not state of the art carbon anode.

210.    On news of this report, the Company's share price declined by approximately 12.2%, or $5.00, from closing at $40.85 per share on April 14, 2021, to closing at $35.85 per share on April 15, 2021.

**The Discriminatory Misconduct**

***Recent Social Justice Corporate Initiatives***

211.    In the face of decades of underrepresentation at the highest levels of corporate America, recently, and in light of the fact that even now women only make up 23.3% of directors globally,[9] there has been a more concerted effort to elevate qualified women to the boards and upper management of public companies. Companies such as "Arconic, Bayer, Comcast, Covestro, Eaton, First Commonwealth Financial, GNC, Range Resources, TriState Capital Holdings, Wabtec, Wesco International and Koninklijke Philips" have all added female directors during the Relevant Period.[10] As one corporate general counsel put it, "[w]e try to educate boards that having diverse members isn't just the right thing to do; it's the right thing to do because diverse boards deliver better returns to shareholders."[11] Outside the U.S., countries such as Belgium, France, Germany, Norway, and the United Arab Emirates, to name a few, have imposed requirements that their companies maintain minimum number of women on corporate boards. Still, the Individual Defendants and Defendant VGA have failed to nominate and appoint a female director to the Board until February 2022.

212.    In addition, while the Individual Defendants and Defendant VGA caused QuantumScape to adopt discriminatory policies and fail to keep up with the times, the rest of corporate America, including the tech industry,[12] publicly condemned racism as well as implemented social justice initiatives at a rapid pace. These efforts were taken to combat systemic racism in America and respond to public outrage over the murders of, among many others, George Floyd, Breonna Taylor, and Ahmaud Arbery.[13] For instance: (1) Microsoft, Intel, and Johnson & Johnson pledged to tie executive pay to certain diversity figures; (2) Google pledged to increase the representations of Black and other underrepresented groups at senior

---

[9] https://www2.deloitte.com/us/en/insights/topics/leadership/women-in-the-boardroom.html. Last visited October 23, 2024.
[10]    https://www.post-gazette.com/business/career-workplace/2020/07/27/Women-corporate-boards-directors-diversity-inclusion-Pittsburgh/stories/202007260028. Last visited October 23, 2024.
[11]  *Id.*
[12]https://www.cio.com/article/3570512/how-top-tech-companies-are-addressing-diversity-and-inclusion.html?page=2. Last visited October 23, 2024.
[13]https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/?sh=e62ec4172148. Last visited October 23, 2024.

employment levels 30% by 2025; (3) Apple, even in the five years preceding the Relevant Period, increased its hiring of women and historically underrepresented groups in tech from 21% in 2014 to 31% in 2018, and committed to "increase representation in leadership across the company[]"; (4) PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; (5) Adidas committed to filling 30% of new positions with Black or Latino workers; and (6) Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-White board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp.

213.     Moreover, Goldman Sachs announced that, effective July 1, 2020, the investment bank would refuse to help companies based in the U.S. or Europe that are without at least one "diverse" board member go public. Further, given the research that shows that performance is "significantly better" for companies with at least one diverse board member, David Solomon, Goldman Sachs' CEO, stated that "I think [having a "diverse" board] is the best advice for companies that want to drive premium returns for their shareholders over time."

214.     In blatant contrast, QuantumScape refused to make a concerted effort to elevate women, nor did it made any sort of showing of solidarity with the Black Lives Matter movement. Instead, the Company remained noticeably on the sidelines amongst the slew of companies that pledged to implement changes to increase diversity, particularly female, Black and Hispanic representation, in corporate America.

215.     In fact, on December 31, 2023, the Nasdaq implemented a rule requiring listed Companies to have diverse boards or explain why they don't.[14] According to *Reuters* at the time the rule was first proposed, the Nasdaq operator said that "over two dozen studies found an association between diverse boards and better financial performance and corporate governance."[15]

---

[14]https://news.bloomberglaw.com/esg/contested-nasdaq-board-diversity-rules-take-effect-explained. Last visited October 23, 2024.
[15]https://www.reuters.com/article/us-nasdaq-sec-diversity/nasdaq-proposes-board-diversity-requirement-for-listed-companies-idUSKBN28B58Q. Last visited October 23, 2024.

216. Following the rule's initial proposal, on January 7, 2021, *Bloomberg Law* reported other tech companies such as Facebook and Microsoft had thrown their support behind the Nasdaq's diversity plan, urging the SEC to approve the proposal to increase diversity on corporate boards.

217. Goldman Sachs's policy change and the Nasdaq's rule only serve to emphasize the importance of board diversity and compliance with antidiscrimination policies to maximize shareholder value and investor protection and also improve corporate decision making and the monitoring of management. These market changes therefore highlight the significance of QuantumScape's lack of diversity on its Board resulting from the Discriminatory Misconduct.

218. During the Relevant Period, the following individuals comprised QuantumScape's Board, none of whom is female, Black, or Hispanic: Defendants Singh, Blome, Buss, Doerr, Leohold, Mirro, Prinz, Straubel, Saluja, and nonparty Wiese.

219. Moreover, the following individuals made up QuantumScape's executive management team, none of whom is female, Black, or Hispanic: CEO Defendant Singh, CFO Defendant Hettrich, CTO Defendant Holme, Chief Development Mohit Singh, Chief Sales Officer Howard Lukens, Vice President – Sales Jay Underwood, Chief Marketing Officer Asim Hussain, and Chief Legal Officer Michael McCarthy.

### *False and Misleading Statements Concerning the Company's Diversity Efforts*

220. As discussed above, on December 17, 2020, QuantumScape filed the Registration Statement with the SEC. The Registration Statement was signed by Defendants Singh, Hettrich, Blome, Buss, Doerr, Leohold, Prinz, Mirro, Straubel, and Saluja. In addition to those false and misleading statements detailed above, the Registration Statement also stated: "We seek team members who want to help solve a significant problem that will positively impact the world. ***We value diversity and recognize the importance of fostering a positive, inclusive culture. As such, we have actively taken steps towards eliminating unconscious bias in our hiring and promotion processes*** while enabling us to add and promote team members who demonstrate behaviors aligned with our values ('What we promote when we promote')." (Emphasis added.)

221.    On December 28, 2020, the amended Registration Statement repeated the false and misleading claim that: "We seek team members who want to help solve a significant problem that will positively impact the world. ***We value diversity and recognize the importance of fostering a positive, inclusive culture. As such, we have actively taken steps towards eliminating unconscious bias in our hiring and promotion processes*** while enabling us to add and promote team members who demonstrate behaviors aligned with our values ('What we promote when we promote')." (Emphasis added.)

222.    On December 30, 2020, the following twice-amended Registration Statement still repeated the false and misleading claim that: "We seek team members who want to help solve a significant problem that will positively impact the world. ***We value diversity and recognize the importance of fostering a positive, inclusive culture. As such, we have actively taken steps towards eliminating unconscious bias in our hiring and promotion processes*** while enabling us to add and promote team members who demonstrate behaviors aligned with our values ('What we promote when we promote')." (Emphasis added.)

223.    The next day, on December 31, 2020, the Prospectus continued to repeat the false and misleading claim that: "We seek team members who want to help solve a significant problem that will positively impact the world. ***We value diversity and recognize the importance of fostering a positive, inclusive culture. As such, we have actively taken steps towards eliminating unconscious bias in our hiring and promotion processes*** while enabling us to add and promote team members who demonstrate behaviors aligned with our values ('What we promote when we promote')." (Emphasis added.)

224.    During the Relevant Period, the Individual Defendants and Defendant VGA breached their fiduciary duties by personally making and/or causing the Company to make the materially false and misleading statements referenced in ¶¶ 211-223. Specifically, the statements failed to disclose, *inter alia*, that the Company did not "value diversity and recognize the importance pf fostering a positive, inclusive culture." Moreover, the statements failed to disclose that the Company had taken woefully insufficient steps towards eliminating bias in its hiring and promotion process, especially since it had *zero* female, Black, or Hispanic individuals represented in either the Board or the executive management team. As a

result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

***Individual Defendants and Defendant VGA Cause the Company to Violate Cal. Corp. Code § 301.3***

225.    Moreover, as another part of the Discriminatory Misconduct, the Individual Defendants and Defendant VGA caused the Company to be in violation of Cal. Corp. Code § 301.3. That provision states, in relevant part, that: "No later than the close of the 2019 calendar year, a publicly held domestic or foreign corporation whose principal executive offices, according to the corporation's SEC 10-K form, are located in California shall have a minimum of one female director on its board." It further establishes that "[t]he Secretary of State may adopt regulations to implement this section. The Secretary of State may impose fines for violations of this section…." Initial fines for violating the statute are $100,000 and subsequent fines are $300,000.

226.    On each of its SEC filings since November 27, 2020, which is to say after "the close of the 2019 calendar year" the Company—a publicly held company whose shares are traded on the NYSE—lists its principal executive offices as being located at 1730 Technology Drive, San Jose, California 95110.

227.    Moreover, at the end of the Relevant Period, the Board consisted of ten males—Defendants Singh, Prinz, Blome, Buss, Doerr, Leohold, Mirro, Saluja, Straubel, and nonparty Wiese—and no females. This is true despite Defendant VGA adding the latest director, Wiese, to the Board on January 14, 2021.

228.    In fact, no female would be added to the Board for at least another year after the addition of Wiese.

229.    Individual Defendants and Defendant VGA breached their fiduciary duties to the Company by causing it, willfully or recklessly, to be in violation of Cal. Corp. Code § 301.3 and subjecting it to potential liability thereunder.

***Lack of Term Limits as Cause for Concern and Method to Discriminate***

230.    According to a report by the Harvard Law School Forum on Corporate Governance, longer-tenured directors do not serve the best interests of the Company. The report stated the following, in relevant part:

Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors*** (***one-third of whom each own or manage assets in excess of $100 billion***) ***who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern***, ***53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.

(Emphasis added.)

231. Upon information and belief, the Company does not limit the number of consecutive terms that a director is able to serve on the Board. Therefore, contrary to any supposed benefit upon which the Company's antiquated policy is based upon, the benefit to the Company from nominating and electing new directors with new ideas and viewpoints from individuals with diverse backgrounds on the Board far outweigh any potential drawback of losing a longstanding director. Longstanding directors are less likely to ask tough questions and challenge proposals of management and fellow directors, given their long-tenure and personal or professional relationships with executive officers and other directors. In fact, new, diverse directors not only have been found to bring a diversity of opinions and philosophy to the board, but also a diversity of behavior, i.e., a willingness to challenge management and other directors which generates better fact-based decision making. Thus, the Individual Defendants and Defendant VGA breached their fiduciary duties to the Company by failing to implement term limits in an effort to maintain control of the Company by avoiding the addition of diverse candidates to the Board to the detriment of the Company.

## DAMAGES TO QUANTUMSCAPE

232. As a direct and proximate result of the Individual Defendants' and Defendant VGA's misconduct, QuantumScape has lost and will continue to lose and expend many millions of dollars.

233. Such expenditures include, but are not limited to, fees associated with the three Securities Class Actions filed against the Company and the Company's former CEO, including one of the three Securities Class Actions which is also filed against the Company's CFO, CTO, Defendant Prinz, and

Defendant VGA, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

234.    Additionally, these expenditures include, but are not limited to, lavish compensation, benefits, and other payments provided to the Individual Defendants and Defendant VGA who breached their fiduciary duties to the Company.

235.    Such expenditures include, but are not limited to, legal fees and other costs associated with the defense of any potential investigations of and/or lawsuits related to the Discriminatory Misconduct, and the loss of talent due to the Company's engagement in the Discriminatory Misconduct. Such expenditures further includes any potential fines for violating state or federal laws related to the Discriminatory Misconduct.

236.    As a direct and proximate result of the Individual Defendants' and Defendant VGA's conduct, QuantumScape has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' and Defendant VGA's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

237.    Plaintiffs bring this action derivatively and for the benefit of QuantumScape to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' and Defendant VGA's breaches of their fiduciary duties as directors and/or officers of QuantumScape, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

238.    QuantumScape is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

239.    Plaintiffs are, and have been at all relevant times, shareholders of QuantumScape. Plaintiffs will adequately and fairly represent the interests of QuantumScape in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND REFUSED ALLEGATIONS

240. On August 4, 2021, Plaintiffs served the pre-suit Demand sent on the Board, attached hereto as Exhibit A.

241. Plaintiffs demanded the Board investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for wrongdoing involving the lack of meaningful diversity and Discriminatory Misconduct between December 17, 2020 and continuing to the present, including false representations in SEC filings and governance documents about workforce diversity at both the Board level and in management, violation of antidiscrimination laws by repeatedly refusing to nominate female/Black/Hispanic people on the Board and management.

242. The Demand alleged that certain of the Individual Defendants unjustly enriched themselves by pocketing several million dollars in unwarranted compensation and signing off on the SPO documents, among other things, where false statements were made.

243. On August 10, 2021, counsel for the Company wrote Plaintiffs' counsel via email stating nothing more than that the Company received the Demand and reserved all rights. See Exhibit B attached hereto.

244. Plaintiffs sent the Supplemental Demand on January 19, 2022, having heard nothing further about the Board's purported consideration of the Demand to inquire further about the claims made in the Demand, and to assert additional claims for misconduct that took place during an overlapping time period raised in the Demand, attached hereto as Exhibit C. The Supplemental Demand added allegations regarding improper insider selling and false statements about QuantumScape's technology and competitive standing, including its partnership with Volkswagen. The motion to dismiss had already been denied in large part in the related Securities Class Action when the Supplemental Demand was made.

245. On March 14, 2022, the WSGR, on the Board's behalf, issued the 15-page, highly litigious Refusal, which solely concerned Plaintiffs' diversity and discrimination allegations, attached hereto as Exhibit D. In a footnote, the Refusal maintained that the Board would separately address the other claims raised in the Supplemental Demand, though Plaintiffs heard nothing further from that point about the Demands.

246.    The Refusal made no mention about the independence of the members of the Nominating and Corporate Governance Committee—or its chosen counsel, WSGR, in connection with their purported investigation into the Demand. In fact, that is because WSGR was conflicted, and the Demand concerned allegations directly aimed at the same individuals that served on the Nominating and Corporate Governance Committee at the time, although their names were conveniently left out of the Refusal. Nonetheless, the goal of the Board was clear from the start when it sent conflicted counsel to engage with Plaintiffs and ignored its duty to investigate the Supplemental Demand altogether until at least the members of the Board could save face in case of any liability in relation. Utilizing Company counsel and planning the scope of work that was tainted by a defense-oriented view from the start does not support an appropriate process for truly considering and responding to the Demands consistent with what Delaware law requires. Even more so when the entire Board unanimously adopts the determinations of conflicted counsel about the issues raised in the Demands—including entirely ignoring the Supplemental Demand.

247.    The Refusal, penned by WSGR, relies on interviews conducted with Company management and, purportedly, "women at different levels within the Company" and claims that the "overall sentiment among the interviewees was that QuantumScape has a positive work environment, where diversity is valued." The Refusal further emphasizes the one female whose tenure on the Board lasted little more than one month to support that the Company complied with Cal. Corp. Code § 301.3 in 2021. However, the Board and Company's own actions support that the Demand had merit, as after receiving the Demand and just before issuing the Refusal, the Board quietly appointed three new female directors to the Board, one of whom was also African American. Tellingly, the Refusal made no mention of this, and the Company's proxy statement filed a few months after the Refusal included a diversity matrix—highlighting the new composition of the Board. If such efforts were truly good faith responses to the Refusal, it would have been clear. Instead, the only action taken by the Board has been to cover its bases, and shirk its duties, expecting that its improper investigation and efforts in response to the Demand would inevitably lead to litigation to protect QuantumScape from further mismanagement, among other things.

Verified Shareholder Derivative Complaint

248.     It is also entirely unclear how WSGR was even selected, why the task of investigating the Demand was given to the Nominating and Corporate Governance Committee, or whether the Board considered potential conflicts and took any measures to ensure that the review process was sufficiently independent. As the Board merely relied in full on WSGR's purported conclusions, at least some of which were legally drawn based on case law concerning demand futility issues—not at issue here, it could not have reasonably concluded that the chances of obtaining any significant monetary recovery for the Company was so unlikely such that pursuing the Demand or even further investigating the claims was not in the Company's interests. To make such a determination, the Board would have needed to be adequately informed about the factual foundations for the claims and any defenses. The Board's Refusal and subsequent correspondence with Plaintiffs' counsel makes clear that this was not the case.

249.     Such action is not the reflection of any good faith exercise of business judgment. Plaintiffs thus consider their Demand wrongfully refused. Moreover, the failure to investigate a demand reflects the gross negligence of the Board and its failure to act in good faith, with due care, and with loyalty to the Company and the Board's attitude towards the Demands that is entirely inconsistent with Delaware law.

250.     Thus, the Board has also wrongfully refused the Supplemental Demand. As the Board failed to follow up at all on the charges made in the Supplemental Demand, and did not secure tolling agreements in connection with any possible claims, the Company is not protected against the running of any potential statute of limitations and the Board has clearly refused to adhere to its baseline duties to investigate the potential claims on behalf of the Company given the damage wrought to QuantumScape.

251.     The Board's decisions ultimately fall far outside the bounds of any presumptively reasonable exercise of business judgment. Therefore, Plaintiffs' Demands have been wrongfully refused and Plaintiffs bring this action to prevent irreparable harm to the Company.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## FIRST CLAIM

### Against the Individual Defendants and Defendant VGA for
### Breach of Fiduciary Duties

252.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

253.    Each Individual Defendant and Defendant VGA owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of QuantumScape's business and affairs.

254.    Each of the Individual Defendants and Defendant VGA violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

255.    The Individual Defendants' and Defendant VGA's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants and Defendant VGA intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of QuantumScape.

256.    In breach of their fiduciary duties owed to QuantumScape, the Individual Defendants and Defendant VGA willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) QuantumScape's lithium-metal solid-state batteries did not have the power, longevity, or energy density that they were being held out as having; (2) the Company does not have, and is extremely unlikely to soon develop, the ability to adapt their batteries to be readily usable in electric vehicles; (3) as a result of the foregoing, the statements complained of herein about the Company's business and prospects were materially false and misleading at the time they were made; and (4) the Company failed to maintain adequate internal controls. As a result of the foregoing, QuantumScape's public statements were materially false and misleading at all relevant times.

257.    The Individual Defendants and Defendant VGA failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while at least four and as many as eight of the Individual Defendants and Defendant VGA sold shares at inflated

prices in the SPO, which renders them personally liable to the Company for breaching their fiduciary duties.

258.    Also in breach of their fiduciary duties, the Individual Defendants and Defendant VGA caused the Company to fail to maintain internal controls.

259.    The Individual Defendants and Defendant VGA had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants and Defendant VGA had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of QuantumScape's securities.

260.    The Individual Defendants and Defendant VGA had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants and Defendant VGA had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of QuantumScape's securities. The Individual Defendants and Defendant VGA, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

261.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

262.    As a direct and proximate result of the Individual Defendants' and Defendant VGA's breaches of their fiduciary obligations, QuantumScape has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

263.    Plaintiffs on behalf of QuantumScape have no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants and Defendant VGA for Breach of Fiduciary Duties Related to the Discriminatory Misconduct**

264.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

265.    Each Individual Defendant and Defendant VGA owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of QuantumScape's business and affairs.

266.    Each of the Individual Defendants and Defendant VGA violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

267.    The Individual Defendants' and Defendant VGA's conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.

268.    The Individual Defendants and Defendant VGA intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of QuantumScape.

269.    In further breach of their fiduciary duties, the Individual Defendants and Defendant VGA either engaged in, or allowed the Company to engage in the Discriminatory Misconduct.

270.    In breach of their fiduciary duties owed to QuantumScape, certain of the Individual Defendants and Defendant VGA willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose the Discriminatory Misconduct.

271.    The Individual Defendants and Defendant VGA also failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

272.    Also in breach of their fiduciary duties, the Individual Defendants and Defendant VGA failed to maintain internal controls.

273.    Moreover, the Individual Defendants and Defendant VGA had actual or constructive knowledge that they had caused the Company to violate Cal. Corp. Code §301.3, in breach of their fiduciary duties.

274.    The Individual Defendants and Defendant VGA had actual or constructive knowledge that the Company issued materially false and misleading statements relating to the Discriminatory Misconduct, and they failed to correct the Company's public statements and representations. The Individual Defendants and Defendant VGA had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of QuantumScape's securities, and disguising insider transactions.

275.    The Individual Defendants and Defendant VGA had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants and Defendant VGA had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of engaging in and concealing the Discriminatory Misconduct and thereby artificially inflating the price of QuantumScape's securities. The Individual Defendants and Defendant VGA, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

276.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

277.    As a direct and proximate result of the Individual Defendants' and Defendant VGA's breaches of their fiduciary obligations, QuantumScape has sustained and continues to sustain significant

damages. As a result of the misconduct alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

278.    Plaintiffs on behalf of QuantumScape have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants and Defendant VGA for Unjust Enrichment

279.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

280.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants and Defendant VGA were unjustly enriched at the expense of, and to the detriment of, QuantumScape.

281.    The Individual Defendants and Defendant VGA either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from QuantumScape that was tied to the performance or artificially inflated valuation of QuantumScape, or received compensation or other payments that were unjust in light of the Individual Defendants' and Defendant VGA's bad faith conduct.

282.    Plaintiffs, as shareholders and representatives of QuantumScape, seek restitution from the Individual Defendants and Defendant VGA and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants and Defendant VGA due to their wrongful conduct and breach of their fiduciary and contractual duties.

283.    Plaintiffs on behalf of QuantumScape have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants and Defendant VGA for Abuse of Control

284.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

285.    The Individual Defendants' and Defendant VGA's misconduct alleged herein constituted an abuse of their ability to control and influence QuantumScape, for which they are legally responsible.

286.    As a direct and proximate result of the Individual Defendants' and Defendant VGA's abuse of control, QuantumScape has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

287.    Plaintiffs on behalf of QuantumScape have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants and Defendant VGA for Gross Mismanagement

288.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

289.    By their actions alleged herein, the Individual Defendants and Defendant VGA, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of QuantumScape in a manner consistent with the operations of a publicly-held corporation.

290.    As a direct and proximate result of the Individual Defendants' and Defendant VGA's gross mismanagement and breaches of duty alleged herein, QuantumScape has sustained and will continue to sustain significant damages.

291.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants and Defendant VGA are liable to the Company.

292.    Plaintiffs on behalf of QuantumScape have no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants and Defendant VGA for Waste of Corporate Assets

293.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

294.    The Individual Defendants and Defendant VGA caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

295.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants and Defendant VGA have caused QuantumScape to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

296.    As a result of the waste of corporate assets, the Individual Defendants and Defendant VGA are each liable to the Company.

297.    Plaintiffs on behalf of QuantumScape have no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Singh, Prinz, Holme, Hettrich, and VGA for Contribution**

**Under Sections 10(b) and 21D of the Exchange Act**

298.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

299.    QuantumScape, and Defendant Singh, are named as defendants in all three of the Securities Class Actions, and Defendants Prinz, Holme, Hettrich, and VGA are named as defendants in one of the three Securities Class Actions, which each assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Singh's, Prinz's, Holme's, Hettrich's, and VGA's willful and/or reckless violations of their obligations as controlling shareholder, officers, and/or directors of QuantumScape.

300.    Defendants Singh, Prinz, Holme, Hettrich, and VGA because of their positions of control and authority as CEO, director, CTO, CFO, and controlling shareholder of QuantumScape, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of QuantumScape, including the wrongful acts complained of herein and in the Securities Class Actions.

301.    Accordingly, Defendants Singh, Prinz, Holme, Hettrich, and VGA are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

302. As such, QuantumScape is entitled to receive all appropriate contribution or indemnification from Defendants Singh, Prinz, Holme, Hettrich, and VGA.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants and Defendant VGA as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of QuantumScape, and that Plaintiffs are an adequate representative of the Company;

(b)    Declaring that the Individual Defendants and Defendant VGA have breached and/or aided and abetted the breach of their fiduciary duties to QuantumScape;

(c)    Determining and awarding to QuantumScape the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants and Defendant VGA, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing QuantumScape, the Individual Defendants, and Defendant VGA to take all necessary actions to reform and improve QuantumScape's corporate governance and internal procedures to comply with applicable laws and to protect QuantumScape and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of QuantumScape to nominate at least five candidates for election to the Board, including at least two women and at least two Black or Hispanic individuals;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

4. a proposal to establish a fund to hire women, Black, Hispanic, and individuals and other minorities, promote women, Black and Hispanic individuals, and other minorities to more management positions at the Company, establish and maintain a mentorship program at QuantumScape for women, Black and Hispanic individuals and other minorities that is committed to providing the skills and mentorship necessary to succeed at the Company;

5. a proposal to establish and require annual training of QuantumScape's entire Board and all executive officers, which training should focus at a minimum on diversity, antidiscrimination, and affirmative action, as well as other relevant topics; and

6. a proposal to adopt a revised executive compensation program that ties 30% of executives' compensation to the achievement of certain specified diversity goals.

(e)      Awarding QuantumScape restitution from Individual Defendants and Defendant VGA, and each of them;

(f)      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Verified Shareholder Derivative Complaint

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: October 24, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Laurence M. Rosen*
Laurence M. Rosen, Esq., SBN 219683
355 S. Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiffs*

94

**<u>VERIFICATION</u>**

I, John Gonzalez, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 10/9/2024 __ day of , 2024.

Signed by:

John Gonzalez
49D190493B59458...

John Gonzalez

## <u>VERIFICATION</u>

I, Matthew Cannella, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this __ day of September, 2024.

10/22/2024

DocuSigned by:

*Matthew Cannella*

65B352F2E70940D...

Matthew Cannella

# EXHIBIT A



## The Rosen Law Firm

### INVESTOR COUNSEL

Phillip Kim
pkim@rosenlegal.com

August 4, 2021

**VIA FEDEX**
The Board of Directors
QuantumScape Corporation
1730 Technology Drive
San Jose, CA 95110

**Re:     Shareholder Demand on QuantumScape Corporation's Board of Directors**

Dear Directors of the Board:

We represent John Gonzalez and Matthew Cannella (the "Shareholders"), who own shares of common stock of QuantumScape Corporation ("QuantumScape" or the "Company").

We hereby demand that the Company's Board of Directors (the "Board") take action against certain current and/or former officers and directors of the Company, including, at least, Jagdeep Singh, Kevin Hettrich, Fritz Prinz, Frank Blome, Brad Buss, John Doerr, Jürgen Leohold, Justin Mirro, Dipender Saluja, J.B. Straubel, and Jens Wiese (collectively, the "Officers and Directors") and any other individuals or entities that engaged in the wrongdoing as set forth below.

By reason of their positions as officers and/or directors of QuantumScape, and because of their ability to control its business and corporate affairs, the Officers and Directors owed QuantumScape and its shareholders fiduciary obligations of good faith, loyalty, and due care. They were and are required to use their utmost ability to control and manage the Company in a fair, just, and honest manner.  Moreover, they were and are required to act in compliance with all applicable federal, state and local laws, rules, and regulations.  Similarly, they were and are required to remain informed as to how QuantumScape conducts its business and corporate affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiries in connection therewith, and take steps necessary to correct such conditions, policies, or practices, and make such public disclosures as necessary to comply with all applicable laws.

As explained below, the Shareholders believe that the Officers and Directors violated these fiduciary duties and/or aided and abetted such breaches of fiduciary duties and were unjustly enriched to the detriment of the Company. Accordingly, QuantumScape must bring an action against them seeking damages and restitution. In addition, the Company must adopt corporate governance improvements immediately.

Shareholder Demand on QuantumScape Corporation's Board of Directors
August 4, 2021
Page 2 of 7 Pages

## I. FACTUAL BACKGROUND

QuantumScape is a San Jose-based company that develops and sells specialized lithium-metal solid-state batteries for use in electrical vehicles as well as other applications.  As of December 31, 2020, the Company had over 250 employees.

Despite QuantumScape claiming in its Code of Conduct that it "prohibits discrimination against or harassment of any team member on the basis of race, . . . color, ethnic or national origin, sex . . . nationality, national origin, ancestry, . . . gender. . . or any other basis or classification protected by applicable federal, state or local law," QuantumScape's Board is among the few publicly traded companies in the United States that has a total lack of female, Black, or Hispanic individuals on its Board or among its executive management team ("Management"). Moreover, while the Company's Nominating and Corporate Governance Committee Charter ("N&CG Charter") states that among the criteria it seeks in director candidates is "diversity with respect to . . . race, ethnicity, [and] gender," the Officers and Directors have not caused the Company to have any Black or Hispanic directors or to have any female directors for a meaningful amount of time.

Despite this lack of diversity, as early as December 17, 2020, and continuing to the present (the "Relevant Period"), the Officers and Directors made false representations in the Company's Securities and Exchange Commission ("SEC") filings, on the Company's website, and in corporate governance documents that QuantumScape is committed to workforce diversity—including with respect to Board composition and hiring and promotion policies—while acting in opposition to those statements. The Officers and Directors have further caused QuantumScape to violate federal and state laws regarding diversity and antidiscrimination by repeatedly refusing to nominate, appoint, and/or hire female, Black, or Hispanic individuals to the Board and/or Management. Instead, the Company had one female director for just over a month before reverting back to a completely male Board, has a Management team of only men, and has had no Black or Hispanic individuals on the Board or in Management throughout the Relevant Period. In violation of the Company's stated antidiscrimination policies, as well as federal and state law, the Officers and Directors have caused the Company to engage in prohibited sex and race discrimination (collectively, the "Discriminatory Misconduct"). The Company's Board assumes accountability for ensuring that QuantumScape follows federal and state laws, and its own policies, that prohibit sex and race discrimination. While diversity is a strong indicator of effective nondiscrimination policies, a lack of diversity is a compelling signal that the Company does, in fact, discriminate.

In contrast to the Officers and Directors causing QuantumScape to adopt discriminatory policies and to fail to meet its legal obligations regarding diversity and antidiscrimination, a multitude of other companies have been publicly condemning racism and rapidly implementing initiatives combating illegal discrimination—or even the specter of illegal discrimination—among their ranks. This has been particularly true following months of public outrage over the murders of, among too many others, George Floyd, Breonna Taylor, and Ahmaud Arbery. For instance: (1) Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to certain diversity figures; (2) Google has pledged to increase the representation of Black individuals and those from other underrepresented groups at senior employment levels by 30% by 2025; (3) PepsiCo

Shareholder Demand on QuantumScape Corporation's Board of Directors
August 4, 2021
Page 3 of 7 Pages

announced a five-year, $400 million initiative that includes the objective of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers; (4) Adidas committed to filling 30% of new positions with Black or Latino workers; (5) Alexis Ohanian, the cofounder of Reddit, resigned from Reddit's all-White board, advocated that his seat be filled by a Black individual, and further pledged to use future gains on his Reddit stock to serve the Black community, beginning with Colin Kaepernick's Know Your Rights Camp; and (6) Verizon announced a new responsible marketing action plan which included, among other things, a commitment to increase spending with diverse-owned video, experiential, and print production companies.

Moreover, Goldman Sachs announced that, effective July 1, 2020, the investment bank would refuse to help U.S.- or Europe-based companies go public if they are without at least one diverse board member. Further, given the research that shows that financial performance is "significantly better" for companies with at least one diverse board member, David Solomon, Goldman Sachs' CEO, stated that "I think [having a diverse board] is the best advice for companies that want to drive premium returns for their shareholders over time."

As just one example of this research, a 2018 report by McKinsey & Company ("McKinsey")[1] found that companies with diverse leadership were more likely to financially outperform average profitability compared to companies with nondiverse leadership. McKinsey attributes this correlation to the fact that companies with diverse leadership attract and retain better talent, improve their decisionmaking processes, increase innovation and insight into customer behavior, enjoy deeper employee satisfaction, and reap the reputational rewards for diversity in the company's interactions with customers, suppliers, local communities, and wider society.

In fact, on December 1, 2020, the Nasdaq filed a proposal with the SEC which would require all Nasdaq-listed companies to adopt new rules related to board diversity or potentially face delisting. The new rules would require companies to have at least two diverse directors or publicly explain why they did not. According to a *Reuters* report, the Nasdaq operator said that "over two dozen studies found an association between diverse boards and better financial performance and corporate governance." The proposal, as amended on February 26, 2021 based upon comments submitted to the SEC by Nasdaq-listed companies, is currently pending the SEC's review and approval process. On January 7, 2021, *Bloomberg Law* reported that Facebook and Microsoft announced their support behind the Nasdaq's diversity plan, urging the SEC to approve the proposal to increase diversity on corporate boards.

In addition, on February 23, 2021, U.S. Senator Bob Menendez reintroduced a bill, which has a companion bill in the House of Representatives, that would boost SEC disclosure rules by extending reporting requirements on the race, ethnicity, gender, and veteran-status of directors and senior leadership. Notably, the U.S. Chamber of Commerce, the Financial Services Forum, the

---

[1] MCKINSEY & COMPANY, DELIVERING THROUGH DIVERSITY (Jan. 2018), https://www.mckinsey.com/~/media/mckinsey/business%20functions/organization/our%20insights/delivering%20through%20diversity/delivering-through-diversity_full-report.ashx. Last visited June 25, 2021.

Shareholder Demand on QuantumScape Corporation's Board of Directors
August 4, 2021
Page 4 of 7 Pages

Real Estate Roundtable, the American Bankers Association, and the Securities Industry and Financial Markets Association have all issued public support for the bill.

The many actions undertaken by the U.S. business community, Goldman Sachs' policy change, the Nasdaq's proposal, and the U.S. legislature's actions only serve to emphasize the importance of board diversity and compliance with diversity and antidiscrimination policies to maximize shareholder value and to improve corporate decisionmaking and a board's ability to effectively monitor management. These market changes highlight the significance of QuantumScape's lack of diversity on its Board and in its Management.

In blatant contrast to these efforts across the business world, QuantumScape's Officers and Directors have refused to offer any sort of showing of solidarity with the growing effort to increase representation of female, Black, and Hispanic individuals at all levels of corporate America. Instead, in the Company's December 2020 registration statement, two amendments thereto, and the accompanying prospectus (collectively, the "SPO Documents"), the Officers and Directors included throwaway language stating: "***We value diversity and recognize the importance of fostering a positive, inclusive culture. As such, we have actively taken steps towards eliminating unconscious bias in our hiring and promotion processes*** while enabling us to add and promote team members who demonstrate behaviors aligned with our values[.]" (Emphasis added.) These are hollow words, given that the Company's Board and Management have not become more racially or ethnically diverse since the Company was made to issue this statement, the Company's Management has at all times been exclusively male, and the Company's Board has been almost exclusively male, save for a brief period, now over, lasting just more than a month. Thus, the Officers and Directors have deceived investors by claiming to abide by certain antidiscrimination policies.

The Officers and Directors refusal to permanently add any women to the Board is all the more striking given that it is in clear violation of California law. Cal. Corp. Code § 301.3 states, in relevant part, that: "No later than the close of the 2019 calendar year, a publicly held domestic or foreign corporation whose principal executive offices, according to the corporation's SEC 10-K form, are located in California shall have a minimum of one female director on its board." Despite the Company filing a 10-K with the SEC on February 23, 2021 listing its principal executive offices in California, the Company, to date, has had just one female director on the Board for an incredibly fleeting amount of time, and currently has an all-male Board. Therefore, the Officers and Directors engagement in the Discriminatory Misconduct is subjecting the Company to potential liability under Cal. Corp. Code § 301.3.

The Officers and Directors' refusal to take any steps towards increasing diversity at the highest levels of the Company, while misleading investors about such efforts, is a serious detriment to the Company given that consumers and investors are demonstrating an ever-increasing expectation that companies take diversity and inclusion efforts seriously. Consumers, investors, and other stakeholders have a demonstrated willingness to take their business elsewhere when companies fall short along these lines. Therefore, the Officers and Directors engagement in the Discriminatory Misconduct is not just illegal and unethical, but damaging to the Company's financial performance, which could be meaningfully improved by increasing diversity on the

Shareholder Demand on QuantumScape Corporation's Board of Directors
August 4, 2021
Page 5 of 7 Pages

Board and Management. Still, the Officers and Directors have done little or nothing to remedy the Discriminatory Misconduct, harming the Company financially and reputationally.

\*          \*          \*

Under the circumstances, the breaches on the part of the Officers and Directors are obvious. QuantumScape has been publicly touting its commitment to diversity in the selection of its directors and in its hiring and promotion policies. Nevertheless, the Officers and Directors have caused QuantumScape's Board and Management to exclude female, Black, and Hispanic individuals throughout the Relevant Period.

The breaches of fiduciary duties committed by the Officers and Directors are numerous and include:

*Causing and/or Allowing the Discriminatory Misconduct to Occur.* The Officers and Directors caused and/or permitted the Company to violate federal and state laws regarding diversity and discrimination, including but not limited to Cal. Corp. Code § 301.3, by repeatedly refusing to nominate, appoint, and/or hire female, Black, and/or Hispanic individuals to the Board and Management. Throughout the Relevant Period, the Company has had *zero* Black or Hispanic individuals on the Board or in Management, has had a Management team composed exclusively of men, and has had an all-male Board at almost all times, including at present.

*Issuing False and Misleading Statements.* The Officers and Directors knowingly or recklessly disseminated materially false and misleading statements in the Company's SPO Documents, in violation of the Securities and Exchange Act of 1934 (the "Exchange Act"), by failing to disclose that: (1) the Company did not "value diversity and recognize the importance of fostering a positive, inclusive culture;" (2) the Company had taken woefully insufficient steps towards eliminating bias in its hiring and promotion process given that it has had *zero* Black or Hispanic individuals represented in either the Board or Management, has had a Management team composed exclusively of men, and has had an all-male Board at almost all times, including at present; and (3) the Company failed to maintain adequate internal controls.

*Unjust Enrichment/Excessive Compensation.* The Officers and Directors have been unjustly enriched as a result of receiving excessive compensation, including cash, option awards, and stock awards, from the Company in light of their misconduct. For the fiscal year 2020 alone, Singh received $17,052,115, Hettrich received $3,717,096, Buss received $4,540,863, Leohold received $60,283, and Prinz received $202,788 in total compensation from the Company. The Officers and Directors continue to be unjustly enriched during the 2021 fiscal year given the ongoing Discriminatory Misconduct and the Officers and Directors' continuing failure to remedy it.

*Failure to Implement and Maintain Adequate Controls.* In further breach of their fiduciary duties, the Officers and Directors caused the Company to fail to maintain adequate internal controls. Thus, in addition to engaging in the wrongful acts detailed herein, the Officers and Directors chose not to implement and/or maintain policies and procedures adequate and necessary

Shareholder Demand on QuantumScape Corporation's Board of Directors
August 4, 2021
Page 6 of 7 Pages

to ensure the Discriminatory Misconduct was stopped, to correct the false and misleading statements which had been issued, and to prevent similar actions from occurring in the future.

*          *          *

To the extent they were not committing the Discriminatory Misconduct themselves, the Officers and Directors were clearly aware of the misconduct alleged herein. The Company's false statements regarding its purported commitment to Board diversity could not have escaped the notice of the Officers and Directors, most of whom signed the SPO Documents containing these statements and some of whom were tasked with considering diversity under the Company's purported policies. Additionally, the Officers and Directors have known for a long time that QuantumScape has been violating federal and state laws regarding diversity and antidiscrimination, and yet the Officers and Directors have repeatedly refused to nominate, appoint, or hire female, Black, or Hispanic individuals to its Board and/or Management. Instead, the Company has had *zero* Black and Hispanic individuals on its Board or in Management, has had a Management team composed exclusively of men, and has had an all-male Board at almost all times, including at present. Through their actions and inactions, the Officers and Directors utterly failed in their duties to the Company.

*          *          *

*Damages.* The Company has been substantially damaged as a result of the Officers and Directors' breaches of fiduciary duty and other misconduct. As a direct and proximate result of the misconduct described herein, QuantumScape has lost and expended, and will continue to lose and expend, many millions of dollars. Such expenditures include, but are not limited to, legal fees associated with the lack of diversity at the Company including as the result of potential lawsuits, liability in such lawsuits, and amounts paid to outside lawyers, accountants, and investigators in connection with any such lawsuits. Such expenditures also include the costs associated with remedying the underlying discrimination at the Company, and the loss of talent and profits which the Company has suffered and continues to suffer due to its utter lack of diversity. Additionally, these expenditures include, but are not limited to, the unjust compensation and benefits paid to the Officers and Directors in light of their misconduct. QuantumScape has further suffered and will continue to suffer a loss of reputation and goodwill for engaging in the Discriminatory Misconduct, and a "liar's discount" that will plague the Company's stock in the future.

## II.  DEMAND

Our client demands that the Board commence a civil action against each responsible individual, including at least the Officers and Directors as well as any other individuals or entities that engaged in the wrongdoing as set forth herein, to recover for the benefit of the Company. The Company must recover from the aforementioned individuals the amount of damages sustained by the Company as a result of their breaches of fiduciary duties, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act as well as the aiding and abetting thereof.  The Board must also assess whether any third parties should be sued, such as QuantumScape's financial advisors, auditors, or attorneys.  QuantumScape must also adopt corporate governance improvements immediately.

Shareholder Demand on QuantumScape Corporation's Board of Directors
August 4, 2021
Page 7 of 7 Pages

      Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon QuantumScape as a result of the conduct described herein. If you have any questions, please do not hesitate to contact the undersigned counsel.

      If, after the receipt of this letter, the Board has not commenced action as demanded within a reasonable period of time, we intend to initiate litigation on behalf of the Company. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

      Thank you for your attention to these matters.

Very truly yours,

Phillip Kim

# EXHIBIT B

**From:** Salceda, Ignacio <ISalceda@wsgr.com>
**Sent:** Tuesday, August 10, 2021 8:42 PM
**To:** Phillip Kim
**Subject:** QuantumScape Corporation

**[EXTERNAL EMAIL]**

I write at the direction of QuantumScape Corporation and solely to confirm that QuantumScape received the attached letter from you.

QuantumScape reserves all rights in response to the letter.


This email and any attachments thereto may contain private, confidential, and privileged material for the sole use of the intended recipient. Any review, copying, or distribution of this email (or any attachments thereto) by others is strictly prohibited. If you are not the intended recipient, please contact the sender immediately and permanently delete the original and any copies of this email and any attachments thereto.

# EXHIBIT C



**The Rosen Law Firm**

**I N V E S T O R   C O U N S E L**

January 19, 2022

Phillip Kim
pkim@rosenlegal.com

<u>**VIA FEDEX**</u>

The Board of Directors                          Ignacio E. Salceda
QuantumScape Corporation                  Wilson Sonsini Goodrich & Rosati
1730 Technology Drive                          650 Page Mill Road
San Jose, CA 95110                               Palo Alto, California 94304-1050
                                                          Email: isalceda@wsgr.com

**Re:    Supplemental Shareholder Demand on QuantumScape Corporation's Board of Directors**

Dear Directors of the Board and Mr. Salceda,

      As you know, we represent John Gonzalez and Matthew Cannella (the "Shareholders"), who own shares of common stock of QuantumScape Corporation ("QuantumScape" or the "Company"). On August 4, 2021, the Shareholders made a demand on the Company's Board of Directors (the "Board") (the "Original Demand") to take action against certain current and/or former officers and directors and controlling shareholders of the Company who, from December 17, 2020 through the present, willfully or with reckless disregard caused the Company to, among other things: (a) violate federal and state laws regarding diversity and discrimination, including but not limited to Cal. Corp. Code § 301.3; (b) issue false and misleading statements and omissions in the Company's secondary public offering documents regarding QuantumScape's diversity policies and practices; and (c) fail to maintain internal controls, all while improperly benefiting themselves. As of this date, we have received no response from the Board.

      In addition to the Shareholders' concerns outlined above, we write to supplement the Original Demand, in light of new information regarding additional misconduct at the Company related to its initial public offering and misrepresentations about QuantumScape's business, operations and prospects, and to demand additionally that the Company's Board take action against certain current and/or former officers and directors of the Company, including, at least, Jagdeep Singh ("Singh"), Kevin Hettrich ("Hettrich"), Timothy Holme ("Holme"), Frank Blome, Brad Buss ("Buss"), John Doerr, Jürgen Leohold ("Leohold"), Justin Mirro ("Mirro"), Fritz Prinz ("Prinz"), Dipender Saluja, J.B. Straubel ("Straubel"), and Jens Wiese (collectively, the "Officers and Directors") and any other individuals or entities that engaged in the wrongdoing as set forth below.

      By reason of their positions as officers and/or directors of QuantumScape and because of their ability to control its business and corporate affairs, the Officers and Directors owed QuantumScape and its shareholders fiduciary obligations of good faith, loyalty, and due care.

Shareholder Demand on QuantumScape Corporation's Board of Directors
January 19, 2022
Page 2 of 8 Pages

They were and are required to use their utmost ability to control and manage the Company in a fair, just, and honest manner. Moreover, they were and are required to act in compliance with all applicable federal, state, and local laws, rules, and regulations. Similarly, they were and are required to remain informed as to how QuantumScape conducts its business and corporate affairs, and upon notice or information of imprudent, illegal, or unsound conditions, policies, or practices, make reasonable inquiries in connection therewith, and take steps necessary to correct such conditions, policies, or practices, and further make such public disclosures as necessary to comply with all applicable laws.

We raise the additional factual developments below for the Board's consideration in conjunction with the Original Demand. As explained herein, the Shareholders believe that the Officers and Directors violated their fiduciary duties and/or aided and abetted such breaches, and were unjustly enriched to the detriment of the Company. Accordingly, QuantumScape must bring an action against them seeking damages and restitution. In addition, the Company must adopt corporate governance improvements immediately.

## I.   BACKGROUND

QuantumScape develops and sells a singular product: its specialized lithium-metal solid-state battery to use in electronic vehicles. For decades, the electric car industry has been dominated by lithium-ion batteries, as no developer has been able to successfully commercialize a solid-state battery that could perform on par with lithium-ion batteries. Although solid-state batteries presented potential benefits, among other concerns, they have been known to experience issues like the formation of metal growths and lithium deposits called "dendrites" when charging and rapid impedance growth due to certain chemical reactions.  QuantumScape's business is focused on commercializing its solid-state battery prototype, which it claimed was safer and otherwise better than traditional lithium-ion batteries. The Company currently does not have any actual commercial operations.

On November 25, 2020, the Company went public after effectuating a reverse merger with Kensington Capital Acquisition Corp ("Kensington"). Shortly thereafter, the Officers and Directors made and/or caused the Company to make a series of statements in the media, during roadshows, in published presentations and filings with the Securities and Exchange Commission ("SEC") touting, *inter alia*, QuantumScape's technology feats, planned production, and partnership with notorious motor vehicle manufacturer, Volkswagen. These misrepresentations artificially inflated the Company's stock price, enabling several of the Officers and Directors to financially benefit from selling their shares in secondary public offerings.

Specifically, between November 27, 2020 and April 14, 2021 (the "Relevant Period"), the Officers and Directors made and/or caused the Company to make representations about QuantumScape's technology and product research that overstated its technological capabilities and its battery prototype's capacities. After 10 years and $300 million spent in research and development, QuantumScape claimed that: it had resolved the "fundamental science risk" associated with solid-state batteries with its technology; its battery was "ready for commercial deployment"—with the last step being scaling up production and making multilayer versions of

**Shareholder Demand on QuantumScape Corporation's Board of Directors**
January 19, 2022
Page 3 of 8 Pages

the cells; and its battery was able to perform at the same level as conventional lithium-ion batteries. In reality, QuantumScape's batteries had not overcome well-known obstacles that plagued solid-state batteries for decades, including dendrite formation. Still, throughout the Relevant Period, the Officers and Directors exaggerated the state of QuantumScape's technology and manipulated testing data to obscure the actual capabilities—or lack thereof—of its technology and premier product.

### *The Officers and Directors Materially Mislead the Investing Public and Profit Off Public Offerings While QuantumScape's Stock Price is Artificially Inflated*

On November 27, 2020, Singh interviewed with CNBC to discuss the Company's initial public offering. During the interview, Singh confidentially explained that the Company was focused on two things, "ramping up production" and "do the final automotive qualification process[]" as the "fundamental science risk" with its solid-state battery was apparently "behind us" given QuantumScape's battery test results. The same day, the Company issued a joint press release with Kensington, boldly asserting that "QuantumScape's solid-state lithium metal batteries are designed to be safer, and to deliver greater range, faster charge times and improved cycle life, than today's lithium-ion battery technology." Unbeknownst to investors at the time, QuantumScape's solid-state batteries were not developed enough for commercial production and the test results that supposedly supported the Company's representations about its battery and technology were achieved under compromised conditions. The Company's battery was only able to perform at the same level, or better than, standard lithium batteries under such manipulated and unrealistic conditions, although the Officers and Directors maintained the opposite.

On December 8, 2020, the Officers and Directors held their solid-state battery showcase, which included presentation slides that misleadingly promoted, among other things, the superiority of QuantumScape's energy density, charge, safety, battery life, and cost over traditional, more expensive, lithium-ion batteries. During the presentation, the Officers and Directors also played a video that charted the obstacles with creating solid-state batteries, indicating that the Company had surmounted such challenges and effectively solved the solid-state battery puzzle. Singh specifically boasted that QuantumScape's technology prevented dendrites and could successfully be charged at a really high rate, making it more favorable than any other solid-state technology, and competitive with lithium-ion batteries. The same day, the Company issued a press release that attached the roadshow presentation. The press release promoted QuantumScape's battery, distinguishing its results from other attempts that "required compromising other aspects of the cell" and maintained that QuantumScape "has released performance data demonstrating that its technology addresses fundamental issues holding back widespread adoption of high-energy density solid-state batteries, including charge time (current density), cycle life, safety, and operating temperature." In an article published by *The Mobilist*, also on December 8, 2020, Singh assured the public, once again, that "what is left is 'not chemistry. It's engineering/manufacturing.'"

On December 17, 2020, the Company filed a registration statement with the SEC on Form S-1 seeking to resell over 300 million shares of its Class A common stock and about 6.6 million warrants to purchase shares of Class A common stock. The registration statement was

Shareholder Demand on QuantumScape Corporation's Board of Directors
January 19, 2022
Page 4 of 8 Pages

declared effective December 31, 2020. The registration statement again represented to the investing public that QuantumScape's solid-state technology was equal or superior to conventional lithium-ion batteries and overstated its capabilities and development.

On the heels of these statements, with the Company's stock significantly inflated as a result of the false and misleading statements discussed above, the Officers and Directors caused the Company to conduct a secondary public offering, on December 31, 2020, during which between four to eight of the Officers and Directors sold their own shares at artificially inflated rates. Singh offered up to 32,608,050 shares of Company Class A and B common stock in the offering; Prinz offered up to 13,484,451 shares of Company Class B common stock; Holme offered up to 15,222,385 shares of Company Class A and B common stock; Hettrich offered up to 2,594,023 shares of Company Class A and B common stock; Buss offered up to 1,712,038 shares of Company Class A common stock; Leohold offered up to 804,350 shares of Company Class A stock; Mirro offered up to 1,744,898 shares of Class A common stock and 879,357 warrants for Class A common stock; and Straubel offered up to 1,407,611 shares of Company Class A and B common stock.

On January 4, 2021, the truth began to emerge when *Seeking Alpha* published a report on the Company, authorized by Dr. Brian Morin, a Ph.D. in material physics and president of the "National Alliance for Advanced Technology Batteries." Dr. Morin criticized QuantumScape's batteries, maintaining that they would never be able to perform in the manner the Officers and Directors promulgated and stated that QuantumScape's batteries faced a slew of undisclosed risks and challenges. For example, at a low temperature, based on the data touted by the Officers and Directors, the battery would only charge 5% in 15 minutes. Dr. Morin's report revealed that the data points regarding the power, range, operation and life in low temperature, and energy density were overstated, and the data failed to disclose material information about dendrites, safety and cost.

On this news, QuantumScape's stock plummeted from closing at $84.45 per share on December 31, 2020, the day of the secondary public offering, to close at $49.96 per share on January 4, 2021—a decline of 40.84%.

The Officers and Directors were undeterred, however, and continued to make false and misleading statements to the investing public. For example, the same day, CNBC interviewed Singh once again. Singh continued to represent that the Company's technology was ready for commercial development and compared favorably with lithium-ion. However, the main two issues with solid-state batteries, namely, dendrite formation and charging capacity still afflicted QuantumScape's battery. On January 15, 2021, Holme published an article on LinkedIn about the data released at the Company's December 8, 2020 showcase to elaborate on the results. The article contained the same/similar misrepresentations as those outlined above. Similarly, the Officers and Directors published a shareholder letter on February 16, 2021, that repeated claims made during the December 8, 2020 presentation. Among other things, QuantumScape's battery uses a compound that is highly volatile and reactive and would be costly to develop. Thereafter, the Officers and Directors continued making similar representations in SEC filings and interviews until February 25, 2021, at least.

**Shareholder Demand on QuantumScape Corporation's Board of Directors**
January 19, 2022
Page 5 of 8 Pages

On April 15, 2021, a research firm, Scorpion Capital Research, published a nearly 200-page report labeling the Company as a "pump and dump" and revealing that QuantumScape had utilized numerous compromises in its testing, including cell size, elevated temperature, and "pulse tests" to manipulate test data and that the actual claims made about the data were false/misrepresentative. For instance, the report included interviews from several Company employees and employees of Volkswagen. These employees confirmed that internally, there was skepticism about the Company's battery's capabilities and issues with testing and data results. According to one former Company employee, Singh would not allow varying interpretations of the science that diverged from what he was selling to investors.

This manipulated data was widely promoted to support QuantumScape's and the Officer's and Director's claims that the Company's battery technology resisted dendrites, performed in low temperatures, charged up to 80% in only 15 minutes, had a long battery life, and aggressive automotive power profile.

On this news, QuantumScape's stock fell from closing at $40.85 per share on April 14, 2021, to close at $35.85 per share on April 15, 2021—a decline of 12.24%.

The Officers and Directors were well aware of QuantumScape's product testing and capabilities of proprietary technology and thus, knew that the statements made during the Relevant Period were materially false and misleading. Indeed, the Company spent approximately $300 million researching and developing QuantumScape's solid-state battery and such research served as the Company's sole focus for a decade. Singh and Holme founded the Company and were heavily involved with the millions of tests and money spent to sell their ideas to the investing public and make a profit. The December 2020 manipulated test results on the Company's only product were the first presented to the public, and the Officers and Directors had substantial motive to ensure that such data was well received. This is further supported by their offerings of shares during the Company's secondary public offering soon after the roadshow. However, the Officers and Directors either recklessly failed to equip themselves with the right information, including about standard lithium-ion batteries that they compared to the Company's batteries, and/or knowingly disregarded the truth in order to mislead investors. Even after the truth began to emerge in January 2021, the Officers and Directors continued to make and/or cause the Company to make false and misleading statements and omissions of material fact.

***District Court Denied a Motion to Dismiss the Plaintiffs' Amended Complaint, Except for Narrow Issue, in Putative Securities Class Action Based on the Same Misconduct***

The Officers' and Directors' misconduct has, among other things, subjected the Company, Singh, Hettrich, and Holme to a class action lawsuit filed in the United States District Court for the Northern District of California captioned, *In re QuantumScape Securities Class Action Litigation*, Master File No. 3:21-cv-00058-WHO, for violations of the federal securities laws (the "Securities Class Action").

On January 14, 2022, the Court in the Securities Class Action entered an order denying defendants' motion to dismiss the amended complaint filed on June 21, 2021, except as it related

**Shareholder Demand on QuantumScape Corporation's Board of Directors**
January 19, 2022
Page 6 of 8 Pages

to one statement made by Singh during the interview that took place on January 4, 2021. The Court credited both reports published by *Seeking Alpha* and Scorpion Capital Research as sufficient disclosures that investors could have reasonably relied upon and held that both sets of statements about the Company's testing conditions "and having solved the 'fundamental science risks' of solid-state batteries such that the batteries were ready for commercialization" and comparisons between QuantumScape's batteries to traditional lithium-ion batteries were actionable as "plausibly false or misleading, not protected by the safe harbor, and not opinions or puffery.[1] With respect to scienter, the Court held, in relevant part that:

> According to the disclosures, however, it used compromised testing conditions and reported that data. If that is true, the defendants must have known they were not reporting the truth—there is no middle ground between the two positions. The most cogent inference that can be drawn, therefore, is that the defendants acted with scienter.

The Court also held that the plaintiffs adequately alleged loss causation, as immediately after the *Seeking Alpha* and Scorpion Capital Research reports were published, the Company's stock price plunged, indicating that "the revelation of the alleged fraud was at least a substantial cause of the loss of value."

\* \* \*

Under the circumstances, the breaches on the part of the Officers and Directors are obvious. On numerous occasions the Officers and Directors acknowledged the compromises often deployed when testing solid state batteries and denied that such compromises were utilized in QuantumScape's testing, when such statements conflicted with reality. Relying on data that they knew was manipulated, the Officers and Directors further exaggerated QuantumScape's technological capacities, providing the public with a false impression that the Company had achieved what battery experts in the field had yet to witness and only needed to work on producing and commercializing. In doing so, the Officers and Directors placed QuantumScape's sole product prototype and reputation at risk. Rather than adequately communicating and addressing the true state of QuantumScape's product and technology, the Officers and Directors perpetuated false statements in the media, during roadshows, in presentations, and in the Company's public filings.

The breaches committed by the Officers and Directors are legion, including:

*Issuing False and Misleading Statements.* Beginning at least on November 27, 2020 through April 14, 2021, the Officers and Directors intentionally and/or recklessly disseminated materially false and misleading statements regarding the Company's business, operations, and prospects that failed to disclose, *inter alia*, that: (1) the Company's technology was not as developed or capable as represented; (2) the "science risk" facing QuantumScape's batteries was

---

[1] Only one statement, not at issue here, was held not actionable and the motion to dismiss was granted "to that narrow extent."

**Shareholder Demand on QuantumScape Corporation's Board of Directors**
January 19, 2022
Page 7 of 8 Pages

not behind them; (3) the battery was not "ready for commercial deployment" and the Company faced more work ahead of it beyond just scaling "up production and mak[ing] multilayer versions of the[] cells[]"; (4) QuantumScape's battery was not competitive with or better than conventional lithium-ion batteries; and (5) the Company failed to maintain internal controls. In truth, the Officers and Directors utilized numerous compromises that distorted the data derived from the Company's test results to maintain a false impression of QuantumScape's business and prospects.

Such material misstatements and omissions misled investors as to the actual risk involved in investing in the Company. The Company was a materially less safe investment than the Officers and Directors had led investors to believe. The Officers and Directors also failed to correct and/or caused the Company to fail to correct these false and/or misleading statements and/or omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

*Insider Trading.* Independently, at least three of the Officers and Directors engaged in lucrative insider sales and improperly benefitted themselves while the price of the Company's stock was artificially inflated before the truth was revealed. Specifically, between February 15, 2021 and April 6, 2021, Singh, Hettrich, and Holme sold 351,860 shares of Company stock for collective proceeds in the amount of $17.5 million. Singh sold 257,552 shares of Company shares on inside information from which he received approximately $12.5 million in proceeds. Hettrich sold 62,019 shares of Company shares on inside information from which he received approximately $3.4 million in proceeds. Holme sold 32,289 shares of Company shares on inside information from which he received approximately $1.6 million in proceeds.

*Unjust Enrichment/Excessive Compensation.* In addition to profits received from selling their stock during the secondary public offering as discussed above, certain of the Officers and Directors were unjustly enriched as a result of excessive compensation including cash, stock, and option awards from the Company in light of the misconduct. Indeed, for the fiscal year ended December 31, 2020: Singh received $17,052,115; Hettrich received $3,717,096; Buss received $4,540,863; Prinz received $202,788; and Leohold received $60,283.

*Failure to Implement and Maintain Adequate Controls.* In further breach of their fiduciary duties, the Officers and Directors caused the Company to fail to maintain adequate internal controls. Thus, in addition to knowingly engaging in the wrongful acts detailed herein, the Officers and Directors chose not to implement and/or maintain policies and procedures adequate and necessary to ensure such wrongful acts were stopped and prevented from occurring in the future.

To the extent they were not committing the misconduct themselves, the Officers and Directors were clearly aware of the misconduct alleged herein. The Company's false statements and gross mismanagement regarding its solid-state battery, including QuantumScape's testing protocols and technology, concerned the Company's core operations and could not have escaped the notice of the Officers and Directors. Indeed, QuantumScape's sole product is its solid-state

**Shareholder Demand on QuantumScape Corporation's Board of Directors**
January 19, 2022
Page 8 of 8 Pages

separator and since its inception, the Company spent hundreds of millions of dollars researching and developing its prototype.

* * *

*Damages.* The Company has been substantially damaged as a result of the Officers' and Directors' breaches of fiduciary duty and other misconduct, plunging QuantumScape into a period of chaos and uncertainty. As a direct and proximate result of the misconduct described herein, QuantumScape has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to, legal fees and any judgments or settlements associated with the Securities Class Action and amounts paid to outside lawyers and investigators in connection with any internal investigations. QuantumScape has further suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

## II.   DEMAND

The Shareholders demand that the Board commence a civil action against each responsible individual to recover for the benefit of the Company, including, at least, the Officers and Directors, and any other individuals or entities that engaged in the wrongdoing as set forth herein. The Company must recover from the aforementioned individuals the amount of damages sustained by the Company as a result of their material misstatements and omissions, breaches of fiduciary duties, gross mismanagement, abuse of control, waste of assets, and unjust enrichment. The Board must also assess whether any third parties should be sued, such as QuantumScape's financial advisors, auditors, or attorneys. QuantumScape must also adopt corporate governance improvements immediately.

Please confirm receipt of this letter and the measures that you plan to take to address the harm inflicted upon QuantumScape as a result of the conduct described herein. If you have any questions, please do not hesitate to contact the undersigned counsel.

If, after the receipt of this letter, the Board has not commenced action as demanded within a reasonable period of time, we intend to initiate litigation on behalf of the Company. We are willing to assist the Board as it conducts the investigation and will review and comment upon all reports and information generated in the course of its work.

Thank you for your attention to these matters.

Very truly yours,

*/s/* Phillip Kim

# EXHIBIT D



Wilson Sonsini Goodrich & Rosati
Professional Corporation

650 Page Mill Road
Palo Alto, California 94304-1050

O: 650.493.9300
F: 650.493.6811

March 14, 2022

***Via Electronic Mail and FedEx***

Phillip Kim, Esq.
The Rosen Law Firm, P.A.
275 Madison Avenue
40th Floor
New York, NY 10016
pkim@rosenlegal.com

Re:   **Shareholder Diversity Demand on QuantumScape Corporation's
Board of Directors**

Dear Mr. Kim:

On November 3, 2021, I advised you that the Board of Directors (the "Board") of QuantumScape Corporation ("QuantumScape" or the "Company") was far along in its process regarding evaluating your demand letter of August 4, 2021 (the "Demand"). I invited you to provide any further information you wanted to have QuantumScape's Board consider. No such further information was provided and accordingly, the Board finished its evaluation of the Demand.[1] Below I summarize the investigative process and provide the Board's unanimous decisionregarding the Demand. .

### INTRODUCTION AND SUMMARY

In August 2021, purported stockholders John Gonzalez and Matthew Cannella (the "Stockholders"), through a letter by you as their attorneys, sent the Demand to QuantumScape's Board. The Demand called upon the Board to take action against certain Company directors and officers, including Jagdeep Singh, Kevin Hettrich, Fritz Prinz, Frank Blome, Brad Buss, John Doerr, Jürgen Leohold, Justin Mirro, Dipender Saluja, J.B. Straubel, and Jens Wiese (collectively, the "Directors and Officers"), for alleged breaches of fiduciary duties of good faith, loyalty, and due care, unjust enrichment, and a failure to remedy ongoing discriminatory wrongdoing.

The Demand's alleged offenses can be sorted into three main categories: (1) violations of internal diversity-related policies and corporate governance procedures; (2) false representations of QuantumScape's commitment to diversity in SEC filings and other public-facing documents; and (3) a failure to follow federal and state laws regarding diversity, including California Corporations Code § 301.3 requiring a certain number of women to serve as directors. According

---

[1] On January 19, 2022 you submitted what you deemed to be a "supplemental demand" concerning issues unrelated to the Demand. This letter does not address that recent supplemental demand.

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 2

to the Demand, these infractions have caused monetary damages to the Company.  As such, the Stockholders demanded that the Board commence a civil action against the Directors and Officers, and any other responsible entities or persons, and immediately adopt corporate governance improvements.

In response to the Demand, the Board asked the Nominating and Governance Committee to investigate the allegations made by the Stockholders, consider whether prosecution of the claims would be in the best interests of the Company, evaluate what action the Company should take with respect thereto, and report its findings to the Board.  The Nominating and Governance Committee engaged Wilson Sonsini Goodrich & Rosati ("WSGR") as counsel to assist with the investigation.

WSGR conducted a thorough review of the Demand, with input from the Nominating and Governance Committee, and reported to the Nominating and Governance Committee its assessment of the claims based on its investigation.  WSGR had the benefit of, and grounded its analysis in, pending and resolved litigation involving similar issues, substantive interviews with key witnesses, review of various internal Company documents (including Board minutes and materials and other internal Company documents), legal analysis of the allegations in the Demand, and input from the Nominating and Governance Committee.

Based on WSGR's investigation and analysis, and the Nominating and Governance Committee's own inquiry and analysis, the Nominating and Governance Committee concluded that the Company would face significant legal and factual challenges if it pursues the claims made in the Demand for little, if any, financial return, and it would therefore not be in the best interests of the Company to pursue the claims.  Accordingly, the Nominating and Governance Committee recommended to the Board that the Demand be rejected.  The Board agreed with and adopted that recommendation.  The factual and legal analysis informing the recommendation is below and set out in greater detail below.

## I.    Factual Investigation

Although much of the Demand hinges on legal issues, which will be discussed below, the Nominating and Governance Committee asked WSGR to conduct an appropriate factual investigation into the issues raised in the Demand.  In addition, WSGR reviewed related issues concerning the Company's diversity, equity, and inclusion practices generally.  As part of this, WSGR conducted interviews and reviewed Board-level materials as well as certain documents from the Company's human resources group.  The persons interviewed included:

- QuantumScape's Head of Human Resources who was interviewed concerning QuantumScape's employment environment and practices, as well as any harassment, diversity and inclusion, and unconscious bias trainings.

- QuantumScape's CEO and Board Chairman who was interviewed concerning diversity and inclusion efforts, including discussions with the Board about

WILSON
SONSINI

Phillip Kim, Esq.
March 14, 2022
Page 3

> outreach to identify qualified diverse candidates, and his efforts to interview and recruit such candidates.

- The Executive Director of the international placement firm that QuantumScape had been working with  since before receipt of the Demand to search for diverse potential candidates for the Board.

- Ms. Celina Mikolajczak, QuantumScape's Chief Manufacturing Officer (and previously Vice President of Manufacturing Engineering) and former member of the Board.  Ms. Mikolajczak was interviewed concerning her experience in being recruited to join the Company's Board and her subsequent experience as a member of the management team, and views regarding the Company's work environment and efforts to increase diversity.

- Additional interviews with women at different levels within the Company concerning their experiences and views regarding the Company's work environment and efforts regarding diversity.

As discussed below, the investigation revealed extensive efforts by the Company to increase diversity, including in the composition of the Board.

In addition, the overall sentiment among interviewees was that QuantumScape has a positive work environment, where diversity is valued.  The Company has also made efforts to increase its diversity and inclusion, including through trainings and recruitment efforts.  There was no indication that the Company had systemic issues regarding discrimination, whether against women or others.

### A.  Composition of the Board of Directors

With specific regard to Board membership, at the time that the Demand was received in August 2021, the Board had two members who are of South Asian heritage, Jagdeep Singh and Dipender Saluja.  Both of those directors continue on the Board.[2]

The Board and the Nominating and Governance Committee have discussed multiple times the absence of female directors.  In an attempt to address that, Board members considered potentially suitable candidates that they knew through their extended business networks.  For example, the Board and the Nominating and Governance Committee identified Ms. Mikolajczak that way.  Ms. Mikolajczak was appointed to the Board on April 13, 2021. Indeed, Ms. Mikolajczak's experience as a battery scientist with deep manufacturing leadership and technical experience, including as VP Battery Technology at Panasonic, made her the perfect "fit" for the

---

[2] The Company's management team also includes a number of members of traditionally under-represented communities, in addition to Mr. Singh.

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 4

Board.[3] Ironically, her experience and fit were so strong that she was quickly asked to take on a senior role in the Company's management team as Vice President of Manufacturing Engineering shortly after she joined the Board. She resigned from the Board to take on this role, which is central to the Company's ongoing development efforts. Ms. Mikolajczak was subsequently named the Company's Chief Manufacturing Officer.

The Company undertook other efforts throughout early 2021 to recruit additional diverse candidates to the Board. As part of these efforts, several potential candidates were identified and contacted throughout the first part 2021. One candidate with whom the Company had active discussions is a dean at a major research university, and who has an extensive science/engineering skill set. This candidate, who has public company board experience, dropped out after informing the Company that her employer would not permit her to accept another corporate directorship. Another candidate had extensive executive experience, although it was ultimately decided that the experience did not fit with the focus areas mentioned above. A third candidate actively considered had extensive board experience, including relevant industry experience, but it was decided not to pursue further discussions. Several other female candidates contacted by the Company declined to be considered. These included the managing partner of an investment firm, a finance executive at a large publicly-traded technology company, and a board member of a major automobile manufacturer.

In light of the unsuccessful efforts discussed above, the Nominating and Governance Committee decided at its July 21, 2021 meeting to retain Russell Reynolds Associates, an international advisory and search firm highly experienced in searching for diverse board candidates, to assist the Company with its efforts to find female and diverse board candidates. The Russell Reynolds engagement was led by an Executive Director of the firm, who serves as the co-lead of the Women on Boards initiative in the United States for Russell Reynolds.

Given the extensive efforts discussed above, the Nominating and Governance Committee concluded that a suit against the QuantumScape's directors and officers would not be able to show that any defendant acted in bad faith or otherwise intended to harm the Company or its stockholders. On the contrary, the record shows engagement at the senior-most levels of the Company in the efforts to recruit diverse directors with the experience and skills which can add to the Board.

---

[3] Ms. Mikolajczak had served since August 2020 as Vice President of Engineering and Battery Technology at Panasonic Energy of North America, a battery manufacturer, and as Vice President of Battery Technology from October 2019 to August 2020. Prior to her service at Panasonic, she served as Director of Engineering, Energy Storage Systems at Uber Technologies, Inc., from January 2018 to August 2019, as Senior Manager, Cell Quality and Materials Engineering at Tesla, Inc., from April 2014 to January 2018, and as Manager, Cell Quality at Tesla from April 2012 to April 2014. Ms. Mikolajczak holds an M.A. in Mechanical and Aerospace Engineering from Princeton University, and a B.S. in Engineering and Applied Science from the California Institute of Technology.

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 5

### B.  Other Diversity, Equity, and Inclusion Efforts

Although the Demand is largely focused on the composition of the Board, the Demand mentions the composition of the Company's management team and alleges that the composition of Board is indicative of some kind of systemic discrimination issue within the Company.  The factual investigation did not reveal any such problem.

As the Company has grown, it has expanded its training and education efforts.  In addition to mandatory anti-harassment training for all new employees, the Company requires anti-harassment training for all employee and supervisor training every two years. The Company has also on different occasions brought in outside speakers and consultants to conduct training relevant to diversity and inclusion.  There has also been additional focus on the hiring process.  In particular, since 2017, QuantumScape revamped its process of creating job descriptions for new hires, instituted interview training of all hiring managers, implemented recruiting technologies to improve the overall hiring process and to increase transparency, expanded the colleges at which it recruits, including to colleges serving historically underrepresented student populations, and achieved more diverse representation amongst QuantumScape employees attending recruiting events.

Diversity, equity, and inclusion is discussed in managerial meetings on a regular basis, including in connection with hiring and performance evaluations.  Diversity, equity, and inclusion efforts are formally evaluated to track QuantumScape's progress. For example, the Company's diversity, equity, and inclusion efforts were discussed in detail at an April 2021 Board of Directors meeting, i.e., well in advance of receiving the Demand.

After full analysis and discussion, the Nominating and Governance Committee concluded that there is not a systemic discrimination issue at the Company.

### II.  Legal Analysis

### A.  Overview

The Demand claims that, as a consequence of an alleged failure to diversify the QuantumScape Board, the Company lost significant revenue.  Given the stage of the Company, with its efforts directed at product development and without having a product that is being sold on the market, the allegation is hard to credit.

In addition, for the Company to prevail on claims for breach of fiduciary duty in any suit against the Directors and/or Officers, it would have to show that the Directors acted disloyally (with respect to a breach of the duty of loyalty) or that the Officers acted at a minimum with gross

WILSON
SONSINI

Phillip Kim, Esq.
March 14, 2022
Page 6

negligence (with respect to a breach of the duty of care).[4]   Beyond that, as a threshold matter, potential claims would be viewed under the lens of the business judgment rule.  Under Delaware law, "directors are entitled to a *presumption* that they were faithful to their fiduciary duties."[5]   The party challenging a business decision would have the burden of overcoming the presumption.[6]   Absent an allegation of interestedness or disloyalty to the Company, the business judgment rule would prevent a court from second-guessing director decisions if they were reached using a rational process and through the use of all material and reasonably available information.[7]

Moreover, QuantumScape's amended and restated certificate of incorporation includes an exculpatory provision, pursuant to 8 *Del. C.* § 102(b)(7), which limits personal liability for directors for breaches of fiduciary duty.[8]   Thus, it would be rational for the Company to consider bringing claims for breach of fiduciary duty against its directors only if evidence of disloyal conduct were uncovered.  Similarly, it would be rational for the Company to consider bringing claims for breach of fiduciary duty against its officers only if evidence of gross negligence or disloyal conduct were discovered.  As discussed above, the factual record does not reflect any disloyal or grossly negligent conduct.

In addition, as discussed below, the derivative suits filed against the boards of other companies shows the challenges that any claim against the Directors and Officers would face.[9]

---

[4] *See McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) ("Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence." (citations omitted)); *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) (holding that "the fiduciary duties of officers are the same as those of directors").

[5] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004).

[6] *Id.* at 1050.

[7] *E.g.*, *In re Citigroup, Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124 (Del. Ch. 2009).

[8] Amended and Restated Certificate of Incorporation of QuantumScape Corporation, Article IX.

[9] The Demand claims that "the Officers and Directors have further caused QuantumScape to violate federal and state laws regarding diversity and antidiscrimination by repeatedly refusing to nominate, appoint, and/or hire female, Black, or Hispanic individuals to the Board and/or Management."  Demand at 2  Other than Section 301.3 of the California Corporations Code, which is discussed below, the Demand does not cite any specific federal laws which require the hiring of any specific race, ethnicity, or gender of person.

**WILSON
SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 7

### B.      Litigation Filed Involving Other Companies Based on Board Diversity

As part of its legal analysis, WSGR surveyed and discussed with the Nominating and Governance Committee derivative lawsuits filed involving other companies relating to diversity on corporate boards.  In order to maintain a derivative suit on behalf of a company, a shareholder needs to either make a pre-ligation demand on the Board (and claim the demand was wrongfully refused) or show in the complaint that a pre-suit demand would have been futile under Delaware law.[10]

The Nominating and Governance Committee was also informed of and discussed the court decisions concerning board diversity from the demand futility context.  Although some of the discussion in these decisions is focused on the higher pleading standards applicable to a shareholder claiming that a pre-suit demand on that company's board of directors would have been futile, the decisions nevertheless show the difficulty a claim, if pursed against the Directors and Officers, would face.  In those cases, courts repeatedly granted motions to dismiss for multiple grounds, because (1) diversity statements did not support inferences of falsity; (2) plaintiffs failed to include sufficient facts about companies' recruitment efforts of diverse candidates; and/or (3) diversity statements were non-actionable puffery or aspirations.[11]

---

[10] *See generally United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1047-48 (Del. 2021) ("In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must (1) make a demand on the company's board of directors or (2) show that demand would be futile.  The demand requirement is a substantive requirement that [e]nsure[s] that a stockholder exhausts his intracorporate remedies, provide[s] a safeguard against strike suits, and assure[s] that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur.  [¶]  Court of Chancery Rule 23.1 implements the substantive demand requirement at the pleading stage by mandating that derivative complaints allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort." (citations omitted) (internal quotation marks omitted)).

[11] See, *e.g.*, *Klein v. Ellison*, No. 20-cv-04439-JSC, 2021 U.S. Dist. LEXIS 97965, at *12-13 (N.D. Cal. May 24, 2021) (Oracle's board not having African American individuals on it did not on its own support an inference of a proxy statement's falsity and plaintiffs did not plead particularized facts about Oracle's diversity recruitment efforts); *Kiger ex rel. Qualcomm Inc. v. Mollenkopf*, No. 21-409-RGA, 2021 U.S. Dist. LEXIS 220509, at *6-7 (D. Del. Nov. 15, 2021) (no falsity where even if Qualcomm's board did not have African Americans on it, African Americans could still have been included in the broader selection pool which was the subject of the company's disclosures); *Ocegueda v. Zuckerberg*, 526 F. Supp. 3d 637, 650-51 (N.D. Cal. 2021) (statements about Facebook's commitment to diversity were non-actionable puffery or aspirational).

**WILSON
SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 8

> **Broad allegations of discrimination may be dismissed for failure to include particularized facts showing an inference of falsity.**

Courts have dismissed many shareholder derivative cases alleging claims based on a lack of diversity for failure to plead with particularity that a pre-suit demand would have been futile.

For example, in *Klein v. Ellison*, shareholders brought a derivative action against the board of directors of Oracle Corporation alleging that Oracle failed to diversify its board, engaged in discriminatory hiring and promotional practices, and made misleading representations about the company actively seeking women and minority candidates in SEC filings. The case was dismissed because plaintiffs did not sufficiently plead demand futility for their claims under the Securities Exchange Act of 1934 and state law claims should have been asserted in the Delaware Court of Chancery per Oracle's bylaws.[12]

In *Klein*, plaintiffs challenged Oracle's statement in its proxy statement that it "actively seek[s] women and minority candidates from the pool from which director candidates are chosen" as false or misleading. The court held that the Oracle board not having any African Americans did not on its own support an inference of the proxy statement's falsity.[13] Further, allegations that the Oracle board never in good faith actively sought minority candidates was a conclusion lacking support by particularized facts. Since plaintiffs did not plead particularized facts about the state of affairs of Oracle's efforts to seek and promote minority candidates to its board, the court held the statements were not actionable. Claims of systemic racism were likewise held to be legal conclusions unsupported by facts showing the board did not believe the statements in the proxy to be true when they were made or knew them to be false.[14]

In *Kiger ex rel. Qualcomm Inc. v. Mollenkopf*, plaintiff filed a derivative suit against the directors of Qualcomm, claiming that statements concerning including, or instructing recruitment firms to include, women and racial or ethnic minorities in the pool of board candidates were false or misleading because the board had no African American members and no African American or minority candidates had been elected in the last six years. The court explained that even if the allegations of the membership of the board were true, it could be possible that those candidates were included in the broader selection pool but happened to not

---

The discussion of the caselaw which follows is not intended to be an all-encompassing discussion of each of the cases.

[12] *Klein*, 2021 U.S. Dist. LEXIS 97965, at *2-7.

[13] *Id.* at *12-13.

[14] *Id.* at *12-13, *20.

**WILSON
SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 9

advance.  Since the company's proxy disclosures concerned the candidate pool and not the final nomination process, they were not false.[15]

### Statements about commitment to diversity have been held to be non-actionable puffery or aspirational statements.

Courts have also rejected claims challenging statements about a commitment to diversity as puffery or non-actionable aspirations of goals.  Such statements express opinions rather than false facts, and are not misleading.  The Demand states that QuantumScape's December 2020 registration statement, its two amendments, and the accompanying prospectus included "throwaway language" about diversity.  Demand at 4.  The Demand quoted the following language from QuantumScape's SEC filings: "We value diversity and recognize the importance of fostering a positive, inclusive culture.  As such, we have actively taken steps towards eliminating unconscious bias in our hiring and promotion processes . . . ."  *Id.*  The Demand describes these words as "hollow" in light of the Company not being more diverse in race, ethnicity, or gender, and that as a result the Company has deceived investors.  *Id.*  Courts have repeatedly held that similar statements are unactionable puffery or aspirational statements, or that there were no specific facts alleged to show the statements were false.  For example, in *Kiger*, plaintiff's challenged a statement in Qualcomm's proxy statement that "[t]he Governance Committee's goal is to assemble a board of directors that brings to us a diversity of perspectives and skills."  The court dismissed the claim as not actionable because it concluded that the statement was mere puffery, noting that multiple courts have found similar statements about a board's or company's goals to be puffery.[16]

---

[15] Kiger, 2021 U.S. Dist. LEXIS 220509, at *6-7; *see, e.g.*, *Lee v. Frost*, No. 21-20885-CIV, 2021 U.S. Dist. LEXIS 165651, at *20-21 (S.D. Fla. Sept. 1, 2021); *Oceguda*, 526 F. Supp. 3d at 651No. 20-cv-04444-LB, 2021 U.S. Dist. LEXIS 52465, at *25 (N.D. Cal. Mar. 19, 2021) ("The plaintiff did not plead plausible facts about discriminatory practices in advertising, hiring, and pay that render [statements about diversity] misleading.").

[16] *Kiger,* 2021 U.S. Dist. LEXIS 220509, at *5-6 (collecting cases).  *See also EllieMaria Toronto ESA v. NortonLifeLock, Inc.*, No. 20-cv-05410-RS, 2021 U.S. Dist. LEXIS 164000, at *15 (N.D. Cal. Aug. 30, 2021) ("Courts routinely find [statements about diversity] to be non-actionable puffery or aspirational (and hence immaterial)."), *appeal filed*, No. 21-16909 (9th Cir. Nov. 12, 2021); *Lee*, 2021 U.S. Dist. LEXIS 165651, at *31-32 (holding that statements in a proxy about valuing diversity were unactionable puffery and collecting cases); *Falat v. Sacks*, No. SACV 20-1782 JVS (KESx), 2021 U.S. Dist. LEXIS 78076, at *17 (C.D. Cal. Apr. 8, 2021) (statements by Monster Beverage Corporation that it "seek[s] to capture diversity in [its] candidates" and "'does not tolerate' harassment or discrimination" were mere puffery, did not constitute objectively verifiable statements of fact, and "there [was] no significant risk of liability for the directors with respect to the alleged breach of fiduciary duty for false statements" in the demand futility context); *Lopez v. CTPartners Exec. Search, Inc.*, 173 F. Supp. 3d 12, 19, 26-29 (S.D.N.Y. 2016) (a company's statements about dedication to a "diverse workforce" and "an inclusive and positive

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 10

The outcome of prior similar cases supports the likelihood that statements included in the Demand would also fall in the category of puffery or aspirational and therefore not actionable.

### Courts have also dismissed such cases for failure to plead scienter or bad faith.

Scienter requires a determination of whether alleged misleading statements or omissions were made with knowledge of their falsity or in bad faith.[17]  Courts have dismissed shareholder derivative cases based on diversity on grounds that plaintiffs did not properly plead scienter.  For example, in *In re Danaher Corp.*, shareholders argued that directors knew statements made in company proxy statements were false because directors intentionally, knowingly, and persistently failed to nominate any African American candidates to the company's board.  The court held that the absence of African American candidates did not mean statements about their commitment to diversity were false, since the two were not mutually exclusive.  The court also noted that "there are other types of diversity besides racial diversity" and the company's comments were about diversity in its workforce generally.[18]

Parallels may be drawn between *In re Danaher Corp*. and the Demand.  The Demand focuses on certain diversity demographics—a purported "lack of female, Black, or Hispanic individuals on [QuantumScape's] Board" (Demand at 2)—but the statements listed in the Demand revolve around diversity generally.  For example, citations from QuantumScape's Code of Conduct about the Company prohibiting discrimination or harassment of *any* team member on *any* protected basis are general.  *See id.* at 2.  Statements in QuantumScape's SEC filings about valuing diversity and the importance of a positive and inclusive culture are similarly broad.  *See id.* at 4.  Additionally, comments about QuantumScape *seeking* candidates of certain demographics are not mutually exclusive with not having *found* those candidates.  *See id.*  Indeed, as the discussion above shows, the Company has made efforts to identify and recruit suitable candidates to the Board.  In addition, the Demand ignores the fact that two of the members of the Board were of South Asian heritage as noted above.

The claims in the Demand focus on the Company's statements concerning its diversity goals and aspirations.  Courts have repeatedly held that such statements are not actionable.  In addition, the Demand presumes that a perceived lack of diversity in the membership of the Board is reflective of discriminatory policies or a discriminatory environment, a claim that is not borne out by the facts.

---

working environment" were "immaterial puffery" and "too hazy and general for any reasonable investor to have relied upon them").

[17] *In re Danaher Corp.*, 2021 U.S. Dist. LEXIS 119542, at *21.

[18] *Id.* at *18-22.

**WILSON
SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 11

### C. California Corporations Code § 301.3

With regard to California Corporations Code § 301.3, which imposes requirements for women on boards of corporations located in California, the Demand claims QuantumScape did not comply with the law. Contrary to the Demand's allegation, the Company did comply with the applicable requirements of Section 301.3 during 2021, as Celina Mikolajczak was appointed to the Board on April 13, 2021. That Ms. Mikolajczak subsequently resigned from the Board effective as of May 20, 2021 to become Vice President of Manufacturing Engineering, does not change the fact that she was a director during a portion of 2021, thus satisfying the requirements of Section 301.3.[19] Even if that were not the case, there are a number of reasons to decline to pursue litigation on this issue.

First, the California Secretary of State has not enacted regulations to enforce the statute's penalty provisions, has stated it does not intend to adopt any such provisions, and has testified that it does intend to enforce the provision such that "it's essentially voluntary". Given the Secretary of State's position, articulated in testimony to a court is that it does not intend to enforce Section 301.3 and that compliance with the law is "essentially voluntary," there would appear to be no risk that a failure to comply with 301.3 would have any financial ramifications.[20]

Second, there is are questions as to whether the law is constitutional. The law is currently facing multiple challenges in California state and federal courts based on the equal protection

---

[19] *See* Cal. Corp. Code § 301.3(e)(1)(3) ("For purposes of this subdivision, a female director having held a seat for at least a portion of the year shall not be a violation.")

[20] *See* Brian Melley, *California Official Says Women on Boards Law is Toothless*, The Business Journal, Dec. 3, 3021, https://thebusinessjournal.com/california-official-says-women-on-boards-law-is-toothless/:

Betsy Bogart, a division chief testifying in Los Angeles Superior Court on behalf of her boss, the secretary of state, said the law is not enforced.

"It's required but there's no penalty, so it's essentially voluntary," Bogart said.

The disclosure came on the second day of trial in a lawsuit by the conservative legal group Judicial Watch that claims it's illegal to use taxpayer funds to enforce a law that violates the equal protection clause of the California Constitution by mandating a gender-based quota.

During opening statements Wednesday in Los Angeles Superior Court, a deputy attorney general said the office would not levy fines for not complying with SB826, the Women on Boards law.

"The secretary of state has no plans to draft regulations or implement fines in furtherance of the act," Deputy Attorney General Ashante Norton said.

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 12

clauses in the United States and California Constitutions.[21]  The issues of constitutionality are complex and will undoubtedly occupy the courts for some time.  While the ultimate outcome of those cases is uncertain, the uncertainty regarding the enforceability of the provision is further grounds for denial of the Demand.

Finally, there is a question as to whether the law, pursuant to the Internal Affairs Doctrine, may be applied to a corporation not incorporated in California.  As the Supreme Court of the United States explained:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.[22]

The Supreme Court has further explained that the Commerce Clause of the United States Constitution "prohibits States from regulating subjects that are in their nature national, or admit only of one uniform system, or plan of regulation," and that there is great value in uniformity of regulation: "So long as each State regulates voting rights only in the corporations it has created, each corporation will be subject to the law of only one State."[23]

---

[21] *Crest v. Padilla*, No. 19STCV27561 (Cal. Super. Ct. L.A. Cnty. filed Aug. 6, 2019) ("taxpayer" suit seeking to stop the use of taxpayer funds to enforce the statute, as according to the plaintiffs the law runs afoul of the equal protection provisions of the California constitution); *Alliance for Fair Bd. Recruitment v. Weber*, No. 2:21-cv-05644-RGK-RAO (C.D. Cal. filed July 12, 2021); *Meland v. Weber*, No. 2:19-cv-02288-JAM-AC (E.D. Cal. filed Nov. 13, 2019) (suit challenging constitutionality under Equal Protection Clause of Fourteenth Amendment).  The Superior Court is currently holding a bench trial in *Crest*.  On December 27, 2021, the District Court in *Meland* denied a motion for a preliminary injunction, although it declined to adjudicate the constitutional challenge at that time.  "[T]his area of equal protection law is unsettled and requires the Court to address an issue of first impression: whether minimum gender diversity requirements violate the Equal Protection Clause.  Because the law is unsettled, Plaintiff here—or plaintiffs in one of the other ongoing lawsuits—may ultimately prevail in their constitutional challenge to SB 826.  [¶]  But that ultimate question of SB 826's constitutionality is not before the Court today.  Rather, a much narrower question is presented: has Plaintiff carried his burden to show he is entitled to a preliminary injunction?"  Order Denying Pl.'s Mot. for Prelim. Inj. At 2-3, *Meland v. Weber*, No. 2:19-cv-02288-JAM-AC (E.D. Cal. Dec. 27, 2021) (internal citation omitted).

[22] *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

[23] *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 88-89 (1987) (citation omitted) (internal quotation marks omitted).

WILSON
SONSINI

Phillip Kim, Esq.
March 14, 2022
Page 13

By governing who may be on the board of directors of a corporation incorporated in a state other than California (such as QuantumScape), Section 301.3 is likely to run afoul of this doctrine. For example, in *VantagePoint Venture Partners 1996 v. Examen, Inc.*, the Delaware Supreme Court held that a provision of the California Corporations Code which required certain non-California corporations to have an affirmative vote of each separate class of outstanding stock (rather than a single vote as permitted by Delaware law) was invalid under the internal affairs doctrine.[24]

A leading commentator, former SEC Commissioner and current Stanford Law School Professor Joseph Grundfest, has stated that under Section 301.3, "[t]he conflict between California law and Delaware law is apparent." California purports to "require that corporations headquartered in California but chartered in Delaware have a minimum number of women directors while Delaware simultaneously permits its chartered corporations to have any number of women directors that is consistent with the board's business judgment, subject to shareholder approval and constraints imposed by the corporation's charter and bylaws."[25]

Again, as in the prior discussion, the ultimate validity of Section 301.3 is significantly in doubt. Given that doubt, it would not be in the Company's best interests to pursue a claim against the Directors and Officers.

In conclusion, as discussed at the start of this section, the Company was in compliance with Section 301.3 during 2021.[26] But even if that were not the case, filing a civil action against the Directors and Officers for non-compliance with a law that the State of California has said is "voluntary", for which there will be no enforcement or penalties, and whose validity is in serious question is not in the best interests of the Company.

---

[24] *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005).

[25] Joseph A. Grundfest, *Mandating Gender Diversity in the Corporate Boardroom: The Inevitable Failure of California's SB 826* at 2-3 (Stanford Law Sch. & The Rock Ctr. for Corp. Governance, Working Paper No. 232, 2018).

[26] There is no question about compliance with California Corporations Code § 301.4, requiring that by the end of 2021, a company located in California have at least one director from an "underrepresented community." The definition of "underrepresented community" includes Asians. During 2021, there were two directors with South Asian heritage, Jagdeep Singh and Dipender Saluja. Section 301.4 is being challenged in *Alliance for Fair Board Recruitment v. Weber* and *Crest v. Padilla*.

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 14

### D. Potential Damages/Costs/Other Considerations

Even if the underlying claims in the Demand were not legally infirm, showing resultant damages to the Company would be highly problematic.  The Company has striven to maximize shareholder value and accomplished this in part due to the composition of its Board.  The Company's prior success would have to be considered in measuring any net loss to the Company, which would reduce the damages, if any, to the Company.  Courts have also dismissed shareholder complaints alleging omissions in regard to directors' lack of commitment to diversity because plaintiffs did not plead facts concerning the causal relationship between any diversity-related falsehoods and loss of corporate income or that such statements "formed an essential link to a loss-generating corporate action."[27] Alleged harm in the form of reelection of directors or compensation approvals for directors perpetuating the alleged unlawful practices have been found to be "conclusory allegations [that] do not establish causation."[28]

Aiding and abetting breaches of fiduciary duties and unjust enrichment claims are likely to be dismissed as duplicative.[29]  If not dismissed, these claims would be difficult to prove.  To the extent they may be proved, damages would be tenuous for similar reasons as those discussed in the preceding paragraph.  A damages award would also be highly unlikely under the applicable law discussed above as well as the business judgment rule.

Moreover, if the Company were to bring claims against any of the Directors and Officers, those individuals would be entitled to indemnification and advancement of their legal fees under the indemnification agreements with them as well as the Company's bylaws.[30]  Further, because

---

[27] *See Ocegueda*, 526 F. Supp. 3d at 651-52.

[28] *Id.* at 652 (quoting *City of Birmingham Relief & Ret. Sys. v. Hastings*, No. 18-cv-02107-BLF, 2019 WL 3815722, at *15 (N.D. Cal. Feb. 13, 2019)), where allegations of excessive executive compensation and loss of corporate goodwill did not establish loss causation); *see also In re Danaher Corp.*, 2021 U.S. Dist. LEXIS 119542, at *30-32 (alleged misleading statements in director election proxy materials were not an essential link to any harm to the company).

[29] *See In re Danaher Corp.*, 2021 U.S. Dist. LEXIS 119542, at *25-26 (dismissing unjust enrichment claim and collecting cases).

[30] *See* QuantumScape Corporation Indemnification Agreement, Section 8 ("The Company shall advance the Expenses incurred by Indemnitee in connection with any Proceeding prior to its final disposition, and such advancement shall be made as soon as reasonably practicable . . . ."); *id.* Section 1(h) ("***Proceeding***" means any threatened, pending or completed action, suit, arbitration, mediation, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or proceeding, whether brought in the right of the Company or otherwise . . . ."); *see also* Amended and Restated Bylaws of QuantumScape Corporation, Section 8.5 ("Expenses (including attorneys' fees) actually and reasonably incurred by an officer or

**WILSON SONSINI**

Phillip Kim, Esq.
March 14, 2022
Page 15

the Company's Director & Officer Insurance policy excepts claims among parties insured under the same policy from coverage, the Company and its stockholders would bear the full extent of these costs.  Given the substantive weaknesses of the claims contemplated by the Demand, the potential financial risk posed by the Company's indemnification and advancement obligations also weighs against bringing the claims.

### III.    Conclusion

Based on the investigation and analysis described above, the Nominating and Governance Committee recommended that the Board decline to pursue the litigation urged by the Demand. After considering the report of the Nominating and Corporate Governance Committee and discussing it, the Board unanimously adopted the recommendation and rejected the demand.

QuantumScape considers this matter concluded with regard to all allegations in the Demand of August 4, 2021.  There will be a separate response as to the separate allegations in your recent supplemental demand letter.

Sincerely,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*Ignacio E. Salceda*

Ignacio E. Salceda

---

director of the Corporation in defending any Proceeding shall be paid by the Corporation in advance of the final disposition of such Proceeding . . . .").